# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GAMMA TRADERS – I LLC and VEGA
TRADERS, LLC, individually and on behalf of
all others similarly situated,

        Plaintiffs,

  v.

MERRILL LYNCH COMMODITIES, INC.,
BANK OF AMERICA CORPORATION,
MORGAN STANLEY & CO. LLC,
EDWARD BASES, JOHN PACILIO, and
JOHN DOE Nos. 1 – 5,

        Defendants.

Case No.: _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Gamma Traders – I LLC ("Gamma") and Vega Traders, LLC ("Vega" and, together with Gamma, "Plaintiffs") complain upon knowledge as to themselves and their own actions and upon information and belief as to all other matters against Defendants Merrill Lynch Commodities, Inc. ("MLCI"), Bank of America Corporation ("BAC"), Morgan Stanley & Co. LLC ("MSC"), Edward Bases ("Bases"), John Pacilio ("Pacilio"), and John Doe Nos. 1 – 5 (collectively, "Defendants") as follows:

## SUMMARY OF ALLEGATIONS

1.      This action arises from Defendants' unlawful and intentional manipulation of COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum Futures, and NYMEX Palladium Futures contracts, and options on those futures contracts (collectively, "precious metals futures contracts") traded on the New York Mercantile Exchange ("NYMEX") and the Commodity Exchange, Inc. ("COMEX") from approximately January 1, 2008 through December 31, 2014 (the

"Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA") and the common law.

2.     Defendants are a group of futures traders and the trading firms that employ them. Defendants manipulated the prices of these precious metals futures contracts using a classic manipulative device called "spoofing," whereby Defendants placed orders that they never intended to execute for precious metals futures contracts to send false and illegitimate supply and demand signals to the market and then canceled those orders before execution. As a result, Defendants caused precious metals futures contracts prices to be artificial throughout the Class Period to financially benefit their trading positions at the expense of other investors, like Plaintiffs and the Class.

3.     The unlawful conduct and manipulation described herein has been the subject of both criminal and regulatory investigations. On July 17, 2018, Defendants Bases and Pacilio were indicted on commodities fraud, spoofing, and conspiracy charges in the Northern District of Illinois relating to the same conduct described in this Complaint.[1] During the Class Period, Defendants Bases and Pacilio were employed by Defendant MLCI.

4.     On June 25, 2019, Defendant MLCI entered into a non-prosecution agreement with the U.S. Department of Justice ("DOJ")[2] and a settlement with the U.S. Commodity Futures Trading Commission ("CFTC"),[3] and agreed to pay a combined $25 million in criminal fines,

---

[1] Indictment, *U.S. v. Bases, et al.*, No. 18 CR 48, ECF No. 66 (N.D. Ill. July 17, 2018).

[2] Non-Prosecution Agreement, U.S. Department of Justice (June 25, 2019), *available at* https://www.justice.gov/opa/press-release/file/1177296/download [hereinafter, the "MLCI NPA"].

[3] *In the Matter of: Merrill Lynch Commodities, Inc.*, CFTC Docket No. 19-07, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC June 25, 2019), https://www.cftc.gov/media/2141/enfmerrilllynchorder062519/download.

restitution and forfeiture of trading profits. The DOJ alleged that Defendants spoofed the markets for precious metals futures contracts *thousands* of times throughout the Class Period.[4]

5.      Furthermore, the CFTC and DOJ identified example days when Defendants manipulated precious metals futures contracts prices. Plaintiffs transacted in thousands of precious metals futures contracts throughout the Class Period, including on the specific days identified as examples of Defendants' spoofing, and suffered a loss on their transactions as a result of Defendants' manipulative conduct.

6.      Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 22 of the CEA, 7 U.S.C. § 25. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332, because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

8.      Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), (c), and (d) and Section 22 of the CEA, 7 U.S.C. § 25(c). One or more of the Defendants resided, transacted business, were found, or had agents in the District. Further, a significant part of the events giving rise to the claims occurred in the Southern District of New York. For example,

---

[4] MLCI NPA Attachment A at ¶ 36.

Defendants Bases and Pacilio worked in Defendant MCLI's New York office and entered spoofing orders from New York.

9.      Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged herein.

**PARTIES**

A.      **Plaintiffs**

10.     Plaintiff Gamma Traders – I LLC ("Gamma") is a New York limited liability company. Plaintiff Gamma transacted in thousands of COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum Futures, and NYMEX Palladium Futures, and options on those futures contracts, throughout the Class Period and traded at artificial prices proximately caused by Defendants' unlawful manipulation, including on dates that the DOJ and CFTC identified as days that the Defendants engaged in spoofing. Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, including on days that Plaintiff Gamma traded, which deprived Plaintiff Gamma of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

11.     Plaintiff Vega Traders, LLC ("Vega") is a Delaware limited liability company. Plaintiff Vega transacted in thousands of COMEX Gold Futures and COMEX Silver Futures, and options on those futures contracts, throughout the Class Period and traded at artificial prices

proximately caused by Defendants' unlawful manipulation, including on dates that the DOJ and CFTC identified as days that the Defendants engaged in spoofing. Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, including on days that Plaintiff Vega traded, which deprived Plaintiff Vega of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff Vega and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Vega to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

> **B.      Defendants**

12.     Defendant Merrill Lynch Commodities, Inc. ("MLCI") is a Delaware corporation with its headquarters in Houston, Texas. Defendant MLCI operates in various locations, including New York. Defendant MLCI is an indirectly wholly owned subsidiary of Bank of America Corporation ("BAC"). Defendant MLCI employed Defendants Bases and Pacilio during the Class Period.

13.     Defendant Bank of America Corporation ("BAC") is a Delaware corporation with its principal executive offices in North Carolina. Defendant BAC is the ultimate parent of Defendant MLCI. Defendant BAC was a signatory to the MCLI NPA and agreed to undertake certain remedial measures related to its control and compliance operations with respect to precious metals futures trading and its MCLI subsidiary.

14.     Defendant Morgan Stanley & Co. LLC ("MSC") is a Delaware limited liability company with its headquarters in New York. Defendant MSC employed Defendant Pacilio during the Class Period.

15.     Defendant Edward Bases is a resident of Connecticut. Defendant Bases was an employee of Defendant MLCI in its New York offices from at least June 2010 until approximately November 2015. The DOJ indicted Defendant Bases on one count of conspiracy to commit wire fraud and commodities fraud and one count of commodities fraud—all related to the conduct at issue in this case.[5]

16.     Defendant John Pacilio is a resident of Connecticut. Defendant Pacilio was an employee of Defendant MLCI in its New York offices from at least October 2007 until approximately June 2011. Defendant Pacilio was an employee of Defendant MSC in its New York office from approximately July 2011 until approximately May 2019. The DOJ indicted Defendant Pacilio on one count of conspiracy to commit wire fraud and commodities fraud, one count of commodities fraud, and five counts of spoofing—all related to the conduct at issue in this case.[6]

17.     Defendants John Doe Nos. 1 – 5 are other individuals or entities that participated in the manipulation and unlawful conduct described herein. These defendants may include other financial firms, or employees, agents, or affiliates of Defendant MLCI, including but not limited to the precious metals trader employed by Defendant MLCI or one of its affiliates (identified in the Indictment of Defendants Bases and Pacilio as "Co-Conspirator 1," and in the MLCI NPA as "Trader 1"), and the U.K. affiliate of Defendant MLCI that employed Co-Conspirator 1/Trader 1.[7]

## SUBSTANTIVE ALLEGATIONS

### A.     Futures & Options Background

18.     **Commodity Futures Contract.** A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price

---

[5] Indictment, *U.S. v. Bases, et al.*, No. 18 CR 48, ECF No. 66 (N.D. Ill. July 17, 2018).

[6] Indictment, *U.S. v. Bases, et al.*, No. 18 CR 48, ECF No. 66 (N.D. Ill. July 17, 2018).

[7] MLCI NPA Attachment A at ¶ 4.

at a specified time in the future. A commodity is the underlying asset upon which a futures contract is based. The commodity underlying a futures contract can be a physical commodity, *e.g.*, gold or silver, or a financial instrument *e.g.*, Treasury bills, foreign currencies, or the value of a stock index.

19.     **"Long" and "Short" Futures.** Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a defined point in the future. While some futures contracts may be settled by delivery of the actual commodity at the conclusion of the contract, precious metals futures contracts are "cash settled" (also referred to as "financially settled"). This means that the parties to the futures contract exchange the cash equivalent of the difference in value between the price specified in the futures contract and the value of the underlying commodity at the time of settlement.

20.     **Offset by Trading.** Futures market participants almost always "offset" their futures contracts before the expiration month when delivery or settlement occurs. For example, a purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract. This sale of one contract offsets or liquidates the earlier purchase of one contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

21.     **Options Contract**. An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, precious metals futures contracts contracts).

22.     **Call options** confer upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price). Call options confer upon the seller, or "option

writer," the obligation to sell the commodity at the strike price. The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit. The seller (who is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, the trader that is short a call option would prefer the value of the underlying asset decrease.

23.     **Put options** confer upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price, and they confer upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised. The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price. Conversely, the seller of the put option wants the price of the underlying asset to stay above the strike price so that the seller of the option would not be forced to buy the underlying futures at an above-market price.

### B.     CME, Globex, and Precious Metals Futures

24.     The CME Group Inc. ("CME Group") owns and operates, among other Designated Contract Markets ("DCMs"), COMEX and NYMEX. At all relevant times, COMEX and NYMEX were registered DCMs with the CFTC, with self-regulatory responsibilities, and were subject to regulation by the CFTC. Thus, COMEX and NYMEX are each a "registered entity" pursuant to Section 1a(40) of the CEA, 7 U.S.C. § 1a(40).

25.     As DCMs pursuant to Section 5 of the CEA, 7 U.S.C. § 7, COMEX and NYMEX specify the terms for each of the futures contracts they list, including the underlying commodity,

trading units, tick size,[8] price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

26.     Globex is an electronic trading platform operated by CME Group. Trading on Globex is conducted electronically using a visible "order book" that displays quantities of anonymous orders (*i.e.*, offers to sell futures contracts and bids to buy futures contracts) at various price points, or "levels." COMEX and NYMEX allow traders to place orders to buy or sell futures contracts electronically through Globex, including orders for precious metals futures contracts.

27.     A **COMEX Gold Futures Contract** is a futures contract where the underlying commodity is 100 troy ounces of gold.  COMEX gold futures contracts are listed on the COMEX, subject to the rules and regulations of COMEX including Chapter 113 of the COMEX Rulebook, and traded electronically on the CME's Globex platform.

28.     A **COMEX Silver Futures Contract** is a futures contract where the underlying commodity is 5,000 troy ounces of silver.  COMEX silver futures contracts are listed on the COMEX, subject to the rules and regulations of COMEX including Chapter 112 of the COMEX Rulebook, and traded electronically on the CME's Globex platform.

29.     A **NYMEX Platinum Futures Contract** is a futures contract where the underlying commodity is 50 troy ounces of platinum.  NYMEX platinum futures contracts are listed on the NYMEX, subject to the rules and regulations of NYMEX including Chapter 105 of the NYMEX Rulebook, and traded electronically on the CME's Globex platform.

30.     A **NYMEX Palladium Futures Contract** is a futures contract where the underlying commodity is 100 troy ounces of palladium.  NYMEX palladium futures contracts are

---

[8] The minimum price increment at which a futures contract could trade on COMEX and NYMEX is called a "tick." COMEX and NYMEX set the value of a tick for each contract that they listed.

listed on the NYMEX, subject to the rules and regulations of NYMEX including Chapter 106 of the NYMEX Rulebook, and traded electronically on the CME's Globex platform.

31.     An "order" is a request submitted to an exchange to buy (a "bid") or sell (an "offer" or "ask") a certain number of a specified futures contract. An order can be for one or more contracts. Submitted orders are entered into the exchange's order book. When an order is matched, *i.e.*, when there exists both a willing buyer and seller for a specified contract at a given price, a transaction occurs and is referred to as a "fill" (or "execution"). At any time before the order is filled, the trader can "cancel" the order. Although, if an order is partially filled, only the unfilled portion of the order will be cancelled, and that portion of the order is pulled from the order book.

32.     There are different types of orders. A "limit order" allows the buyer, or seller, to define the maximum purchase price for buying, or minimum sale price for selling, a specified contract. Any portion of a limit order that can be matched is immediately executed. A limit order remains on the book until the order is either executed, cancelled, or expires. Limit orders that remain in the order book, and have not expired or been filled or cancelled, are sometimes referred to as "resting orders."

33.     An "iceberg" or "iceberg order" is a type of order that traders can use when trading futures contracts on COMEX and NYMEX. In an iceberg order, the total amount of the order is divided into a certain pre-set quantity and only that quantity is visible to other market participants, with the remainder of the order not visible to other market participants. Whenever the visible portion of the order is filled, the same, pre-set quantity of the remaining portion automatically becomes visible; this process repeats until the remainder of the order is either executed or canceled.

34.     The order book, sometimes referred to as the "ladder," allows traders to view the number of orders and the aggregate number of contracts that all traders are actively bidding or

offering at a given price level. Only the total numbers of orders and contracts at various price levels are visible, not the number of traders or the identities of the traders who placed the orders, which means that other market participants could not detect that Defendants placed orders simultaneously on opposite sides of the market. The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level. The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between these two prices.

35.     Traders can view the aggregate resting contracts and orders up to the tenth-bid and tenth-ask levels. This combined bid and ask information is often referred to as the visible order book and represents the visible market depth (an illustrative example of a visible order book is contained in FIGURE 1). Traders use the information contained in the order book to make trading decisions.



FIGURE 1.

36.     Globex bids and offers are matched according to an algorithm known as "FIFO,"
which stands for first-in, first-out. Under the FIFO order matching method, orders on the same side
of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority.
Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size.
Iceberg orders are an exception; for iceberg orders, once the visible quantity is completely filled, the
replenishment quantity goes to the back of the time priority queue.

**C.      Defendants manipulated the prices of precious metals futures contracts and
        options contracts to artificial levels throughout the Class Period.**

37.     The purpose of Defendants' manipulative scheme was for Defendants to inject
materially false and illegitimate signals of supply and demand into the market in order to (a) induce

other market participants to trade against Defendants' genuine orders (*i.e.*, orders that Defendants did want to execute) on the opposite side of the market from the spoof orders at prices, quantities, and times at which Plaintiffs and the other market participants otherwise would not have traded, and (b) financially benefit Defendants at the expense of Plaintiffs and the Class.

38.     Accordingly, in order for Defendants to make money and avoid losses, Defendants routinely placed electronic orders to buy and sell NYMEX and COMEX precious metals futures contracts with the intent to cancel those orders before execution.

39.     Defendants placed the spoof orders electronically from computers at Defendant MCLI's office in New York onto the NYMEX and COMEX.  The illegitimate supply and demand signals conveyed by the spoof orders were then disseminated to the market.

40.     In placing the spoof orders, Defendants intended to and did inject materially false and illegitimate signals of supply and demand into the market for NYMEX and COMEX precious metals futures and options contracts.  The spoof orders thus were intended to induce Plaintiffs and other market participants to trade against Defendants' genuine orders that they wanted to execute on the opposite side of the market from the spoof orders at prices, quantities, and times at which Plaintiffs and the other market participants otherwise would not have traded.

41.     Accordingly, the spoof orders were designed to, and did, artificially move the prices of NYMEX and COMEX precious metals futures and options contracts during the Class Period in a direction that was favorable to Defendants but unfavorable to Plaintiff and the Class.

42.     The Defendants spoofed the markets for precious metals futures contracts and options thousands of times throughout the Class Period. The CFTC and DOJ provided multiple examples of Defendants' spoofing in the Indictment of Defendants Bases and Pacilio and the MCLI NPA.

43.     For example, on or about November 16, 2010, Defendant Pacilio, in the course of his employment with Defendant MCLI, placed six spoof orders to buy a total of approximately 250 COMEX Silver Futures contracts, which Defendant Pacilio placed in order to manipulate other market participants to fill his genuine order on the opposite side of the market through the false supply and demand signals conveyed by his spoof orders. Defendant Pacilio cancelled the spoof orders without any of them being filled. While engaged in the market manipulation described above, Defendant Pacilio confirmed in an electronic chat with other traders that he was engaging in spoofing.

44.     Additionally, on February 11, 2011, Defendant Pacilio, in the course of his employment with Defendant MCLI, manipulated the market for COMEX Silver Futures by placing three spoof orders to sell approximately 550 silver futures contracts at a price of $29.975, in order to manipulate other market participants to fill the genuine order of Defendant Pacilio's colleague, which was resting on the opposite side of the market, through the false supply and demand signals conveyed by his spoof orders. Defendant Pacilio then canceled the spoof orders without any of them being filled. Again, Defendant Pacilio confirmed that he had been spoofing in an electronic chat with other traders.

45.     On June 10, 2011, Defendant Bases, in the course of his employment with Defendant MCLI, manipulated the market for COMEX Gold Futures. Defendant Bases placed four spoof orders to sell approximately 40 gold futures contracts at a price of $1,535.40 and five additional spoof orders to sell approximately 50 gold futures contracts at a price of $1,535.30. Defendant Bases placed the spoof orders convey false supply and demand signals to the market, in order to manipulate other market participants to fill the genuine order of Defendant Bases'

colleague, which was resting on the opposite side of the market. Defendant Bases canceled the spoof orders without any of them being filled.

46.     On February 9, 2012, Defendant Bases, in the course of his employment with Defendant MCLI, manipulated the market for COMEX Gold Futures. Defendant Bases placed three spoof orders to buy approximately 30 gold futures contracts at a price of $1,747.30. Defendant Bases placed the spoof orders convey false supply and demand signals to the market, in order to manipulate other market participants to fill the genuine order of Defendant Bases' colleague, which was resting on the opposite side of the market. Defendant Bases canceled the spoof orders without any of them being filled.

47.     On this same date, February 9, 2012, Plaintiff Gamma purchased and sold dozens of COMEX Gold Futures contracts and options on gold futures contracts. As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

48.     On January 10, 2014, Defendant Bases, in the course of his employment with Defendant MCLI, manipulated the market for COMEX Gold Futures. Defendant Bases placed four spoof orders to buy approximately 40 gold futures contracts at a price of $1,245.10. Defendant Bases placed the spoof orders convey false supply and demand signals to the market, in order to manipulate other market participants to fill his genuine order, which was resting on the opposite side of the market. Defendant Bases canceled the spoof orders without any of them being filled.

49.     On this same date, January 10, 2014, Plaintiff Gamma purchased and sold COMEX Gold Futures contracts and options on gold futures contracts. As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

50.     Also on this same date, January 10, 2014, Plaintiff Vega purchased COMEX Gold Futures contracts and options on gold futures contracts. As a result of Defendants' spoofing, Plaintiff Vega was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Vega and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Vega to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

51.     As an additional example, on January 24, 2014, Defendant Pacilio, in the course of his employment with Defendant MSC, manipulated the market for COMEX Gold Futures. Defendant Pacilio placed spoof orders to buy approximately 50 gold futures contracts at a price of $1,268.00. Defendant Pacilio placed the spoof orders, even though he did not intend for the orders to be executed when he placed them, in order to convey false supply and demand signals to the market.

52.     On this same date, January 24, 2014, Plaintiff Gamma purchased and sold dozens of COMEX Gold Futures contracts. As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants'

spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

53.    On February 18, 2014, Defendant Pacilio, in the course of his employment with Defendant MSC, manipulated the market for COMEX Gold Futures. Defendant Pacilio placed spoof orders to buy approximately 100 gold futures contracts at a price of $1,322.20. Defendant Pacilio placed the spoof orders, even though he did not intend for the orders to be executed when he placed them, in order to convey false supply and demand signals to the market.

54.    On this same date, February 18, 2014, Plaintiff Gamma purchased and sold COMEX Gold Futures contracts and options on gold futures contracts. As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

55.    Also on this same date, February 18, 2014, Plaintiff Vega purchased and sold COMEX Gold Futures contracts and options on gold futures contracts. As a result of Defendants' spoofing, Plaintiff Vega was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Vega and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Vega to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

56.     On February 28, 2014, Defendant Pacilio, in the course of his employment with Defendant MSC, manipulated the market for NYMEX Platinum Futures. Defendant Pacilio placed spoof orders to buy approximately 200 platinum futures contracts at a price of $1,453.20. Defendant Pacilio placed the spoof orders, even though he did not intend for the orders to be executed when he placed them, in order to convey false supply and demand signals to the market.

57.     On this same date, February 28, 2014, Plaintiff Gamma purchased and sold options on NYMEX Platinum Futures contracts. As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, options on precious metals futures contracts. These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in his trading of options on precious metals futures contracts during the Class Period.

58.     On April 17, 2014, Defendant Pacilio, in the course of his employment with Defendant MSC, manipulated the market for COMEX Silver Futures. Defendant Pacilio placed spoof orders to sell approximately 100 silver futures contracts at a price of $19.635. Defendant Pacilio placed the spoof orders, even though he did not intend for the orders to be executed when he placed them, in order to convey false supply and demand signals to the market.

59.     On this same date, April 17, 2014, Plaintiff Gamma purchased and sold COMEX Silver Futures contracts and options on gold futures contracts. As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff

Gamma to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

60.     On October 6, 2014, Defendant Pacilio, in the course of his employment with Defendant MSC, manipulated the market for NYMEX Platinum Futures. Defendant Pacilio placed spoof orders to buy approximately 100 platinum futures contracts at a price of $1,244.00. Defendant Pacilio placed the spoof orders, even though he did not intend for the orders to be executed when he placed them, in order to convey false supply and demand signals to the market.

61.     Through their manipulative conduct, Defendants unlawfully increased their profits at the expense of Plaintiffs and the Class. As a result of Defendants' sophisticated manipulative strategy, innocent market participants such as Plaintiffs who traded NYMEX and COMEX precious metals futures and options contracts, traded at artificial prices throughout the Class Period caused by Defendants manipulation.

## CLASS ACTION ALLEGATIONS

62.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and as representative of the following Class:

> All persons that purchased or sold any NYMEX platinum futures contract, NYMEX palladium futures contract, COMEX silver futures contract, COMEX gold futures contract, or any option on those futures contracts, during the period of at least January 1, 2008 through at least December 31, 2014.[9]

63.     Excluded from the Class are Defendants, their officers and directors, management, employees, subsidiaries, or affiliates.  Also excluded from the Class is the Judge presiding over this action, his or her law clerks, spouse, any other person within the third degree of relationship living in the Judge's household, the spouse of such person, and the United States Government.

---

[9] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, the Class Period.

64.     The Class is so numerous that joinder of the individual members of the proposed Class is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least hundreds, if not thousands, of geographically dispersed Class members transacted in NYMEX platinum futures contract, NYMEX palladium futures contract, COMEX silver futures contract, COMEX gold futures contract, or any option on those futures contracts throughout the Class Period.

65.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in the violations of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

66.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are an adequate representative of the Class and has no interest that is adverse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including commodity futures manipulation class action litigation.

67.     Common questions of law or fact exist as to Plaintiffs and all Class members, and these common questions predominate over any questions affecting only individual members of the Class. These predominant questions of law and/or fact common to the Class include, without limitation:

    a.  Whether Defendants' manipulated the price of NYMEX platinum futures contract(s), NYMEX palladium futures contract(s), COMEX silver futures contract(s), COMEX gold futures contract(s), or the price of options on those futures contracts, in violation of the CEA;

    b.  Whether Defendants' manipulated the price of NYMEX platinum futures contract(s), NYMEX palladium futures contract(s), COMEX silver futures

contract(s), COMEX gold futures contract(s), or the price of options on those futures contracts, to be artificial;

c.   Whether such manipulation caused a cognizable injury under the CEA;

d.   Whether Defendants' unlawful conduct caused actual damages to Plaintiffs and the Class;

e.   Whether Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class;

f.   The operative time period and extent of Defendants' unlawful conduct; and

g.   The appropriate nature and measure of Class-wide relief.

68.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a "large number" of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

69.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

70.    The applicable statutes of limitations relating to the claims for relief alleged in herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

71.     By its very nature, the unlawful activity alleged herein was self-concealing. Defendants engaged in secret and surreptitious activities to submit and cancel trade orders in order to manipulate the prices of NYMEX and COMEX precious metals futures contracts to artificial levels.

72.     Defendants concealed their manipulative acts by, inter alia, placing orders electronically with the intent to buy or sell NYMEX and COMEX precious metals futures contracts at a certain price, even though they secretly had no intent of transacting at that level. At no point did Defendant disclose that they placed these orders to manipulate the prices of NYMEX and COMEX precious metals futures contracts. Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiffs and the members of the Class could not have discovered the existence of Defendants' manipulation any earlier than the date of the public disclosures thereof.

73.     As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of reasonable diligence on or before June 25, 2019, when the U.S. Department of Justice issued a press release regarding the non-prosecution agreement with Defendant MLCI.

74.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiffs assert the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiffs.

75.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## For Manipulation in Violation of the Commodity Exchange Act

## 7 U.S.C. §§ 1, *et seq.*

## (As Against All Defendants)

76.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

77.     Defendants through their acts alleged herein, from at least January 1, 2008 through at least December 31, 2014, specifically intended to and did cause unlawful and artificial prices of NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of fictitious buy and sell orders and other manipulative conduct.

78.     Defendants manipulated the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

79.     During the Class Period, the prices of NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, did not result from the legitimate market information and the forces of supply and demand.  Instead, the prices of NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

80.     Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled, and specifically intending to cancel those orders prior to execution. Defendants did this with the intent to inject illegitimate information about supply and demand into the market place, and to artificially move prices up or down to suit Defendants' own trades and positions. As a result of these artificial prices, Plaintiffs and the Class suffered losses on their trades in NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts.

81.     Through their use of spoofing and other manipulative techniques, Defendants manipulated the prices of NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, throughout the Class Period and thereby caused damages to Plaintiffs and Class members who purchased or sold such instruments at the artificially inflated or deflated prices.

82.     At all times and in all circumstances previously alleged herein, Defendants had the ability to cause and did cause artificial prices of NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts.  Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, and were aware of the effects of spoofing and other manipulative conduct on those markets.

83.     By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

84.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered damages and injury-in-fact due to artificial prices for NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, to which Plaintiffs and the Class would not have been subject but for the unlawful conduct of the Defendants as alleged herein.

85.     Plaintiffs and members of the Class are each entitled to actual damages sustained in NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

## For Employing a Manipulative and Deceptive Device In Violation of The Commodity Exchange Act

## 7 U.S.C. §§ 1, *et seq.* and Regulation 180.1(a)

## (As Against All Defendants)

86.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

87.     Defendants' unlawful conduct as described herein, including the use of systematically submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices for NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, constitutes the employment of a manipulative and deceptive device.

88.     As alleged herein, Defendants acted intentionally—and, even if they are found to not have acted intentionally, then at least acted recklessly—in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiffs and the Class.

89.     By their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

90.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered damages and injury-in-fact due to artificial prices for NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, to which Plaintiffs and the Class would not have been subject but for the unlawful conduct of the Defendants as alleged herein.

91.     Plaintiffs and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

### THIRD CLAIM FOR RELIEF

### Principal-Agent Liability for Violation of The Commodity Exchange Act

### 7 U.S.C. §§ 1, *et seq.*

### (As Against All Defendants)

92.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

93.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

94.     Plaintiffs and members of the Class are each entitled to damages for the violation alleged herein.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

### (As Against All Defendants)

95.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

96.     Defendants financially-benefited from their unlawful acts. As alleged herein, Defendants submitted spoof orders electronically and employed other manipulative techniques to manipulate the prices of NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, in an artificial direction.  Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions, at the expense of Plaintiffs and the Class.

97.     These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact at artificial prices for in NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts.

98.     As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution.

99.     Each Defendant should pay restitution for its own unjust enrichment to Plaintiffs and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the requested relief as follows:

a. for an Order certifying this lawsuit as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, designating Plaintiffs as Class representatives, and appointing their counsel as Class counsel;

b. for a Judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

c. for a Judgment awarding Plaintiffs and the Class restitution of any and all sums of Defendants' unjust enrichment;

d. for an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

e. for such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated: June 27, 2019

Respectfully submitted,

**LOWEY DANNENBERG, P.C.**

By: /s/ Vincent Briganti
Vincent Briganti
Christian P. Levis
Raymond P. Girnys
Johnathan Seredynski
Peter Demato, Jr.
Amir Alimehri
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: vbriganti@lowey.com
        clevis@lowey.com

rgirnys@lowey.com
jseredynski@lowey.com
pdemato@lowey.com
aalimehri@lowey.com

*Attorneys for Plaintiffs*