## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MERRILL, BOFA, AND MORGAN STANLEY SPOOFING LITIGATION | Master Docket No. 19-cv-6002 (LJL) |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | <u>CLASS ACTION</u> |

### <u>FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>

Plaintiffs Gamma Traders – I LLC, Vega Traders, LLC, Robert Charles Class A, L.P., Robert L. Teel, Michael Patterson, Yuri Alishaev, Abraham Jeremias, and Morris Jeremias (collectively, "Plaintiffs") complain upon knowledge, as to themselves and their own actions, and upon information and belief, as to all other matters, against Defendants Merrill Lynch Commodities, Inc., Bank of America Corporation, Morgan Stanley & Co. LLC, Edward Bases, John Pacilio, and John Doe Nos. 1-18 (collectively, "Defendants"), as follows:

### <u>SUMMARY OF ALLEGATIONS</u>

1.     This action arises from Defendants' unlawful and intentional manipulation of COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum Futures, and NYMEX Palladium Futures contracts, and options on those futures contracts (collectively, "precious metals futures contracts") traded on the New York Mercantile Exchange ("NYMEX") and the Commodity Exchange, Inc. ("COMEX") from approximately January 1, 2007 through December 31, 2014 (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq.* (the "CEA"), and the common law.

2.     Defendants are a group of futures traders and the trading firms that employ them. Defendants manipulated the prices of precious metals futures contracts using a classic

manipulative device called "spoofing," whereby Defendants placed orders for precious metals futures contracts that they never intended to execute – and, in fact, canceled before execution – in order to send false and illegitimate supply and demand signals to the market.  In this manner, Defendants manipulated the prices of precious metals futures contracts throughout the Class Period to financially benefit their trading positions at the expense of other investors, like Plaintiffs and the Class (defined below).

3.      The unlawful conduct and manipulation described herein has been the subject of both criminal and regulatory investigations.   On July 17, 2018, Defendants Edward Bases ("Bases") and John Pacilio ("Pacilio"), who were employed by Defendant Merrill Lynch Commodities, Inc. ("MLCI"), were indicted on commodities fraud, spoofing, and conspiracy charges in the U.S. District Court for the Northern District of Illinois relating to the same conduct described in this Complaint.[1]

4.      In addition, on June 25, 2019, Defendant MLCI entered into a non-prosecution agreement ("NPA") with the U.S. Department of Justice ("DOJ")[2] and a settlement with the U.S. Commodity Futures Trading Commission ("CFTC"),[3] agreeing to pay a combined $25 million in criminal fines, restitution, and forfeiture of trading profits.  In the Statement of Facts incorporated into the NPA, Defendant MLCI admitted that its traders spoofed the markets for precious metals futures contracts ***thousands*** of times throughout the Class Period.[4]

---

[1]      Indictment, *U.S. v. Bases*, No. 1:18-cr-00048, ECF No. 66 (N.D. Ill. July 17, 2018) (hereinafter, the "Indictment").

[2]      *Non-Prosecution Agreement*, U.S. DEP'T OF JUST. (June 25, 2019), https://www.justice.gov/opa/press-release/file/1177296/download (hereinafter, the "MLCI NPA").

[3]      *In the Matter of: Merrill Lynch Commodities, Inc.*, CFTC Docket No. 19-07, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC June 25, 2019), https://www.cftc.gov/media/2141/enfmerrilllynchorder062519/download.

[4]      MLCI NPA, Attachment A ¶36.

5.      The DOJ and CFTC identified, by way of example, some of the days on which Defendants manipulated precious metals futures contracts prices.  Plaintiffs transacted in thousands of precious metals futures contracts throughout the Class Period, including on the specific days identified as examples of Defendants' spoofing, and suffered a loss on their transactions as a result of Defendants' manipulative conduct.

6.      Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the CEA, 7 U.S.C. §25.  This Court also has jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that they form part of the same case or controversy and under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

8.      Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §§1391(b)-(d) and §22 of the CEA, 7 U.S.C. §25(c).  One or more of the Defendants resided, transacted business, were found, or had agents in the Southern District of New York.  Further, a significant part of the events giving rise to the claims occurred in the Southern District of New York.  For example, Defendants Bases and Pacilio worked in Defendant MLCI's New York office and entered spoofing orders from New York.

9.      Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate

commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged herein.

## PARTIES

### A.   Plaintiffs

10.     Plaintiff Gamma Traders – I LLC ("Gamma") is a New York limited liability company.  Plaintiff Gamma transacted in thousands of COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum Futures, and NYMEX Palladium Futures, and options on those futures contracts throughout the Class Period and traded at artificial prices proximately caused by Defendants' unlawful manipulation, including on dates that the DOJ and CFTC identified as days that Defendants spoofed.  Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, including on days that Plaintiff Gamma traded, which deprived Plaintiff Gamma of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff Gamma to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

11.     Plaintiff Vega Traders, LLC ("Vega") is a Delaware limited liability company.  Plaintiff Vega transacted in thousands of COMEX Gold Futures and COMEX Silver Futures, and options on those futures contracts throughout the Class Period and traded at artificial prices proximately caused by Defendants' unlawful manipulation, including on dates that the DOJ and CFTC identified as days that Defendants spoofed.  Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, including on days that Plaintiff Vega traded, which deprived Plaintiff Vega of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff Vega to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Vega to earn less

profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

12.     Plaintiff Robert Charles Class A, L.P. ("RCA") is a California limited partnership, which, at all relevant times, maintained its principal place of business in San Diego, California. Plaintiff RCA transacted in COMEX Gold Futures and COMEX Silver Futures, and options on those futures contracts throughout the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, which deprived Plaintiff RCA of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff RCA to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff RCA to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

13.     Plaintiff Robert L. Teel ("Teel") is a resident of Washington and was a resident of California throughout the Class Period.  Plaintiff Teel transacted in COMEX Gold Futures and COMEX Silver Futures, and options on those futures contracts throughout the Class Period and traded at artificial prices proximately caused by Defendants' unlawful manipulation, including on dates that the DOJ and CFTC identified as days that Defendants spoofed.  Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, which deprived Plaintiff Teel of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff Teel to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Teel to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

14.     Plaintiff Michael Patterson ("Patterson") is a resident of Georgia.   Plaintiff Patterson transacted in COMEX Gold Futures and COMEX Silver Futures, and options on those futures contracts throughout the Class Period and traded at artificial prices proximately caused by Defendants' unlawful manipulation, including on dates that the DOJ and CFTC identified as days that Defendants spoofed.   Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, which deprived Plaintiff Patterson of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff Patterson to pay more to purchase, or receive less to sell, precious metals futures contracts.   These artificial prices caused Plaintiff Patterson to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

15.     Plaintiff Yuri Alishaev ("Alishaev") is a resident of New York.   Plaintiff Alishaev transacted in COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum Futures, and NYMEX Palladium Futures, and options on those futures contracts throughout the Class Period and traded at artificial prices proximately caused by Defendants' unlawful manipulation, including on dates that the DOJ and CFTC identified as days that Defendants spoofed.   Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, including on days that Plaintiff Alishaev traded, which deprived Plaintiff Alishaev of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff Alishaev to pay more to purchase, or receive less to sell, precious metals futures contracts.   These artificial prices caused Plaintiff Alishaev to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

16.     Plaintiff Abraham Jeremias is a resident of New York.   Plaintiff Abraham Jeremias transacted in COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum Futures, and

NYMEX Palladium Futures, and options on those futures contracts throughout the Class Period and traded at artificial prices proximately caused by Defendants' unlawful manipulation, including on dates that the DOJ and CFTC identified as days that Defendants spoofed.  Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, including on days that Plaintiff Abraham Jeremias traded, which deprived Plaintiff Abraham Jeremias of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff Abraham Jeremias to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Abraham Jeremias to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

17.     Plaintiff Morris Jeremias is a resident of New York.  Plaintiff Morris Jeremias transacted in hundreds of COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum Futures, and NYMEX Palladium Futures, and options on those futures contracts throughout the Class Period and traded at artificial prices proximately caused by Defendants' unlawful manipulation, including on dates that the DOJ and CFTC identified as days that Defendants spoofed.  Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, including on days that Plaintiff Morris Jeremias traded, which deprived Plaintiff Morris Jeremias of the ability to transact in a lawful market that was free of manipulation and caused Plaintiff Morris Jeremias to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Morris Jeremias to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

### B.     Defendants

18.     Defendant MLCI is a Delaware corporation with its headquarters in Houston, Texas.  Defendant MLCI operates in various locations, including New York.  Defendant MLCI is

an indirectly wholly owned subsidiary of Defendant Bank of America Corporation. Defendant MLCI employed Defendants Bases and Pacilio during the Class Period.

19.    Defendant Bank of America Corporation ("BAC") is a Delaware corporation with its principal executive offices in North Carolina. Defendant BAC is the ultimate parent of Defendant MLCI. Defendant BAC was a signatory to the MLCI NPA and agreed to undertake certain remedial measures related to its control and compliance operations with respect to precious metals futures trading and its MLCI subsidiary.

20.    Defendant Morgan Stanley & Co. LLC ("MSC") is a Delaware limited liability company with its headquarters in New York. Defendant MSC employed Defendant Pacilio during the Class Period.

21.    Defendant Bases is a resident of Connecticut. Defendant Bases was an employee of Defendant MLCI in its New York offices from at least June 2010 until approximately November 2015. The DOJ indicted Defendant Bases on one count of conspiracy to commit wire fraud and commodities fraud and one count of commodities fraud – all related to the conduct at issue in this case.[5]

22.    Defendant Pacilio is a resident of Connecticut. Defendant Pacilio was an employee of Defendant MLCI in its New York offices from at least October 2007 until approximately June 2011. Defendant Pacilio was an employee of Defendant MSC in its New York office from approximately July 2011 until approximately May 2019. The DOJ indicted Defendant Pacilio on one count of conspiracy to commit wire fraud and commodities fraud, one count of commodities fraud, and five counts of spoofing – all related to the conduct at issue in this case.[6]

---

[5]    *See* Indictment.

[6]    *Id.*

23.     Defendants John Doe Nos. 1-18 are other individuals or entities that participated in the manipulation and unlawful conduct described herein.  These defendants may include other financial firms or employees, agents, or affiliates of Defendant MLCI, including, but not limited to, the precious metals trader employed by Defendant MLCI or one of its affiliates (identified in the Indictment as "Co-Conspirator 1" (or "CC-1") and in the MLCI NPA as "Trader 1") and the U.K. affiliate of Defendant MLCI that employed CC-1/Trader 1.[7]

## SUBSTANTIVE ALLEGATIONS

### A.     Background

24.     **Commodity Futures Contract.**  A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price at a specified time in the future.  A commodity is the underlying asset upon which a futures contract is based.  The commodity underlying a futures contract can be a physical commodity, *e.g.*, corn or silver, or a financial instrument, *e.g.*, Treasury bills, foreign currencies, or the value of a stock index.

25.     **"Long" and "Short" Futures.**  Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a defined point in the future.  Precious metals futures contracts are settled through physical delivery.

26.     **Offset by Trading.**  Futures market participants almost always "offset" their futures contracts before the expiration month when delivery or settlement occurs.  For example, a purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract.  This

---

[7]     Indictment ¶1(c); MLCI NPA, Attachment A ¶4.

sale of one contract offsets or liquidates the earlier purchase of one contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

27.    **Options Contract.**  An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period.  The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, precious metals futures contracts).

28.    **Call options** confer upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price).  Call options confer upon the seller, or "option writer," the obligation to sell the commodity at the strike price.  The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit.  The seller (who is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value.  Therefore, the trader that is short a call option would prefer the value of the underlying asset decrease.

29.    **Put options** confer upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price, and they confer upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised.  The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price.  Conversely, the seller of the put option wants the price of the underlying asset to stay above the strike price so that the seller of the option would not be forced to buy the underlying futures at an above-market price.

B.      **CME, Globex, and Precious Metals Futures Contracts**

30.      Futures contracts are traded on markets designated and regulated by the CFTC.  The CME Group Inc. ("CME Group") owns and operates, among other such Designated Contract Markets ("DCMs"), COMEX and NYMEX.  At all relevant times, COMEX and NYMEX were registered DCMs with the CFTC, with self-regulatory responsibilities, and were subject to regulation by the CFTC.  Thus, COMEX and NYMEX are each a "registered entity" pursuant to §1a(40) of the CEA, 7 U.S.C. §1a(40).

31.      As DCMs pursuant to §5 of the CEA, 7 U.S.C. §7, COMEX and NYMEX specify the terms for each of the futures contracts they list, including the underlying commodity, trading units, tick size,[8] price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

32.      COMEX and NYMEX allow traders to place orders to buy ("bids") or sell ("offers") precious metals futures contracts, electronically through Globex, an electronic trading platform.  Trading on Globex is conducted electronically using a visible "order book" that displays quantities of anonymous orders (*i.e.*, offers to sell futures contracts and bids to buy futures contracts) at various price points, or "levels."

33.      COMEX Gold Futures Contracts and COMEX Silver Futures Contract are listed on the COMEX, subject to the rules and regulations of COMEX, including Chapters 112 and 113 of the COMEX Rulebook, and are traded electronically on the CME's Globex platform.

34.      NYMEX Platinum Futures Contracts and NYMEX Palladium Futures Contracts are listed on the NYMEX, subject to the rules and regulations of NYMEX, including Chapters 105 and 106 of the NYMEX Rulebook, and are traded electronically on the CME's Globex platform.

---

[8]      The minimum price increment at which a futures contract could trade on COMEX and NYMEX is called a "tick."  COMEX and NYMEX set the value of a tick for each contract that they list.

35.     When an order is matched, *i.e.*, when there exists both a willing buyer and seller for a specified contract at a given price, a transaction occurs and is referred to as a "fill" (or "execution").  At any time before the order is filled, the trader can "cancel" the order.  However, if an order is partially filled, only the unfilled portion of the order will be cancelled, and that portion of the order is pulled from the order book.

36.     There are different types of orders.  A "limit order" allows the buyer, or seller, to define the maximum purchase price for buying, or minimum sale price for selling, a specified contract.  Any portion of a limit order that can be matched is immediately executed.  A limit order remains on the book until the order is either executed, cancelled, or expires.  Limit orders that remain in the order book, and have not expired or been filled or cancelled, are sometimes referred to as "resting orders."

37.     An "iceberg" or "iceberg order" is a type of order that traders can use when trading futures contracts on COMEX and NYMEX.  In an iceberg order, the total amount of the order is divided into a certain pre-set quantity and only that quantity is visible to other market participants, with the remainder of the order not visible to other market participants.  Whenever the visible portion of the order is filled, the same pre-set quantity of the remaining portion automatically becomes visible; this process repeats until the remainder of the order is either executed or canceled.

38.     The order book, sometimes referred to as the "ladder," allows traders to view the number of orders and the aggregate number of contracts that all traders are actively bidding or offering at a given price level.  Only the total numbers of orders and contracts at various price levels are visible, not the number of traders or the identities of the traders who placed the orders, which means that other market participants cannot detect if a trader is placing orders simultaneously on opposite sides of the market, as Defendants did here.  The highest price at which

someone is willing to buy is referred to as the best-bid level, or first-bid level.  The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell.  The bid-ask spread is the difference between these two prices.  An illustrative example of a visible order book is contained in FIGURE 1.

**FIGURE 1.**

| Price/ Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 106.5 | | | 12 | 20 |
| 106 | | | 10 | 50 |
| 105.5 | | | 15 | 25 |
| 105 | | | 8 | 30 |
| 104 | | | 6 | 20 |
| 103.5 | | | 11 | 100 |
| 103 | | | 8 | 50 |
| 102 | | | 3 | 20 |
| 101.5 | | | 5 | 25 |
| 101 | | | 6 | 30 |
| | | | | |
| 99 | 6 | 50 | | |
| 98.5 | 10 | 20 | | |
| 98 | 14 | 100 | | |
| 97.5 | 8 | 25 | | |
| 97 | 6 | 25 | | |
| 96.5 | 12 | 30 | | |
| 95.5 | 4 | 50 | | |
| 95 | 7 | 40 | | |
| 94 | 5 | 20 | | |
| 94.5 | 7 | 15 | | |
| **TOTAL**: | 79 | 375 | 84 | 370 |

The "Tenth Offer Level." The CME's Order Book showed the first ten offer levels.

The "First Offer Level" or "First Ask Level" (*i.e.*, the lowest offer in the order book).

The "Spread" or "Bid/Ask Spread"

The "First Bid Level" (*i.e.*, the highest bid in the order book).

The "Tenth Bid Level." The CME's Order Book showed the first ten bid levels.

39.     Globex bids and offers are matched according to an algorithm known as "FIFO," which stands for first-in, first-out.  Under the FIFO order matching method, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority.  Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size.  Iceberg orders are an exception; for iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue.

C.     **Spoofing**

40.     Spoofing is the act of bidding or offering with the intent, at the time the bid or offer is placed, to cancel the bid or offer before execution.  These orders, the "spoof orders," create a false impression of supply or demand that moves futures contract prices in a desired direction vis-à-vis an order the spoofer intends to execute (the "genuine order").  For example, if a trader wants to buy futures contracts at a price below the lowest ask price then available in the market, *i.e.*, a price lower than that at which any market participant would be willing to sell, he/she will place a genuine order, often in the form of an iceberg order to reduce any upward pricing pressure, at that below market price and work to spoof prices lower.  To do this, the trader will place one or more large spoof orders – orders the trader never intends to execute – to sell a substantial amount of the same contract on the opposite side of the market.  The spoof orders are made at a price that is at or above the first-ask level (the lowest-ask price available in the market), meaning that they are passive orders that will not be immediately filled.  These large orders falsely signal that investors are selling their futures contracts, causing prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the genuine order.  The manipulator cancels the large spoof orders before they get filled, so the trader never enters a transaction at that price level.

41.     Figures 2a and 2b below show the order book imbalance and artificial appearance of supply and demand forces that spoofing causes.  Figure 2a is a hypothetical order book.  The best bid is two ticks away from the best offer and, therefore, no executable trades are present.  For the purposes of this example, the order book begins fairly balanced, with roughly even numbers of contracts being offered and bid.  Figure 2b shows how that same order book would appear after a hypothetical genuine order and series of spoof orders are entered.  Specifically, the order book in Figure 2b shows that an iceberg buy order is placed to buy 50 contracts, but only showing five

contracts to the market at a time.  Then, spoof orders are placed on the opposite side of the market: one spoof order for 200 contracts is placed at the first-offer level; four spoof orders for a total of 100 contracts are also placed at the first-offer level; and six additional spoof orders for a total of 250 contracts are placed at the second-offer level.  Following these spoof orders, the order book shows a significant imbalance, giving the appearance of far more sellers in the market than buyers, which signals artificial supply to market participants and leads to artificial, downward price pressure.

**FIGURE 2a.**

Order Book Before the Spoofing Begins

| Price/ Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 25.050 | | | 25 | 185 |
| 25.045 | | | 14 | 100 |
| 25.040 | | | 28 | 150 |
| 25.035 | | | 16 | 201 |
| 25.030 | | | 12 | 144 |
| 25.025 | | | 10 | 100 |
| 25.020 | | | 5 | 112 |
| 25.015 | | | 10 | 206 |
| 25.010 | | | 14 | 120 |
| 25.005 | | | 15 | 386 |
| | | | | |
| 24.095 | 18 | 242 | | |
| 24.090 | 20 | 314 | | |
| 24.085 | 22 | 163 | | |
| 24.080 | 24 | 264 | | |
| 24.075 | 10 | 102 | | |
| 24.070 | 12 | 148 | | |
| 24.065 | 18 | 104 | | |
| 24.060 | 11 | 94 | | |
| 24.055 | 6 | 85 | | |
| 24.050 | 12 | 227 | | |
| **TOTAL:** | 153 | 1743 | 149 | 1704 |

FIGURE 2b.

| Price/Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered | |
|---|---|---|---|---|---|
| | | Order Book After the Spoofing | | | |
| 25.050 | | | 25 | 185 | Six spoof orders to sell a total of 250 contracts are placed at the second offer level. |
| 25.045 | | | 14 | 100 | |
| 25.040 | | | 28 | 150 | |
| 25.035 | | | 16 | 201 | |
| 25.030 | | | 12 | 144 | |
| 25.025 | | | 10 | 100 | One spoof order to sell 200 contracts is placed at the first offer level. |
| 25.020 | | | 5 | 112 | |
| 25.015 | | | 10 | 206 | |
| 25.010 | | | 14 20 | 120 370 | An additional four spoof orders to sell a total 100 contracts are placed at the first offer level. |
| 25.005 | | | 15 20 | 386 686 | |
| | | | | | |
| 24.095 | 18 19 | 242 247 | | | A primary order to buy 50 contracts is placed as an iceberg order. Because this is an iceberg order, the market only sees 1 new order for 5 contracts, reducing upward price pressure that might partially counteract the spoof orders. |
| 24.090 | 20 | 314 | | | |
| 24.085 | 22 | 163 | | | |
| 24.080 | 24 | 264 | | | |
| 24.075 | 10 | 102 | | | |
| 24.070 | 12 | 148 | | | |
| 24.065 | 18 | 104 | | | |
| 24.060 | 11 | 94 | | | |
| 24.055 | 6 | 85 | | | |
| 24.050 | 12 | 227 | | | |
| **TOTAL:** | 154 | 1748 | 160 | 2254 | |

42.     The same technique can also be used in reverse to manipulate prices artificially higher.  For example, a trader can place an order to sell futures contracts above the current market prices and then, by entering and canceling large orders to buy that same futures contract, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of their initial sell order.

43.     In each instance, the trader profits because spoofing allows the trader to buy futures contracts at below the current market price, or to sell futures contracts at above the current market price.

16

**D.    Defendants Manipulated the Prices of Precious Metals Futures Contracts and Options Contracts to Artificial Levels Throughout the Class Period**

44.    In the NPA, Defendant MLCI admitted that during the period from at least 2008 through 2014, precious metals traders employed by MLCI, including Defendants Bases and Pacilio, engaged in a scheme to deceive other precious metals traders by placing thousands of spoof orders that they never intended to execute, with the intent to create the false and misleading impression of increased supply and demand in the market in order to: (a) induce other market participants to trade at times, prices, and quantities that they would not have absent Defendants' manipulation of the market; and (b) financially benefit Defendants at the expense of Plaintiffs and the Class.

45.    Defendants placed the spoof orders electronically from computers at Defendant MLCI's office in New York onto the NYMEX and COMEX.  The illegitimate supply and demand signals conveyed by the spoof orders were thereby disseminated to the market and artificially moved prevailing market prices in the direction of Defendants' genuine orders, injuring Plaintiffs and Class members.  Defendants' own statements during the Class Period confirm that their spoof orders were designed to – and did – artificially move the prices of precious metals futures contracts.[9]

46.    Defendants' manipulation of the markets for precious metals futures contracts caused prices to be artificial throughout the Class Period.  The Indictment of Defendants Bases and Pacilio and the MLCI NPA provided just a handful of examples of the thousands of spoof orders that Defendants Bases and Pacilio placed during the Class Period, which are outlined below:

---

[9]    Indictment ¶15.

### 1.    November 16, 2010

47.    On or about November 16, 2010, Defendant Pacilio, in the course of his employment with Defendant MLCI, placed six spoof orders to buy a total of approximately 250 COMEX Silver Futures contracts sending false supply and demand signals to the market in order to fill his genuine order on the opposite side of the market at an artificial price.  Defendant Pacilio cancelled the spoof orders without any of them being filled.  While engaged in the market manipulation described above, Defendant Pacilio confirmed in an electronic chat with other traders that he was engaging in spoofing, stating that '"the algos are really geared up in here. if you spoof this it really moves.'"[10]

### 2.    February 4, 2011

48.    On February 4, 2011, Defendant Bases placed a primary order, as an iceberg order, to buy 50 COMEX Gold Futures contracts (showing only one lot to the market at a time) at a price of $1,348.60.  Defendant Pacilio then placed one spoof order to sell 500 COMEX Gold Futures contracts at a price of $1,348.70 and two spoof orders to sell 25 COMEX Gold Futures contracts, sending false supply and demand signals to the market in order to fill Defendant Bases's genuine order on the opposite side of the market at an artificial price.  Ultimately, Defendant Bases's genuine order was filled in its entirety and Defendant Pacilio canceled the spoof orders without any of them being filled.

49.    On this same date, February 4, 2011, Plaintiff Gamma sold COMEX Gold Futures contracts.  As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Gamma and the Class to receive less to sell precious metals futures contracts.  These artificial

---

[10]    MLCI NPA, Attachment A ¶¶29-30.

prices caused Plaintiff Gamma to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

### 3.    February 11, 2011

50.    On February 11, 2011, Defendant Pacilio, in the course of his employment with Defendant MLCI, manipulated the market for COMEX Silver Futures by placing three spoof orders to sell approximately 550 silver futures contracts at a price of $29.975, sending false supply and demand signals to the market in order to fill his or his colleague's genuine order on the opposite side of the market at an artificial price.  Defendant Pacilio then canceled the spoof orders without any of them being filled.  Again, Defendant Pacilio confirmed that he had been spoofing in an electronic chat with other traders:

| | |
|---|---|
| [Defendant] Pacilio: | that was me pushing it |
| [Defendant] Pacilio: | dont do it yourself. i will help you |
| [Defendant] Pacilio: | dont spoof it |
| [Defendant] Pacilio: | what did you get 70 lots there? |
| Trader 1: | Ok |
| Trader 1: | Yep[11] |

51.    On this same date, February 11, 2011, Plaintiff Patterson traded COMEX Silver Futures contracts.  As a result of Defendants' spoofing, Plaintiff Patterson was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Patterson and the Class to receive less to buy precious metals futures contracts.  These artificial prices caused Plaintiff Patterson to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

---

[11]    MLCI NPA, Attachment A ¶¶ 31-32.

### 4.      March 29, 2011

52.      On March 29, 2011, Defendant Pacilio, in the course of his employment with Defendant MLCI, manipulated the market for COMEX Gold Futures by placing three spoof orders to sell a total of 375 gold futures contracts at a price of $1,420.00, sending false supply and demand signals to the market, in order to fill his genuine order on the opposite side of the market at an artificial price.  Defendant Pacilio canceled the spoof orders without any of them being filled.

### 5.      June 10, 2011

53.      On June 10, 2011, Defendant Bases, in the course of his employment with Defendant MLCI, manipulated the market for COMEX Gold Futures by placing four spoof orders to sell approximately 40 gold futures contracts at a price of $1,535.40 and five additional spoof orders to sell approximately 50 gold futures contracts at a price of $1,535.30, sending false supply and demand signals to the market in order to fill his genuine order on the opposite side of the market at an artificial price.  Defendant Bases canceled the spoof orders without any of them being filled.

54.      On this same date, June 10, 2011, Plaintiff RCA sold COMEX Gold Futures contracts and options.  As a result of Defendants' spoofing, Plaintiff RCA was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff RCA and the Class to receive less to sell precious metals futures contracts.  These artificial prices caused Plaintiff RCA to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

55.      On this same date, June 10, 2011, Plaintiff Teel sold COMEX Gold Futures contracts.  As a result of Defendants' spoofing, Plaintiff Teel was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Teel and the Class to receive less to sell precious metals futures contracts.  These artificial prices caused

Plaintiff Teel to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

### 6.     November 14, 2011

56.     On or about November 14, 2011, when Defendant Bases, in the course of his employment with Defendant MLCI, manipulated the market for COMEX Gold Futures.  First, Defendant Bases placed a genuine order, as an iceberg order, to buy 50 gold futures contracts (only showing one lot to the market at a time).  Defendant Bases then placed nine spoof orders to sell a total of 90 gold futures contracts at prices of $1,780.60 and $1,780.70, sending false supply and demand signals to the market in order to fill his genuine order on the opposite side of the market at an artificial price.  Defendant Bases had his entire genuine order filled and canceled the spoof orders before any of them were filled.

### 7.     February 9, 2012

57.     On February 9, 2012, Defendant Bases, in the course of his employment with Defendant MLCI, manipulated the market for COMEX Gold Futures by placing three spoof orders to buy approximately 30 gold futures contracts at a price of $1,747.30, sending false supply and demand signals to the market in order to fill his colleague's genuine order, which was resting on the opposite side of the market, at an artificial price.  Defendant Bases canceled the spoof orders without any of them being filled.

58.     On this same date, February 9, 2012, Plaintiff Gamma purchased and sold dozens of COMEX Gold Futures contracts and options on gold futures contracts.  As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices

caused Plaintiff Gamma to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

59.     Also, on this same date, February 9, 2012, Plaintiff Patterson bought and sold COMEX Gold futures contracts.  As a result of Defendants' spoofing, Plaintiff Patterson was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Patterson and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Patterson to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

### 8.     July 26, 2012

60.     On July 26, 2012, Defendant Bases, in the course of his employment with Defendant MLCI, manipulated the market for COMEX Gold Futures by placing five spoof orders to sell approximately 50 gold futures contracts at a price of $1,616.80, sending false supply and demand signals to the market in order to fill his genuine order, which was resting on the opposite side of the market, at an artificial price.  Defendant Bases canceled the spoof orders without any of them being filled.

### 9.     January 10, 2014

61.     On January 10, 2014, Defendant Bases, in the course of his employment with Defendant MLCI, manipulated the market for COMEX Gold Futures by placing four spoof orders to buy approximately 40 gold futures contracts at a price of $1,245.10, sending false supply and demand signals to the market in order to fill his genuine order on the opposite side of the market at an artificial price.  Defendant Bases canceled the spoof orders without any of them being filled.

62.     On this same date, January 10, 2014, Plaintiff Gamma purchased and sold COMEX Gold Futures contracts and options on gold futures contracts.  As a result of Defendants' spoofing,

Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

63.      Also, on this same date, January 10, 2014, Plaintiff Vega purchased COMEX Gold Futures contracts and options on gold futures contracts.  As a result of Defendants' spoofing, Plaintiff Vega was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Vega and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Vega to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

64.      Additionally, on this same date, January 10, 2014, Plaintiff Morris Jeremias purchased and sold COMEX Gold Futures contracts.  As a result of Defendants' spoofing, Plaintiff Morris Jeremias was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Morris Jeremias and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Morris Jeremias to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

### 10.      January 24, 2014

65.      On January 24, 2014, Defendant Pacilio, in the course of his employment with Defendant MSC, manipulated the market for COMEX Gold Futures by placing spoof orders to buy approximately 50 gold futures contracts at a price of $1,268.00.  Defendant Pacilio placed the

spoof orders, even though he did not intend for the orders to be executed when he placed them, in order to convey false supply and demand signals to the market.

66.     On this same date, January 24, 2014, Plaintiff Gamma purchased and sold dozens of COMEX Gold Futures contracts.  As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

67.     Also, on this same date, January 24, 2014, Plaintiff Alishaev bought and sold COMEX Gold futures contracts.  As a result of Defendants' spoofing, Plaintiff Alishaev was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Alishaev and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Alishaev to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

68.     Additionally, on this same date, January 24, 2014, Plaintiff Abraham Jeremias bought and sold COMEX Gold futures contracts and suffered a net loss because he transacted at artificial prices caused by Defendant Pacilio's spoofing.  As a result of Defendants' spoofing, Plaintiff Morris Jeremias was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Morris Jeremias and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused

Plaintiff Morris Jeremias to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

### 11.    February 18, 2014

69.    On February 18, 2014, Defendant Pacilio, in the course of his employment with Defendant MSC, manipulated the market for COMEX Gold Futures by placing spoof orders to buy approximately 100 gold futures contracts at a price of $1,322.20.  Defendant Pacilio placed the spoof orders, even though he did not intend for the orders to be executed when he placed them, in order to convey false supply and demand signals to the market.

70.    On this same date, February 18, 2014, Plaintiff Gamma purchased and sold COMEX Gold Futures contracts and options on gold futures contracts.  As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

71.    Also, on this same date, February 18, 2014, Plaintiff Vega purchased and sold COMEX Gold Futures contracts and options on gold futures contracts.  As a result of Defendants' spoofing, Plaintiff Vega was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Vega and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Vega to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

72.    Additionally, on this same date, February 18, 2014, Plaintiff Alishaev bought and sold COMEX Gold futures contracts.  As a result of Defendants' spoofing, Plaintiff Alishaev was

deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Alishaev and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Alishaev to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

73.     On this same date, February 18, 2014, Plaintiff Morris Jeremias also bought and sold COMEX Gold futures contracts. As a result of Defendants' spoofing, Plaintiff Morris Jeremias was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Morris Jeremias and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Morris Jeremias to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

74.     Also, on this same date, February 18, 2014, Plaintiff Abraham Jeremias bought and sold COMEX Gold futures contracts. As a result of Defendants' spoofing, Plaintiff Abraham Jeremias was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Abraham Jeremias and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Abraham Jeremias to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

### 12.     February 28, 2014

75.     On February 28, 2014, Defendant Pacilio, in the course of his employment with Defendant MSC, manipulated the market for NYMEX Platinum Futures by placing spoof orders to buy approximately 200 platinum futures contracts at a price of $1,453.20. Defendant Pacilio

placed the spoof orders, even though he did not intend for the orders to be executed when he placed them, in order to convey false supply and demand signals to the market.

76.     On this same date, February 28, 2014, Plaintiff Gamma purchased and sold options on NYMEX Platinum Futures contracts.  As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, options on precious metals futures contracts.  These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in its trading of options on precious metals futures contracts during the Class Period.

### 13.     April 17, 2014

77.     On April 17, 2014, Defendant Pacilio, in the course of his employment with Defendant MSC, manipulated the market for COMEX Silver Futures by placing spoof orders to sell approximately 100 silver futures contracts at a price of $19.635.  Defendant Pacilio placed the spoof orders, even though he did not intend for the orders to be executed when he placed them, in order to convey false supply and demand signals to the market.

78.     On this same date, April 17, 2014, Plaintiff Gamma purchased and sold COMEX Silver Futures contracts and options on gold futures contracts.  As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation.  Defendants' spoofing caused Plaintiff Gamma and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

79.     Also, on this same date, April 17, 2014, Plaintiff Alishaev bought and sold COMEX Silver futures contracts.  As a result of Defendants' spoofing, Plaintiff Alishaev was deprived of

the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Alishaev and the Class to pay more to purchase, or receive less to sell, precious metals futures contracts. These artificial prices caused Plaintiff Alishaev to earn less profits or suffer greater losses in his trading of precious metals futures contracts during the Class Period.

### 14.   October 6, 2014

80.    On October 6, 2014, Defendant Pacilio, in the course of his employment with Defendant MSC, manipulated the market for NYMEX Platinum Futures by placing spoof orders to buy approximately 100 platinum futures contracts at a price of $1,244.00. Defendant Pacilio placed the spoof orders, even though he did not intend for the orders to be executed when he placed them, in order to convey false supply and demand signals to the market.

81.    Defendants placed additional spoof orders during the Class Period, including, but not limited to, those in the table below, which were intended to facilitate the execution of primary orders by themselves or others. In each instance, the spoof orders were canceled within seconds without getting any fills:

| Date | Total Order Size | Total Contract Size | Precious Metal Affected |
|---|---|---|---|
| 7/26/2010 | 22 | 220 | Gold |
| 8/9/2010 | 1 | 205 | Platinum |
| 8/27/2010 | 19 | 190 | Gold |
| 9/3/2010 | 1 | 225 | Gold |
| 9/22/2010 | 1 | 200 | Gold |
| 9/24/2010 | 5 | 50 | Gold |
| 11/4/2010 | 1 | 500 | Gold |
| 11/16/2010 | 6 | 250 | Silver |
| 12/28/2010 | 18 | 180 | Gold |
| 1/4/2011 | 3 | 230 | Silver |

| Date | Total Order Size | Total Contract Size | Precious Metal Affected |
|---|---|---|---|
| 1/5/2011 | 11 | 110 | Silver |
| 2/11/2011 | 3 | 550 | Silver |
| 4/27/2011 | 5 | 50 | Gold |
| 8/17/2011 | 5 | 50 | Gold |
| 9/7/2011 | 18 | 180 | Gold |
| 3/25/2011 | 5 | 50 | Gold |

82.     Through their manipulative conduct, Defendants unlawfully increased their profits at the expense of Plaintiffs and the Class.  As a result of Defendants' sophisticated manipulative strategy, innocent market participants – such as Plaintiffs – who traded NYMEX and COMEX precious metals futures and options contracts, traded at artificial prices throughout the Class Period caused by Defendants manipulation.

## CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and as representatives of the following Class:

> All persons and entities that purchased or sold any NYMEX Platinum Futures contract, NYMEX Palladium Futures contract, COMEX Silver Futures contract, COMEX Gold Futures contract, or any option on those futures contracts, during the period of at least January 1, 2007 through at least December 31, 2014.[12]

84.     Excluded from the Class are Defendants, their officers and directors, management, employees, subsidiaries, or affiliates.  Also excluded from the Class is the Judge presiding over this action, his or her law clerks, spouse, any other person within the third degree of relationship living in the Judge's household, the spouse of such person, and the U.S. government.

---

[12]     Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, the Class Period.

85.     The Class is so numerous that joinder of the individual members of the proposed Class is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least hundreds, if not thousands, of geographically dispersed Class members transacted in NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, or options on those futures contracts throughout the Class Period.

86.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in the violations of law, as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws, as alleged herein.

87.     Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are adequate representatives of the Class and have no interests that are adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and experienced in class action litigation, including commodity futures manipulation class action litigation.

88.     Common questions of law or fact exist, as to Plaintiffs and all Class members, and these common questions predominate over any questions affecting only individual members of the Class.   These predominant questions of law and/or fact common to the Class include, without limitation:

(a)     whether Defendants' manipulated the price of NYMEX Platinum Futures contract(s), NYMEX Palladium Futures contract(s), COMEX Silver Futures contract(s), COMEX Gold Futures contract(s), or the price of options on those futures contracts in violation of the CEA;

(b)      whether Defendants' manipulated the price of NYMEX Platinum Futures contract(s), NYMEX Palladium Futures contract(s), COMEX Silver Futures contract(s), COMEX Gold Futures contract(s), or the price of options on those futures contracts to be artificial;

(c)      whether such manipulation caused a cognizable injury under the CEA;

(d)      whether Defendants' unlawful conduct caused actual damages to Plaintiffs and the Class;

(e)      whether Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class;

(f)      the operative time period and extent of Defendants' unlawful conduct; and

(g)      the appropriate nature and measure of Class-wide relief.

89.      A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not afford to individually litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

90.      Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

91.     The applicable statutes of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

92.     By its very nature, the unlawful activity alleged herein was self-concealing. Defendants engaged in secret and surreptitious activities to submit and cancel trade orders in order to manipulate the prices of NYMEX and COMEX precious metals futures contracts to artificial levels.

93.     Defendants concealed their manipulative acts by, *inter alia*, placing orders electronically with the intent to buy or sell NYMEX and COMEX precious metals futures contracts at a certain price, even though they secretly had no intent of transacting at that level.  At no point did Defendants disclose that they placed these orders to manipulate the prices of NYMEX and COMEX precious metals futures contracts.  Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiffs and the members of the Class could not have discovered the existence of Defendants' manipulation any earlier than the date of the public disclosures thereof.

94.     Additionally, Defendants MLCI and MSC have made repeated public statements that they maintain established procedures that ensure compliance with all applicable laws and regulations.

95.     As a result, Plaintiffs and the Class had no knowledge of, and could not have had knowledge of, Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of reasonable diligence before January 29, 2018, when criminal complaints against Defendants Bases and Pacilio were unsealed.

32

96.     Upon the public release of such information on June 25, 2019, Plaintiffs quickly engaged legal counsel and investigated the misconduct reported to determine whether they were affected during the relevant period and whether they had a legal claim for which to seek redress.

97.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiffs assert the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiffs.

98.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

**FIRST CLAIM FOR RELIEF**
**For Manipulation in Violation of the Commodity Exchange Act**
**7 U.S.C. §§1, *et seq.***
**(As Against All Defendants)**

99.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

100.     Defendants through their acts alleged herein, from at least January 1, 2008 through at least December 31, 2014, specifically intended to, and did, cause unlawful and artificial prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts in violation of the CEA, 7 U.S.C. §§1, *et seq.*, through their use of fictitious buy and sell orders and other manipulative conduct.

101.     Defendants manipulated the price of a commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

102.     During the Class Period, the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts did not result from the legitimate market

information and the forces of supply and demand.  Instead, the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

103.    Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled and specifically intending to cancel those orders prior to execution.  Defendants did this with the intent to inject illegitimate information about supply and demand into the market place and to artificially move prices up or down to suit Defendants' own trades and positions.  As a result of these artificial prices, Plaintiffs and the Class suffered losses on their trades in NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts.

104.    Through their use of spoofing and other manipulative techniques, Defendants manipulated the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts throughout the Class Period and thereby caused damages to Plaintiffs and Class members who purchased or sold such instruments at the artificially inflated or deflated prices.

105.    At all times and in all circumstances previously alleged herein, Defendants had the ability to cause, and did cause, artificial prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts.  Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts,

and options on those futures contracts and were aware of the effects of spoofing and other manipulative conduct on those markets.

106.    By their intentional misconduct, Defendants each violated §§6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§9, 13b, 13(a), and 25(a), throughout the Class Period.

107.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered damages and injury-in-fact due to the artificial prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts to which Plaintiffs and the Class would not have been subject, but for the unlawful conduct of the Defendants, as alleged herein.

108.    Plaintiffs and members of the Class are each entitled to actual damages sustained in NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts for the violations of the CEA alleged herein.

**SECOND CLAIM FOR RELIEF**
**For Employing a Manipulative and Deceptive Device in Violation of**
**The Commodity Exchange Act**
**7 U.S.C. §§1, *et seq.* and Regulation 180.1(a)**
**(As Against All Defendants)**

109.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

110.    Defendants' unlawful conduct, as described herein, including the use of systematically submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts constitutes the employment of a manipulative and deceptive device.

111.     As alleged herein, Defendants acted intentionally – and, even if they are found to not have acted intentionally, then at least acted recklessly – in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiffs and the Class.

112.     By their intentional misconduct, Defendants each violated §§6(c) and 22(a) of the CEA, 7 U.S.C. §§9 and 25(a), throughout the Class Period.

113.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered damages and injury-in-fact due to artificial prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts to which Plaintiffs and the Class would not have been subject, but for the unlawful conduct of the Defendants, as alleged herein.

114.     Plaintiffs and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

**THIRD CLAIM FOR RELIEF**
**For Principal-Agent Liability for Violation of The Commodity Exchange Act**
**7 U.S.C. §§1, *et seq.***
**(As Against All Defendants)**

115.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

116.     Each Defendant is liable under §2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

117.     Plaintiffs and members of the Class are each entitled to damages for the violation alleged herein.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (As Against All Defendants)

118.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

119.     Defendants financially benefited from their unlawful acts.  As alleged herein, Defendants submitted spoof orders electronically and employed other manipulative techniques to manipulate the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts in an artificial direction.  Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions at the expense of Plaintiffs and the Class.

120.     These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact at artificial prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts.

121.     As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution.

122.     Each Defendant should pay restitution for its own unjust enrichment to Plaintiffs and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the requested relief as follows:

A.      For an Order certifying this lawsuit as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), designating Plaintiffs as the Class Representatives and appointing their counsel as Class Counsel;

B.      For a judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest, at the maximum rate allowable by law;

C.      For a judgment awarding Plaintiffs and the Class restitution of any and all sums of Defendants' unjust enrichment;

D.      For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

E.      For such other relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated:  March 9, 2020

**LOWEY DANNENBERG, P.C.**

Vincent Briganti
Christian P. Levis
Raymond P. Girnys
Johnathan Seredynski
Amir Alimehri
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile:  (914) 997-0035
Email: vbriganti@lowey.com
            clevis@lowey.com
            rgirnys@lowey.com
            jseredynski@lowey.com
            aalimehri@lowey.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

  _/s/ Deborah Clark-Weintraub_____
Deborah Clark-Weintraub
Max R. Schwartz
Thomas L. Laughlin, IV
Jeffrey P. Jacobson
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
Email:  dweintraub@scott-scott.com
            mschwartz@scott-scott.com
            tlaughlin@scott-scott.com
            jjacobson@scott-scott.com

*Interim Co-Lead Counsel for Plaintiffs and the Class*