**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: MERRILL, BOFA, AND MORGAN STANLEY SPOOFING LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | 1:19-cv-06002 (LJL) |

**DEFENDANTS MERRILL LYNCH COMMODITIES, INC., BANK OF AMERICA CORPORATION, AND MORGAN STANLEY & CO. LLC'S JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE <u>FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

### TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ..............................................................................................................3

    I.      Overview of Precious Metals Market and Nature of Spoofing Allegations ...........3

    II.     Previous Precious Metals Litigation and Investigations.........................................3

    III.    The Parties and the Procedural History ................................................................5

ARGUMENT ..................................................................................................................7

    I.      Plaintiffs' CEA and Unjust Enrichment Claims Are Untimely ..............................7

           A.     Plaintiffs' CEA Claim is Untimely Because Plaintiffs Were on Notice
                  of Their Claims More than Two Years Before they Filed Suit...................7

                1.     Plaintiffs Had Inquiry Notice of the Conduct Alleged in this
                            Suit No Later than December 2016. .................................................7

                2.     Plaintiffs Fail to Plead Fraudulent Concealment. ..........................10

           B.     Plaintiffs' Unjust Enrichment Claim Is Untimely Because It Is Based
                  on the Same Conduct as the CEA Claim. ..................................................12

    II.     The CEA Does Not Provide a Private Right of Action to Pursue "Spoofing"
          Claims ................................................................................................................13

           A.     The CEA's Limited Private Right of Action Does Not Include a Right
                  of Action for Spoofing Violations. ...........................................................13

           B.     Spoofing Is Not Covered by the Private Right of Action for
                  Manipulation. ..........................................................................................15

           C.     Plaintiffs' CEA Claims Are Based on Spoofing, Not Manipulation. ........17

    III.    Plaintiffs Fail to Adequately Allege Actual Damages..........................................18

    IV.    Plaintiffs Fail to Plead CEA Manipulative Device Claims For Conduct that
          Occurred Before August 15, 2011 .......................................................................23

    V.     Plaintiffs Fail to State a Claim for Unjust Enrichment .........................................24

CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*131 Maine St. Assocs. v. Manko*,
179 F. Supp. 2d 339 (S.D.N.Y. 2002)......................................................................10

*Alexander v. Sandoval*,
532 U.S. 275 (2001)................................................................................................14, 15

*In re Amaranth Nat. Gas. Commodities Litig.*,
269 F.R.D. 366 (S.D.N.Y. 2010) ...........................................................................18

*In re Barclays PLC, Barclays Bank PLC, & Barclays Capital Inc.*,
CFTC No. 15-25, 2015 WL 2445060 (May 20, 2015) ...........................................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................23

*Braman v. CME Grp., Inc.*,
149 F. Supp. 3d 874 (N.D. Ill. 2015) .....................................................................15

*Butala v. Agashiwala*,
916 F. Supp. 314 (S.D.N.Y. 1996).....................................................................11, 12

*Certain Underwriters at Lloyd's v. Milberg LLP*,
No. 08 Civ. 7522 (LAP), 2009 WL 3241489 (S.D.N.Y. Sept. 30, 2009)...............10

*CFTC v. McDonnell*,
287 F. Supp. 3d 213 (E.D.N.Y. 2018) ...................................................................16

*CFTC v. Schor*,
478 U.S. 833 (1986)................................................................................................16

*Chevron Corp. v. Donziger*,
871 F. Supp. 2d 229 (S.D.N.Y. 2012).....................................................................25

*In re Commodity Exch., Inc.*,
213 F. Supp. 3d 631 (S.D.N.Y. 2016).....................................................................24

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
631 F.3d 42 (2d Cir. 2011)......................................................................................24

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*,
368 F. Supp. 3d 681 (S.D.N.Y. 2019)......................................................................12

ii

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  No. 13 CIV. 7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)..............................17

*Geldermann, Inc. v. CFTC*,
  836 F.2d 310 (7th Cir. 1987) ..............................................................16

*Harry v. Total Gas & Power N. Am., Inc.*,
  889 F.3d 104 (2d Cir. 2018)...............................................................19, 20, 22

*Hinds County, Miss. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)....................................................12

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017)....................................................24

*Kaye v. Grossman*,
  202 F.3d 611 (2d Cir. 2000).................................................................24

*Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*,
  464 F.3d 255 (2d Cir. 2006).................................................................15

*Koch v. Christies Int'l PLC*,
  699 F.3d 141 (2d Cir. 2012).................................................................7

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  27 F. Supp. 3d 447 (S.D.N.Y. 2014)......................................................23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  935 F. Supp. 2d 666 (S.D.N.Y. 2013)....................................................11

*In re LIBOR-based Fin. Instruments Antitrust Litig.*,
  962 F. Supp. 2d 606 (S.D.N.Y. 2013)....................................................18, 19

*Loginovskaya v. Batratchenko*,
  764 F.3d 266 (2d Cir. 2014).................................................................14

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
  213 F. Supp. 3d 530 (S.D.N.Y. 2016)....................................................24

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018)......................................... *passim*

*Malmsteen v. Berdon, LLP*,
  477 F. Supp. 2d 655 (S.D.N.Y. 2007)....................................................12

*Myun-Uk Choi v. Tower Research Capital LLC*,
  165 F. Supp. 3d 42 (S.D.N.Y. 2016)......................................................24

*In re N. Sea Brent Crude Oil Futures Litig.*,
  256 F. Supp. 3d 298 (S.D.N.Y. 2017)....................................................14

*In re Natural Gas Commodity Litig.*,
  337 F. Supp. 2d 498 (S.D.N.Y. 2004)....................................................10

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*,
  484 U.S. 97 (1987)............................................................................16

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
  933 F.3d 99 (2d Cir. 2019)................................................................14

*In re Platinum & Palladium Antitrust Litig.*,
  No. 1:14-CV-9391-GHW, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017).....................*passim*

*Russello v. United States*,
  464 U.S. 16 (1983)............................................................................16

*Sewell v. Bernardin*,
  795 F.3d 337 (2d Cir. 2015)..................................................................7

*Shak v. JPMorgan Chase & Co.*,
  156 F. Supp. 3d 462 (S.D.N.Y. 2016)....................................................13

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017)....................................................22

*Spinale v. Tenzer Greenblatt, LLP*,
  765 N.Y.S.2d 786 (1st Dep't 2003)........................................................13

*Staehr v. Hartford Fin. Servs. Grp.*,
  547 F.3d 406 (2d Cir. 2008)..................................................................7

*TCA Television Corp. v. McCollum*,
  151 F. Supp. 3d 419 (S.D.N.Y. 2015)....................................................21

*United States v. Wong Kim Bo*,
  472 F.2d 720 (5th Cir. 1972) ..............................................................16

*Zola v. Gordon*,
  685 F. Supp. 354 (S.D.N.Y. 1988)........................................................10

## STATUTES & RULES

7 U.S.C. § 6c......................................................................................15

7 U.S.C. § 6c(a)(5)..........................................................................14, 16

7 U.S.C. § 9........................................................................................15

7 U.S.C. § 25(a)(1)(D) ..................................................................................14, 18, 19

7 U.S.C. § 25(a)(2)...................................................................................................14

7 U.S.C. § 25(c) .........................................................................................................7

Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) .........................14, 15, 16

Federal Rule of Civil Procedure Rule 9(b) ..............................................................11

Federal Rule of Civil Procedure 12(b)(6) ..................................................................1

**OTHER AUTHORITIES**

Antidisruptive Practices Authority, 78 Fed. Reg. 31,890 (May 28, 2013) ...................16

CME Group 2014 Annual Report at 49, http://www.annualreports.com/Hosted
Data/AnnualReportArchive/c/NASDAQ_CME_2014.PDF.....................................21

Jean Eaglesham & Christopher M. Matthews, *Big Banks Face Scrutiny Over
Pricing of Metals: U.S. Justice Department investigates price-setting process
for gold, silver, platinum, and palladium*, Wall St. J. (Feb. 23, 2015) .....................4

Ronald Filler, *Ask the Professor—What Is The Impact Of The Recent Second
Circuit Decision In Tower Research Capital On The Global Futures
Markets?*, 38 No. 6 Futures & Derivatives L. Rep. NL 2 (2018) ...........................15

Press Release, CFTC, CFTC Finds Former Trader David Liew Engaged in
Spoofing and Manipulation of the Gold and Silver Futures Markets and
Permanently Bans Him from Trading and Other Activities in CFTC-Regulated
Markets (June 2, 2017),
https://www.cftc.gov/PressRoom/PressReleases/pr7567-17 .....................................5

Xan Rice, *Trading to influence gold price fix was 'routine,'* Fin. Times (June 3,
2014) ...........................................................................................................................9

Defendants Merrill Lynch Commodities, Inc. ("MLCI"), Bank of America Corporation ("BAC," and together with MLCI, the "Bank of America Defendants") and Morgan Stanley & Co. LLC ("Morgan Stanley") respectfully submit this joint memorandum of law in support of their motion to dismiss the First Amended Consolidated Class Action Complaint (the "FAC" or the "Complaint") under Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

The FAC fails to remedy any of the serious deficiencies identified in Defendants' motions to dismiss the Consolidated Class Action Complaint (the "CAC"). The FAC makes a handful of superficial changes, but it does not and cannot eliminate any of the fundamental flaws that were present in the CAC: Plaintiffs attempt to bring stale claims based on alleged trading activity for which there is no private cause of action and which is not properly alleged to have caused Plaintiffs any actual damages. The Complaint should be dismissed with prejudice for multiple independent reasons.

*First*, Plaintiffs' claims remain time barred. The Commodity Exchange Act ("CEA") has a two-year statute of limitations, and the same limitation period applies to Plaintiffs' unjust enrichment claims. The FAC, however, alleges misconduct from 2007 to 2014, a period that ended ***five years*** before Plaintiffs filed their complaint. Moreover, Plaintiffs have been on notice of their claims since December 2016 at the latest (more than two years before this case was filed), when their counsel filed a proposed amended complaint in *In re London Silver Fixing, Ltd., Antitrust Litig.*, No. 1:14-md-2573 (S.D.N.Y.) ("*Silver*"), alleging that BAC and others engaged in spoofing—the same conduct (by the same individuals) alleged here. In addition, other lawsuits filed in 2014 and 2015 alleged widespread spoofing in the gold, platinum, and palladium markets, and there have been publicly disclosed investigations into the precious metals markets since at least 2015, four years before Plaintiffs initiated the present action. Plaintiffs'

1

addition of boilerplate allegations to the FAC claiming that Defendants misrepresented the adequacy of their compliance policies does nothing to show why Plaintiffs lacked notice of the claims years ago or why fraudulent concealment should apply.

*Second*, the FAC makes no attempt to address the fact that the CEA does not provide a private cause of action for spoofing claims.  While Plaintiffs affix a manipulation label to their CEA claims, Plaintiffs captioned the case as a "Spoofing Litigation," and the factual allegations contained in the FAC allege only spoofing and no other form of misconduct.  Because Congress drew a clear distinction in the CEA between manipulation and the "disruptive practice" of spoofing, and intentionally excluded a private right of action for such "disruptive practices," the FAC must be dismissed.

*Third*, Plaintiffs' allegations of actual damages remain patently insufficient.  The FAC still fails to allege how the claimed instances of spoofing affected prices in the highly liquid precious metals markets at the times Plaintiffs were trading; any direct connection between Plaintiffs' trades and the alleged spoofing; or whether Plaintiffs benefitted or were harmed by any theoretical price movements caused by the alleged spoofing.  Instead, Plaintiffs would still have this Court pile inference upon inference to make the leap that the handful of alleged spoofing transactions that they identify had a net negative effect on their trades regardless of time, size, market volume, and intervening events.  Indeed, the FAC highlights the failure to allege actual damages, as it adds a table that lists additional purported spoofing transactions but makes no effort to assess how those transactions impacted their own trading.  As in *Silver*, Plaintiffs fail to plead actual damages.

*Fourth*, any manipulative device claims premised on alleged conduct prior to August 15, 2011 must be dismissed because the relevant statute and rule were not in effect before then.

*Finally*, Plaintiffs still fail to state a claim for unjust enrichment because they do not allege that they transacted or had any substantive relationship with any Defendant, and they fail to allege that Defendants were enriched at Plaintiffs' expense.

## BACKGROUND

### I.    Overview of Precious Metals Market and Nature of Spoofing Allegations

Plaintiffs' claims arise from alleged spoof trades of futures contracts in the markets for precious metals—gold, silver, platinum, and palladium.  Market participants wishing to transact in precious metals place orders to buy or sell futures contracts and options on those futures contracts electronically.  *See* FAC ¶ 32.  When willing buyers and sellers for a specific contract are matched, a transaction is "filled."  *Id.* ¶ 35.  Spoofing is defined as the act of bidding or offering with the intent, at the time the bid or offer is placed, to cancel the bid or offer before execution.  *Id.* ¶ 40.  Spoofed orders create a false impression of the prevailing market supply and demand and may move market prices in a direction desired by the person placing the spoofed orders.  *Id.*

### II.    Previous Precious Metals Litigation and Investigations

Since 2014, there have been multiple litigations and investigations concerning alleged spoofing in the precious metals markets.

For example, in 2014, counsel for Plaintiffs in this case commenced the *Silver* litigation, alleging that four banks engaged in a conspiracy with respect to setting the price of silver bullion.  In **December 2016**, the *Silver* plaintiffs filed a proposed third amended complaint ("PTAC"), which added BAC and other entities as defendants and expanded the case to include allegations that defendants engaged in spoofing in the silver futures and options market.  The conduct alleged in the *Silver* PTAC is substantially similar to the conduct alleged here, and plaintiffs presented in that litigation some of the same chat transcripts relied upon by Plaintiffs in

this case.  Significantly, chats cited in *Silver* also discussed the gold and palladium markets (in addition to silver).  *See* PTAC ¶¶ 235, 261–267, 274, 301–304, 326, *Silver*, No. 1:14-md-2573 (S.D.N.Y. filed on Dec. 7, 2016), ECF. No. 180-2.[1]  The *Silver* Court dismissed the "spoofing" claims with prejudice, finding that plaintiffs failed to plead actual damages as a result of the alleged episodic spoofing.  332 F. Supp. 3d 885, 926 (S.D.N.Y. 2018) ("*Silver II*").[2]

In addition, in ***March 2015***, litigation in this district alleged persistent spoofing in the gold market.  *See In re Commodity Exchange, Inc. Gold Futures and Options Trading Litig.*, No. 14-md-2548 (S.D.N.Y.) ("*Gold*").  And even earlier, in ***2014***, a putative class action alleged widespread spoofing in the platinum and palladium markets.  *In re Platinum & Palladium Antitrust Litig.*, No. 1:14-CV-9391-GHW, 2017 WL 1169626, at *6 (S.D.N.Y. Mar. 28, 2017).

There also have been various publicly reported regulatory investigations into conduct in the metals markets.  For example, in 2015, there was extensive media coverage of a U.S. Department of Justice ("DOJ") investigation of ten large banks in connection with price-setting mechanics across the gold, silver, platinum, and palladium markets.[3]  Similarly, in May 2015, the U.S. Commodity Futures Trading Commission ("CFTC") announced a civil enforcement action against two individuals for spoofing in the gold and silver futures markets.  *See* Consent Order & Judgment, *CFTC v. Khara*, No. 1:15-cv-3497 (S.D.N.Y. filed Mar. 31, 2016), ECF No. 35.  And, on June 1, 2017—more than two years before Plaintiffs filed the first complaint in the instant litigation—a former trader at Deutsche Bank AG, David Liew, pleaded guilty to placing

---

[1] The *Silver* Court granted leave to file the proposed third amended complaint on June 16, 2017.  Mem. & Order, *Silver*, No. 14-md-2573 (S.D.N.Y. filed June 8, 2017), ECF No. 253 ("June 8, 2017 *Silver* Order").

[2] The *Silver* Court dismissed all claims against the Bank of America defendants in that proceeding.  *See Silver II*, 332 F. Supp. 3d at 926.

[3] Jean Eaglesham & Christopher M. Matthews, *Big Banks Face Scrutiny Over Pricing of Metals: U.S. Justice Department investigates price-setting process for gold, silver, platinum, and palladium*, Wall St. J. (Feb. 23, 2015), https://www.wsj.com/articles/big-banks-face-scrutiny-over-pricing-of-metals-1424744801.

spoofing trades in the gold and silver futures markets.[4]  On June 2, 2017 the CFTC also entered

an order filing and settling charges against Mr. Liew for the same conduct, and the CFTC's press

release announcing the settlement made clear that Mr. Liew coordinated his spoofing with others

who traded in the market, both at Deutsche Bank AG and another financial institution.[5]

## III.    The Parties and the Procedural History

On June 25, 2019, MLCI entered a non-prosecution agreement with the DOJ and a

consent order with the CFTC regarding silver and other precious metals.  FAC ¶ 4.  On June 27,

2019, Plaintiffs Gamma Traders – I LLC and Vega Traders, LLC filed a complaint against the

Bank of America Defendants, Morgan Stanley, Mr. Bases, and Mr. Pacilio, alleging that

Defendants engaged in spoofing in the precious metals markets.  *See* ECF No. 1.  After two

similar suits were filed in this district, all three cases were consolidated, *see* ECF No. 23, and

Plaintiffs filed the CAC on November 12, 2019.  *See* ECF No. 27.  Defendants moved to dismiss

the CAC on January 13, 2020.  *See* ECF Nos. 33–36, 38.  In response to these motions, Plaintiffs

chose to amend their Complaint and filed the FAC on March 9, 2020.  ECF No. 51.

Plaintiffs bring four claims against Defendants—CEA market manipulation, CEA

manipulative device, CEA principal–agent liability, and unjust enrichment.  They allege that

Defendants engaged in "unlawful and intentional manipulation" of precious metals futures

contracts and options traded on the New York Mercantile Exchange and the Commodity

Exchange, Inc. between 2007 and 2014.  FAC ¶ 1.  Plaintiffs allege that "Defendants

manipulated the prices of precious metals futures contracts using a classic manipulative device

---

[4] *See* Information, *United States v. Liew*, No. 17-cr-1 (N.D. Ill. May 24, 2017), ECF No. 17.

[5] Press Release, CFTC, CFTC Finds Former Trader David Liew Engaged in Spoofing and Manipulation of the Gold and Silver Futures Markets and Permanently Bans Him from Trading and Other Activities in CFTC-Regulated Markets (June 2, 2017), https://www.cftc.gov/PressRoom/PressReleases/pr7567-17.

called 'spoofing'" and that "Defendants spoofed the market for Precious Metals Futures Contracts thousands of times throughout the Class Period, including on days that [Plaintiffs] traded." *Id.* ¶¶ 2, 10–17.  Although Plaintiffs claim thousands of incidents of spoofing, they only allege twenty-eight such episodes of spoofing between July 2010 and October 2014, only nine of which occurred on days that Plaintiffs allege they traded. *Id.* ¶¶ 47–82.  Plaintiffs allege that on those nine days, they "traded," "sold," or "purchased and sold" precious metals futures contracts and options. *Id.* ¶¶ 49, 51, 54–55, 58–59, 62–64, 66–68, 70–74, 76, 78–79, 81 tbl.  As a result, they were allegedly "deprived of the ability to transact in a lawful market that was free of manipulation." *See, e.g.*, *id.* ¶ 49.

The FAC devotes an entire section to explaining spoofing, including figures depicting hypothetical order books to explain how spoofing "signals artificial supply to market participants and leads to artificial, downward [or upward] price pressure." *Id.* ¶¶ 40–43 & figs. 2a & 2b. Each of Plaintiffs' twenty-eight alleged episodes of so-called manipulation is based on an assertion that Pacilio or Bases "manipulated the market . . . ***by placing [a number of] spoof orders***." *Id.* ¶¶ 47–48, 50, 52–53, 56–57, 60–61, 65, 69, 75, 77, 80, 81 tbl. (emphasis added). Plaintiffs allege no conduct other than spoofing to support their manipulation claim. *See id.*  For each episode, Plaintiffs allege injuries "[a]s a result of Defendants' spoofing" and argue that "Defendants' spoofing caused [Plaintiffs] to earn less profits or suffer greater losses in [their] trading of precious metals futures contracts during the Class Period." *Id.* ¶¶ 49, 51, 54–55, 58–59, 62–64, 66, 67–68, 70–74, 76, 78–79, 82.  Despite vague references to "other manipulative trading activities," "other manipulative techniques," and "other manipulative conduct" in the boilerplate recitation of their legal theories, Plaintiffs do not specify or describe *any* manipulative device, technique, or conduct. *Id.* ¶¶ 99, 101–102, 107, 116.  They only allege spoofing.

## ARGUMENT

**I.**   **Plaintiffs' CEA and Unjust Enrichment Claims Are Untimely**

    **A.**   **Plaintiffs' CEA Claim is Untimely Because Plaintiffs Were on Notice of Their Claims More than Two Years Before they Filed Suit.**

A claim pursuant to the CEA must be brought "not later than two years after the date the cause of action arises."  7 U.S.C. § 25(c).  Plaintiffs first filed suit on June 27, 2019. Accordingly, any claims based on conduct before June 27, 2017 are time barred.  Plaintiffs, however, allege that the wrongful conduct giving rise to their claims occurred between 2007 and 2014, a period ending ***five years before they filed suit***.  *See, e.g.*, FAC ¶ 83.  Moreover, Plaintiffs' counsel was aware, and Plaintiffs should have been aware, of their potential claims no later than December 2016, when substantially the same claims were asserted in *Silver*.  The CEA claims are therefore barred by the statute of limitations and should be dismissed.  *See Sewell v. Bernardin*, 795 F.3d 337, 339–41 (2d Cir. 2015) ("'Dismissal under [Rule 12(b)(6)] is appropriate when a defendant raises a statutory bar,' such as lack of timeliness, 'as an affirmative defense and it is clear . . . that the plaintiff's claims are barred as a matter of law.'" (quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008)).

    **1.**   **Plaintiffs Had Inquiry Notice of the Conduct Alleged in this Suit No Later than December 2016.**

To determine when the CEA's two-year statute of limitations accrues, the Second Circuit applies an "inquiry notice" standard.  "Inquiry notice—often called storm warnings in the securities context—gives rise to a duty of inquiry when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded."  *Silver II*, 332 F. Supp. 3d at 912 (quoting *Koch v. Christies Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012)). Plaintiffs undoubtedly had inquiry notice, if not actual notice, of the alleged conduct in this case

no later than December 2016 in light of public allegations and media reports made on and before that date concerning potential manipulation in the precious metals markets.

Multiple lawsuits filed more than two years before June 27, 2019, including some initiated by counsel representing Plaintiffs, ***concerned the exact same conduct alleged here***— spoofing in the precious metals futures markets—and thus gave Plaintiffs notice of their claims. Most notably, the *Silver* PTAC, which was filed in ***December 2016***, alleged that the defendants in that case, including one of the Bank of America Defendants, engaged in spoofing in the silver markets, including in the silver futures market.  *Silver* PTAC ¶¶ 261–267.  As Judge Caproni noted, "Plaintiffs assert that the [materials added to the PTAC] are evidence of information sharing, pricing coordination, and concerted manipulation of the silver markets."  June 8, 2017 *Silver* Order at 4.[6]

Significantly, the chats quoted in the *Silver* PTAC were not limited to the silver market. Rather, they also discussed trading in gold and palladium, and therefore provided Plaintiffs notice of any potential claim related to all precious metals.  *Silver* PTAC ¶¶ 235 (discussion of gold market by a Merrill Lynch trader), 303 (discussion of trades in silver and palladium markets by a Merrill Lynch trader).  The *Silver* PTAC thus did much more than put Plaintiffs on "inquiry notice" of potential claims for spoofing in precious metals futures markets—it put them on ***actual notice*** of their claims and the allegations supporting those claims.

Further, in ***March 2015***, more than a year before the PTAC in *Silver*, the second consolidated amended complaint in *Gold* (the "*Gold* SCAC") alleged persistent spoofing in the

---

[6] The similarity between *Silver* and this action is illustrated by the fact that chats that form the basis of the FAC here were presented by the *Silver* Plaintiffs in the course of litigating dismissal motions as further evidence of manipulation.  *Compare Silver* ECF No. 344-6 ¶¶ 38(a), 39(c), *with* FAC ¶¶ 47, 50 (same chats).

gold market.[7]  Although Defendants here are not defendants in *Gold*, the *Gold* SCAC alleges that the alleged spoofing was endemic among **all** institutions that trade gold futures.  *Gold* SCAC ¶¶ 292–293 (filed Mar. 16, 2015), ECF No. 44.  In support of this allegation, the *Gold* SCAC cites two articles reporting that traders at banks believed spoofing was common.  *See id.*  One of these articles quoted a hedge fund trader as saying that he would investigate "all banks" that traded gold digital options for potential improper trades.  *See id.*; *see also* Xan Rice, *Trading to influence gold price fix was 'routine,'* Fin. Times (June 3, 2014), www.ft.com/intl/cms/s/ 0/7fd97990-eb08-11e3-9c8b-00144feabdc0.html.

And even earlier, in *2014*, putative class actions alleged widespread spoofing in the platinum and palladium futures markets.  *Platinum & Palladium*, 2017 WL 1169626, at *6. Especially when viewed together with *Gold* and *Silver*, these cases put Plaintiffs on notice of potential claims in all precious metals futures markets.

Public reports of regulatory enforcement efforts across the precious metals markets also provided notice to Plaintiffs long before June 27, 2017.  The public disclosures included (1) extensive media coverage in 2015 of a DOJ investigation into price setting in the gold, silver, platinum, and palladium markets; (2) the CFTC's 2015 announcement of a civil enforcement action for spoofing in the gold and silver futures markets; and (3) a former trader's June 1, 2017 CFTC consent decree and guilty plea for placing spoofing trades in the gold and silver futures

---

[7] Plaintiffs' actual notice of the *Gold* litigation is apparent because Plaintiffs' counsel in the instant litigation, as interim class counsel in *Silver*, has been coordinating with counsel for the *Gold* plaintiffs on matters related to scheduling and discovery.  *See, e.g.*, Joint Ltr., *Silver*, No. 14-md-2573 (S.D.N.Y. filed Dec. 5, 2019), ECF No. 437 ("We have also been in contact with the parties in *In re Commodity Exchange, Inc. Gold Futures and Options Trading Litigation*, No. 14-md-2548 (VEC) (S.D.N.Y.) ('*Gold*') to coordinate the proposed schedules in both cases in order to accommodate Defendants' request that Plaintiffs in both cases coordinate depositions of overlapping witnesses.").

markets, which made clear that the trader coordinated his spoofing with traders at another financial institution.  *See supra* Background Part II.

Each of these disclosures of alleged spoofing and other misconduct put Plaintiffs on inquiry notice more than two years before they filed the Complaint.  *See, e.g.*, *Certain Underwriters at Lloyd's v. Milberg LLP*, No. 08 Civ. 7522 (LAP), 2009 WL 3241489, at \*9 (S.D.N.Y. Sept. 30, 2009) (disclosures of relevant government investigation triggers a duty on the part of the plaintiff to inquire as to potential fraud).  Viewed in their entirety, they provide an overwhelming record of actual notice well over two years before Plaintiffs filed the Complaint here, rendering their claims untimely.

### 2.    Plaintiffs Fail to Plead Fraudulent Concealment.

The CEA's two-year statute of limitations for private claims may be tolled "if a plaintiff can show fraudulent concealment of the violation by a defendant."  *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 512 (S.D.N.Y. 2004).  To demonstrate fraudulent concealment, a plaintiff must plead, *with particularity*, "(1) that the defendant concealed the existence of the CEA violation; (2) that the plaintiff remained unaware of the violation during the limitations period; and (3) that the plaintiff's continuing ignorance as to the claim was not a result of a lack of due diligence."  *Id.* at 513.

*First*, Plaintiffs at a minimum cannot satisfy the second prong of fraudulent concealment because they have had inquiry notice (if not actual notice) of their claims for more than two years, for the reasons explained above.  "[A]ll that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing."  *131 Maine St. Assocs. v. Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y. 2002) (quoting *Zola v. Gordon*, 685 F. Supp. 354, 367 (S.D.N.Y. 1988)); *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 710 (S.D.N.Y. 2013) ("*LIBOR I*") (plaintiffs did not adequately

10

allege fraudulent concealment in part because they did not "remain unaware of defendants' violation during the limitations period, as they were on notice . . . that they had likely been injured" (alterations and quotation marks in original omitted)).

While Plaintiffs now effectively concede that they were at least on inquiry notice as of January 2018, *see* FAC ¶ 95, Plaintiffs cannot seriously argue that they had no other "reason to suspect" the existence of spoofing more than two years before June 27, 2019: their counsel made similar allegations of spoofing against Bank of America in *Silver* in December 2016, and there was widespread public disclosure of litigation and regulatory investigations involving alleged spoofing in the metals markets at issue here.

*Second*, Plaintiffs also fail to allege with particularity, as required by Rule 9(b), that Defendants concealed the purported CEA violations. *See Butala v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996) (Rule 9(b) applies to claims of fraudulent concealment). Instead, the FAC alleges in conclusory fashion that Defendants engaged in "active acts of concealment" and "inherently self-concealing conduct." FAC ¶¶ 91–93. The only alleged acts of concealment, however, are the placing of orders with no intent of transacting. *See id.* This allegedly "secret" and "surreptitious" conduct, *id.* ¶ 91, involved the submission and cancellation of actual orders on actual exchanges, visible to all market participants, including Plaintiffs. This public trading activity does not support a claim of either active concealment or self-concealment, particularly in the context of widespread public disclosures of potential spoofing in the precious metals markets. The FAC also adds a boilerplate allegation suggesting that Plaintiffs were misled by MLCI's and MSC's "repeated public statements that they maintain established procedures that ensure compliance with all applicable laws and regulations." *Id.* ¶ 95. This does not plead with particularity "how any of the aspects of the defendants' misrepresentations obscured their fraud

11

notwithstanding all the information the plaintiffs concededly possessed." *Butala*, 916 F. Supp. at 320.  Plaintiffs' contention remains particularly implausible considering that their counsel alleged widespread spoofing in the silver futures market in 2016.

> *Finally*, as to the third prong, Plaintiffs cannot demonstrate that any alleged continuing ignorance was not a result of their lack of due diligence.  "Due diligence is not adequately pled if plaintiffs 'did not allege in the [complaint] that they exercised due diligence' or if they 'make no allegation of any specific inquiries of [defendants], [or] detail when such inquiries were made, to whom, regarding what, and with what response.'" *Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 704 (S.D.N.Y. 2019) (quoting *Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 521 (S.D.N.Y. 2009)) (alterations in original).  The FAC's new allegation that Plaintiffs diligently engaged counsel in June 2019 (FAC ¶ 96) merely highlights Plaintiffs complete lack of diligence before then.  As shown above, there were multiple, significant events that alerted the public to allegations of spoofing in the precious metals markets.  Plaintiffs continue to fail to detail what they did in response to this information or otherwise allege that they acted with due diligence.

## B.  Plaintiffs' Unjust Enrichment Claim Is Untimely Because It Is Based on the Same Conduct as the CEA Claim.

Plaintiffs' claim for unjust enrichment also is time barred.  Where an unjust enrichment claim "is merely incidental to or duplicative of another claim with a shorter limitations period," the shorter period will apply rather than New York's six-year statute of limitations.  *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007).  Plaintiffs' unjust enrichment claim is entirely duplicative of their CEA claims because Plaintiffs fail to "articulate [any] theory of unjust conduct independent of the alleged acts of market manipulation underlying the CEA

claims." *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 479 (S.D.N.Y. 2016).[8]

Accordingly, Plaintiffs' unjust enrichment claim is subject to the same two-year statute of

limitations period applicable to Plaintiffs' CEA claims and is similarly time barred.

## II.     The CEA Does Not Provide a Private Right of Action to Pursue "Spoofing" Claims

Plaintiffs cannot manufacture standing by dressing up their spoofing claims as claims for

"manipulation."  The CEA grants only a limited private right of action—one that does not extend

to spoofing violations.  Plaintiffs' focus on Defendants' alleged spoofing as the cause of their

purported injuries demonstrates that their CEA claims are "manipulation" claims in name only

and that, at bottom, Plaintiffs' claims fall squarely within the type of activity that Congress

affirmatively determined would not be subject to a private right of action.  Permitting Plaintiffs

to advance a manipulation claim on the basis of these factual allegations would not only collapse

the legislative distinction between manipulation and spoofing, it would also eviscerate the well-

drawn boundaries that Congress established for the CEA's limited private right of action.

Because the Plaintiffs lack a statutory basis to sue for alleged spoofing, the Court must dismiss

Plaintiffs' CEA claims.

### A.     The CEA's Limited Private Right of Action Does Not Include a Right of Action for Spoofing Violations.

Effective July 16, 2011, Section 747 of the Dodd-Frank Wall Street Reform and

Consumer Protection Act ("Dodd-Frank Act") comprehensively amended the CEA, including by

amending Section 6(c)(1) to prohibit the use or employment of "any manipulative or deceptive

---

[8] Plaintiffs' demand for restitution does not distinguish the unjust enrichment claim for purposes of the statute of limitations analysis.  *Shak*, 156 F. Supp. 3d at 479–80 ("Plaintiffs may not overcome the fundamentally monetary nature of the recovery they seek by recasting it as a bid for restitution and a constructive trust."); *see also Spinale v. Tenzer Greenblatt, LLP*, 765 N.Y.S.2d 786, 786 (1st Dep't 2003) ("Although plaintiffs pleaded causes of action nominally for restitution and unjust enrichment, those causes are based on the same allegations as their [other] causes," and therefore "plaintiffs' causes are governed by the . . . [shorter] limitations period . . . .").

device" and amending Section 4c(a) to prohibit certain "disruptive practices." Pub. L. No. 111-203, § 747, 124 Stat. 1376, 1739 (2010), (codified at 7 U.S.C. § 6c(a)(5)). As relevant here, Section 4c(a)(5)(C) of the CEA makes it unlawful for any person to engage in conduct on a registered entity that is "commonly known to the trade as [] 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)." *Id.* Importantly, while the CEA was amended to include a private right of action for violations of new Section 6(c)(1), Congress did not include a similar amendment to provide a private right of action for disruptive practices violations under Section 4c(a).

The CEA's private right of action is found in Section 22 and contains "the *exclusive remedies*" available to a private person. 7 U.S.C. § 25(a)(2) (emphasis added). By its terms, that private right of action is "limited to four circumstances" that are separate and distinct from disruptive trading practices such as spoofing, *Loginovskaya v. Batratchenko*, 764 F.3d 266, 270 (2d Cir. 2014), including (i) the use or employment of a "manipulative" device, or (ii) a "manipulation" of the price of a futures contract. 7 U.S.C. § 25(a)(1)(D)(i), (ii); *see In re N. Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 308 (S.D.N.Y. 2017) ("[I]t is 'not remarkable' that suits by private plaintiffs may be more limited in scope than actions by the CFTC." (quoting *Loginovskaya*, 764 F.3d at 273)).

"In determining whether Congress has created a private right of action, 'the interpretive inquiry begins with the text and structure of the statute.'" *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 104 (2d Cir. 2019) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288 n.7 (2001)). Section 753 of the Dodd-Frank Act amended the CEA's private right of action only with respect to "manipulation." Dodd-Frank Act § 753(c), 124 Stat. at 1754. Critically, while Congress amended Section 22's private right of action for "manipulative" practices to add

14

a right of action for manipulative devices, it deliberately omitted from the amendment the newly created provision in the Dodd-Frank Act regarding "disruptive" practices, including spoofing, which is the only form of conduct Plaintiffs actually allege in the FAC.

If Congress intended to include a private right of action for the new spoofing prohibition, it would have done so in the Dodd-Frank Act in the same manner that it did for manipulative devices. *Id.* § 753, 124 Stat. at 1750-54. As at least one court has already recognized, the absence of an express grant of a private right of action for spoofing claims under Section 25 must be interpreted to mean the CEA does not create a private right of action for spoofing. *See Braman v. CME Grp., Inc.*, 149 F. Supp. 3d 874, 884–92 (N.D. Ill. 2015).[9] Civil enforcement authority for spoofing therefore rests exclusively with the CFTC, and Plaintiffs are not entitled to sue for spoofing. *See Alexander*, 532 U.S. at 286–87 ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.").

### B.      Spoofing Is Not Covered by the Private Right of Action for Manipulation.

In the absence of an explicit grant of a private right of action for spoofing, Plaintiffs cannot stretch the private right of action for manipulation to encompass spoofing. To do so negates both Congress's intent to limit the CEA's private right of action, *see Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006), and its delineation of manipulation and spoofing as distinct practices in the Dodd-Frank Act.

Congress deliberately bifurcated the CEA's prohibitions on "manipulative" practices, which appear in Section 6 of the CEA (codified at 7 U.S.C. § 9), and the prohibitions on "disruptive" practices (including spoofing), which appear in Section 4 (codified at 7 U.S.C.

---

[9] *See also* Ronald Filler, *Ask the Professor—What Is The Impact Of The Recent Second Circuit Decision In Tower Research Capital On The Global Futures Markets?*, 38 No. 6 Futures & Derivatives L. Rep. NL 2 (2018) ("Section 22(a)(1)(D) of the CEA . . . does not authorize any private rights of actions regarding any 'spoofing' allegation under Section 4c(a)(5) and only applies to any manipulative behavior under Section 6(c)(1) of the CEA.").

§ 6c).  *See also* Dodd-Frank Act §§ 747, 753, 124 Stat. at 1739, 1750 (Congress added the

prohibition on spoofing in Section 747 and amended the prohibition on manipulation in Section

753).  And "[w]here Congress includes particular language in one section of a statute but omits it

in another section of the same Act, it is generally presumed that Congress acts intentionally and

purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23

(1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)); *see, e.g.*,

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 106 (1987) (whereas Congress

"expressly provided for nationwide service of process" in some CEA enforcement provisions,

the absence of any express provision in Section 22 of the CEA confirms that "such authorization

was not its intention").  It is no accident that, in proscribing spoofing in a section of the CEA

separate from the section regarding manipulation, Congress described spoofing as a "disruptive"

trading practice and not a form of manipulation.  7 U.S.C. § 6c(a)(5).  The CEA's text thus

conclusively demonstrates Congress's intent to exclude spoofing from the private right of action

for manipulation.

Likewise, the CFTC has stated that it "interprets the [spoofing] prohibitions in CEA

Section 4c(a)(5) to be distinct statutory provisions from the anti-manipulation provisions in

Section 753 of the Dodd-Frank Act" (Section 6 of the CEA).  *See* Antidisruptive Practices

Authority, 78 Fed. Reg. 31,890, 31,892 (May 28, 2013).  While the statute is clear, if the Court

nevertheless finds it ambiguous, the CFTC's interpretation is entitled to deference.  *See*

*Geldermann, Inc. v. CFTC*, 836 F.2d 310, 315 (7th Cir. 1987) (holding district court erred in

failing to give deference to CFTC's interpretation of the CEA); *see also CFTC v. Schor*,

478 U.S. 833, 844–45 (1986); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 224 (E.D.N.Y. 2018).

The alleged spoofing described in the FAC—defined by the CEA to be merely a "disruptive"

16

practice—is simply not a "manipulative device" or "manipulation" subject to the CEA's private right of action and thus cannot form the basis for a private lawsuit.

### C.     Plaintiffs' CEA Claims Are Based on Spoofing, Not Manipulation.

Plaintiffs cannot escape dismissal by recasting a claim premised on alleged spoofing as a claim for market manipulation. *See, e.g.*, *Platinum & Palladium*, 2017 WL 1169626, at \*35 (rejecting attempt to "shoehorn" CEA market manipulation claims into false report claims); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at \*23–24 (S.D.N.Y. Sept. 20, 2016) (same).  All of the factual allegations in the FAC relate to spoofing episodes, and Plaintiffs fail to allege any other manipulative conduct. *See, e.g.*, FAC ¶¶ 10–17 ("Defendants spoofed the market for Precious Metals Futures Contracts thousands of times throughout the Class Period, including on days that [Plaintiffs] traded.").  Each of Plaintiffs' twenty-eight alleged episodes of so-called manipulation is based on an assertion that Pacilio or Bases "manipulated the market . . . ***by placing [a number of] spoof orders***." *Id.* ¶¶ 47, 48, 50, 52–53, 56–57, 60–61, 65, 69, 75, 77, 80, 81 tbl. (emphasis added).  The FAC devotes a section to explaining spoofing, including figures depicting hypothetical order books to explain how spoofing "signals artificial supply to market participants and leads to artificial, downward [or upward] price pressure." *Id.* ¶¶ 40–43 & figs. 2a & 2b.  The words "spoof" or "spoofing" appear 127 times and in half of the FAC's paragraphs.

All of the injuries Plaintiffs allege are "[a]s a result of Defendants' spoofing" and no other manipulative activity, technique, or conduct. *Id.* ¶¶ 49, 51, 54–55, 58–59, 62–64, 66–68, 70–74, 76, 78–79, 82.  For each aforementioned episode, Plaintiffs argue that "Defendants' spoofing caused [Plaintiffs] to earn less profits or suffer greater losses in [their] trading of precious metals futures contracts during the Class Period." *Id.*

Plaintiffs' threadbare allegations of "other manipulative trading activities" do not save their CEA claims.  *Id.* ¶¶ 102, 104–05, 110, 119.  They do not identify or plausibly allege any such other activities.  *See Platinum & Palladium*, 2017 WL 1169626, at *35 (rejecting a false reports claim where "[b]eyond a recitation of the statutory language, the SAC's 136 pages . . . contain no other reference to or illustration of any false reports associated with Defendants' conduct").  Despite vague references to "other manipulative trading activities," "other manipulative techniques," and "other manipulative conduct" in the boilerplate recitation of their legal theories, Plaintiffs do not specify or describe any such manipulative device, technique, or conduct.  *Id.* ¶¶ 102, 104–05, 110, 119.  Plaintiffs have alleged a spoofing case, not a manipulation case.

As shown above, the text and structure of the CEA demonstrate that Congress did not intend to extend the CEA's limited private right of action to spoofing claims.  Congress has demonstrated its intent to treat spoofing and manipulation separately and differently; Plaintiffs cannot circumvent that intent through creative pleading in the context of this "Spoofing Litigation" (as Plaintiffs themselves describe it in the caption of the FAC).  The Court should therefore dismiss Plaintiffs' CEA claims.

## III.    Plaintiffs Fail to Adequately Allege Actual Damages

Plaintiffs' CEA claims also fail because they fail to adequately plead actual damages—a necessary element of their claim.  In order to state a manipulation claim under the CEA, Plaintiffs must allege "actual damages resulting from" the alleged manipulation.  *In re Amaranth Nat. Gas. Commodities Litig.*, 269 F.R.D. 366, 378 (S.D.N.Y. 2010) (quoting 7 U.S.C. § 25(a)(1)(D)).  This actual damages requirement is often referred to as "CEA standing."  *See In re LIBOR-based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) ("*LIBOR II*").  "Although described as an aspect of standing, CEA standing is actually an

element of the substantive cause of action." *Silver II*, 332 F. Supp. 3d at 921 (citing *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 112 (2d Cir. 2018)).

As the Second Circuit held in *Total Gas*, "[p]laintiffs can only recover in a civil action if they can establish that they themselves have been harmed by Defendants' activities." 889 F.3d at 110. "For one trader to have injured another, the former must have taken an action that had an impact on the latter's position and that impact must have been negative." *Id.* at 112. Accordingly, to successfully plead a manipulation claim a plaintiff "must plausibly allege (1) that she transacted in at least one commodity contract at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations, and (2) that the manipulated prices were to the plaintiff's detriment." *Id.* (citing 7 U.S.C. § 25(a)(1)(D)).

The FAC fails to plausibly allege that Plaintiffs bought at a price that was higher or sold at a price that was lower than it should have been due to Defendants' conduct.[10] Like the *Silver* TAC, the FAC "alleges essentially no connection between Defendants' manipulative conduct and trades by the Plaintiffs." *Silver II*, 332 F. Supp. 3d at 922. Applying *Total Gas*, Judge Caproni recognized that "episodic manipulation does not warp market forces continuously throughout the class period or in a predictable manner." *Id.* at 922. This lack of "persistent impact on market prices" is particularly true "in a highly liquid, broad market," such as precious metals. *Id.* at 907. Moreover, "[b]ecause episodic manipulation—unlike persistent suppression—may move the market in either direction, it is not always clear that every trader who was affected by the manipulation was harmed." *Id.* at 923; *see also, e.g.*, *LIBOR II*, 962 F.

---

[10] As the Second Circuit explained, the most direct way to establish such damages is for a plaintiff to identify a "specific manipulated transaction or set of transactions between a plaintiff and a defendant with the plaintiff on the (net) losing end and the defendant on the (net) winning end. In such direct transactions, the effect of a defendant's alleged actions and its detriment to a plaintiff are inextricably tied together." *Total Gas*, 889 F.3d at 112. Plaintiffs do not allege that they transacted directly with any of the Defendants.

Supp. 2d at 622 (where defendant engaged in "isolated (though repeated) manipulative activity," plaintiffs must allege that they "engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged trader-based manipulative conduct, and that the artificiality was *adverse to their position*" (emphasis added)).  The FAC thus should be dismissed for the same reasons that Judge Caproni found similar allegations in *Silver* to be lacking.

Plaintiffs attempt to avoid the same fate as the *Silver* and *LIBOR* plaintiffs by alleging that they traded on some of the same days that they allege spoofing conduct occurred.  *See, e.g.*, FAC ¶ 54.  This attempt fails for at least three reasons.

*First*, in order to plausibly allege damages, Plaintiffs need to demonstrate how the volume of alleged spoofing activity could have impacted the market such that their trades were adversely affected.  *Silver II*, 332 F. Supp. 3d at 923 ("Where, as in this case, plaintiffs do not plausibly allege a predictable and persistent market impact from manipulation, relatively more detailed allegations are required."); *see also Total Gas*, 889 F.3d at 114 (rejecting sufficiency of pleading because of "[t]he enormous disparity between the number of contracts Defendants purchased in order to successfully manipulate one or two regional markets and the number of contracts they would have had to purchase to make a dent [in a much larger market] render it implausible that trading at the former distorted trading at the latter").  As Judge Caproni reasoned, "manipulation in highly liquid markets (like the silver markets, *see* TAC ¶ 125), is likely to be less than the impact of manipulation in less liquid or illiquid markets."  *Silver II*, 332 F. Supp. 3d at 923.  Given the highly liquid precious metals markets in which Plaintiffs traded, with tens of thousands of futures contracts traded daily, Plaintiffs fail to "plausibly allege" how the handful of alleged spoofing trades over the alleged class period could have impacted their

trades.  *Compare* CME Group 2014 Annual Report at 49, http://www.annualreports.com/Hosted

Data/AnnualReportArchive/c/NASDAQ_CME_2014.PDF (explaining that average daily volume

in gold contracts from 2012 through 2014 ranged from 196,000 to 232,000 contracts traded per

day, and for silver contracts 60,000 to 66,000 contracts traded per day), *with* FAC ¶¶ 61 (alleging

40 gold contracts purchased through 4 spoofing orders), 77 (alleging spoof orders resulting in

sale of 100 silver futures contracts).[11]

  *Second*, Plaintiffs still do not allege that they traded at the time of or immediately after

the alleged spoofing on the days they traded, which is the only time the alleged spoofing could

conceivably have affected prices.  *See* FAC ¶¶ 49, 51, 54–55, 58–59, 62–64, 66–68, 70–74, 76,

78–79, 82.[12]  Defendants raised this point in their previous motion to dismiss, and Plaintiffs

surely have at their disposal data on ***their own trades*** showing what time they traded, which they

can compare with the timing of the alleged spoofing behavior that filings in the criminal

proceedings detail down to the precise ***millisecond***.[13]  Plaintiffs' failure to allege the time of day

that their trades or the alleged spoofing occurred and the duration of any impact that the spoofing

had on the market is inexcusable and makes it impossible to draw a direct connection between

any manipulative conduct and any damages purportedly suffered.  As Judge Caproni explained in

*Silver*, plaintiffs need to provide factual allegations "on the expected impact of particular

manipulative tactics on the market," and merely listing dates upon which plaintiffs traded and

---

[11] This Court can take judicial notice of market data when deciding a motion to dismiss, as this is information that can "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *TCA Television Corp. v. McCollum*, 151 F. Supp. 3d 419, 425 (S.D.N.Y. 2015).

[12] Plaintiffs do not allege that they engaged in *any* trades on nineteen of the twenty-eight days when they allege spoofing.  *See* FAC ¶¶ 47–82.

[13] For example, the table of alleged spoofing transactions contained in the FAC at paragraph 81 appears to be taken directly from filings in the criminal proceedings, but with the transaction times omitted.  Second Superseding Indictment ¶¶ 22 tbl., 24 tbl., *United States v. Bases*, No. 18 Cr. 48 (N.D. Ill. Filed on Feb. 27, 2020), ECF No. 244. Although Defendants do not concede the truth of any allegations in the criminal proceedings, to the extent Plaintiffs rely on such pleadings they cannot ignore the allegations that directly undermine their claims.

asserting that they may have suffered the impact of manipulative conduct is not sufficient to establish that plaintiffs "must have been injured."  *Silver II*, 332 F. Supp. 3d at 923 & n.34.  Any trade that took place earlier in the day than the alleged spoofing could not have been impacted by the spoofing.  And even if Plaintiffs had alleged that they traded *after* the time of the alleged spoofing—which they have not—they would have to allege facts demonstrating that any effect of the spoofing persisted at the time they traded.  Plaintiffs have not come close to meeting this requirement, especially since "strategies like 'spoofing' . . . depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief."  *Id.* at 923.[14]

    *Third*, even if Plaintiffs had alleged that they transacted at a time when the market was affected by the alleged manipulation, they have not alleged facts demonstrating that any manipulation harmed—rather than benefitted—them.  "[E]ven assuming manipulation occurred during periods in which [plaintiff] transacted, without any details of his transactions it is just as likely he was a beneficiary of defendants' misconduct—substantially reducing the already questionable likelihood of harm from manipulation on the dates of [plaintiff's] transactions."  *See Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 571 (S.D.N.Y. 2017).  Here, as in *Sonterra* and *Silver*, Plaintiffs allege "episodic acts of manipulation in varying directions," and fail to allege how these manipulative acts harmed their trading positions.  *See id.*; *Total Gas*, 889 F.3d at 115 (rejecting sufficiency of pleading when plaintiffs'

---

[14] Plaintiffs' FAC asserts that the alleged spoofed orders were only available to the market for seconds but that those orders nonetheless caused an artificial price level.  If the futures market is liquid enough to react to a "spoofed" order within seconds (as Plaintiffs allege), then it stands to reason that any artificial price level caused by the spoofed orders would similarly disappear within seconds as well.  Thus, Plaintiffs need to do far more than allege that they traded on the same *day* as an alleged spoofed order and instead should be required to plead (i) how the alleged spoof order moved the market, (ii) that they traded within the time that the spoofed order was available or within a very short time of its withdrawal, and (iii) that they traded in a direction that was harmed by the alleged spoof order.

multidirectional trading allegations "provides just as much support for the proposition that they were *benefited* by [defendant's] trading as for the proposition that they were *harmed* by it"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014) ("*LIBOR III*") ("Moreover, because the manipulation was allegedly varying in direction, there may be some days when plaintiffs were actually *helped*, rather than harmed, by the alleged artificiality, depending on their position in the market.").

In short, "the series of inferences" that Plaintiffs ask this Court to draw to connect the alleged price "artificiality [caused by any alleged spoofing] to actual damage suffered by Plaintiffs" are "collectively implausible." *Silver II*, 332 F. Supp. 3d at 925.  The Court would have to infer that "the artificiality caused by these spoofs altered market prices for an unspecified period of time" on the days that trading occurred, that there was "a connection between the artificiality-of-unknown-duration and a specific trade by Plaintiffs," and that "this artificiality moved the market *against* Plaintiffs' position." *Id.*  Plaintiffs utterly fail to allege these connections, and the Court cannot simply speculate about their alleged injury.  *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").  For the same reasons the Court in *Silver* refused to permit that level of speculation there, this Court should dismiss the CEA claims for failure to allege actual damages.

## IV.   Plaintiffs Fail to Plead CEA Manipulative Device Claims For Conduct that Occurred Before August 15, 2011

Plaintiffs purport to bring manipulative device claims under CEA Section 6(c)(1), 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a).  *See* FAC ¶¶ 109–14.  Even if this Court were inclined to permit Plaintiffs' nonviable case to proceed, any manipulative device claims premised on conduct that occurred prior to August 15, 2011 must be dismissed because the

relevant statute and rule were not in effect before that time.  *See In re London Silver Fixing, Ltd. Antitrust Litig.*, 213 F. Supp. 3d 530,  569–70 (S.D.N.Y. 2016) ("*Silver I*") ("[B]ecause Rule 180.1 did not become effective until August 15, 2011, Plaintiffs' manipulative device claim based on pre-August 15, 2011 conduct must be dismissed."); *In re Barclays PLC, Barclays Bank PLC, & Barclays Capital Inc.*, CFTC No. 15-25, 2015 WL 2445060, at *14 (May 20, 2015) (differentiating between conduct occurring pre- and post-August 15, 2011 for purposes of Regulation 180.1).  Plaintiffs define the class period as January 1, 2007 through December 31, 2014, FAC ¶ 1, and allege fourteen different instances prior to August 15, 2011 in which Defendants supposedly engaged in spoofing in violation of CEA Section 6(c)(1) and CFTC Regulation 180.1(a), *see id.* ¶¶ 47–55; 81.  These manipulative device claims (and any others based on alleged trades before August 15, 2011) must be dismissed.

## V.    Plaintiffs Fail to State a Claim for Unjust Enrichment

"In order to succeed on a claim for unjust enrichment under New York law, a plaintiff must prove that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (internal quotation marks omitted).  The first two prongs require a nexus among the parties or "proof that the defendant 'received a specific and direct benefit from the property sought to be recovered, rather than an indirect benefit.'"  *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 500 (S.D.N.Y. 2017) ("*IRS*") (quoting *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 676 (S.D.N.Y. 2016)); *see Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).  Courts in this District consistently dismiss claims for unjust enrichment premised on market manipulation where the plaintiff fails to allege that they had any direct dealings with the defendants.  *See, e.g.*, *IRS*, 261 F. Supp. 3d at 501; *Myun-Uk Choi v. Tower Research Capital LLC*, 165 F. Supp. 3d 42,

51 (S.D.N.Y. 2016) (dismissing unjust enrichment claim where "Plaintiffs have failed to allege any direct dealing or actual, substantive relationship with the Defendants").  This Court should dismiss here because Plaintiffs have not met that requirement, as they have not alleged that they transacted or otherwise interacted with any Defendant.

"[B]ecause Plaintiffs do not allege that they transacted directly with Defendants, they have not adequately pleaded that Defendants were enriched at their expense."  *Platinum & Palladium*, 2017 WL 1169626, at *38.  Plaintiffs' conclusory allegation that "artificial prices" "caused Plaintiff[s] . . . to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period," FAC ¶¶ 10–17, or that "Defendants intended to, and did, artificially alter prices in a direction that benefited their trades and positions, at the expense of Plaintiffs and the Class," *id.* ¶ 119, are inadequate to allege with particularity that Defendants "received something of value which belongs to the plaintiff."  *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 260 (S.D.N.Y. 2012) (citation omitted).  Accordingly, the Plaintiffs' unjust enrichment claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be granted and the FAC should be dismissed with prejudice.

Dated:  New York, New York
      May 8, 2020

s/ Adam S. Hakki
Adam S. Hakki
Richard F. Schwed
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022
Telephone:  (212) 848-4000
Facsimile:  (646) 848-4000
Email:  ahakki@shearman.com
      rschwed@shearman.com

*Attorneys for Defendants Merrill Lynch Commodities, Inc. and Bank of America Corporation*

Respectfully submitted,

/s/ Scott D. Musoff (on consent)[15]
Scott D. Musoff
Emma S. Gardner
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001-8602
Telephone:  (212) 735-3000
Facsimile:  (917) 735-2000
Email:  scott.musoff@skadden.com
      emma.gardner@skadden.com

Jonathan L. Marcus (admitted *pro hac vice*)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:  (202) 371-7596
Facsimile:  (202) 661-0596
Email:  jonathan.marcus@skadden.com

*Attorneys for Defendant Morgan Stanley & Co. LLC*

---

[15] Electronic signatures are provided with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

26