**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MERRILL, BOFA, AND MORGAN STANLEY SPOOFING LITIGATION | Master Docket No. 19-CV-6002 (LJL) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS THE
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**................................................................................................ii

**INTRODUCTION** ............................................................................................................1

**FACTUAL BACKGROUND**...........................................................................................3

**ARGUMENT** ...................................................................................................................5

***PART I: THE BANK DEFENDANTS' ARGUMENTS***.....................................................5

I.      The CEA Provides a Private Right of Action for Defendants' Manipulation. ...........5

II.     All of Plaintiffs' Claims Are Timely. .......................................................................12

        A.     Plaintiffs Were Not on Inquiry Notice Prior to January 25, 2018..................13

        B.     Plaintiffs' Claims Were Tolled by the Fraudulent Concealment Doctrine......16

III.    Plaintiffs Plausibly Allege That They Suffered Actual Damages Under The CEA. ...18

IV.     The Complaint States a Plausible Claim for Unjust Enrichment...............................23

***PART II: THE INDIVIDUAL DEFENDANTS' AND MORGAN STANLEY'S***
***ARGUMENTS***.................................................................................................................25

V.      Standards of Review..................................................................................................25

VI.     Plaintiffs Successfully State a Claim for Price Manipulation....................................26

        A.     The Complaint Adequately Pleads That Defendants Possessed the Ability to Influence
               Market Prices ...............................................................................................27

        B.     The Complaint Adequately Alleges Precious Metals Futures Prices Were
               "Artificial."…...............................................................................................28

        C.     The Complaint Adequately Pleads that Defendants "Caused" Price Artificiality........29

        D.     The Complaint Adequately Pleads that Defendants Specifically Intended to Influence
               Market Prices. ..............................................................................................30

        E.     Plaintiffs Adequately Allege Principal-Agent Liability. ...............................32

        F.     Plaintiffs Plausibly Allege a CEA Manipulative Device Claim.......................32

**CONCLUSION**...............................................................................................................33

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.,*
  175 F. Supp. 3d 44 (S.D.N.Y. 2016) ................................................................. 17, 21

*In re Alcatel Sec. Litig.,*
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) ..................................................................13

*In re Amaranth Nat. Gas Commodities Litig.,*
  587 F. Supp. 2d 513 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013)...........................31

*In re Amaranth Nat. Gas Commodities Litig.,*
  269 F.R.D. 366 (S.D.N.Y. 2010)..........................................................................23

*In re Amaranth Nat. Gas Commodities Litig.,*
  730 F.3d 170 (2d Cir. 2013)............................................................................ 8, 26

*Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.,* No. 18 CIV. 10364 (LGS),
  2020 WL 2765693 (S.D.N.Y. May 28, 2020) ................................................................14

*Anderson News LLC v. Am. Media Inc.,*
  680 F.3d 162 (2d Cir. 2012)............................................................................27

*Bd. of Trade of City of Chicago v. Olsen,*
  262 U.S. 1 (1923).......................................................................................8

*Braman v. The CME Grp., Inc.,*
  149 F. Supp. 3d 874 (N.D. Ill. 2015)..................................................................10

*Brewer v. Hashim,*
  738 F. App'x 34 (2d Cir. 2018) .......................................................................12

*Cange v. Stotler & Co.,*
  826 F.2d 581 (7th Cir. 1987) ..........................................................................7

*Cargill, Inc. v. Hardin,*
  452 F.2d 1154 (8th Cir. 1971) ....................................................................... 8, 9

*CFTC v. Amaranth Advisors, L.L.C.,*
  554 F. Supp. 2d 523 (S.D.N.Y. 2008) ...................................................................31

*CFTC v. Oystacher,*
  203 F. Supp. 3d 934 (N.D. Ill. 2016)...................................................................6

*CFTC v. Parnon Energy Inc.,*
875 F. Supp. 2d 233 (S.D.N.Y. 2012) .................................................25, 28, 29

*CFTC v. Wilson,*
27 F. Supp. 3d 517 (S.D.N.Y. 2014) ........................................................ 25, 29

*In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*
213 F. Supp. 3d 631 (S.D.N.Y. 2016) ...............................................................*passim*

*In re Commodity Exch., Inc., Silver Futures and Options Trading Litig.,*
No. 11 MD 2213 RPP, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ................................29

*CP Stone Fort Holdings, LLC v. Doe(s),*
No. 16 C 4991, 2017 WL 1093166 (N.D. Ill. Mar. 22, 2017) ....................................6

*In re Crude Oil Commodity Futures Litig.,*
No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) .........................25

*In re Crude Oil Commodity Futures Litig.,*
913 F. Supp. 2d 41 (S.D.N.Y. 2012) .................................................12, 18, 21

*Cruden v. Bank of New York,*
957 F.2d 961 (2d Cir. 1992) ..............................................................12

*Dennis v. JPMorgan Chase & Co.,*
343 F. Supp. 3d 122 (S.D.N.Y. 2018),
*adhered to on denial of reconsideration,*
No. 16-CV-6496 (LAK), 2018 WL 6985207 (S.D.N.Y. Dec. 20, 2018) ................................12, 21, 30

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
No. 13 CIV. 7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ....................11, 21, 28

*Frey v. CFTC,*
931 F.2d 1171 (7th Cir. 1991) ..............................................................8

*In re GSE Bonds Antitrust Litig.,*
396 F. Supp. 3d 354 (S.D.N.Y. 2019) ....................................................13

*Harry v. Total Gas & Power N. Am., Inc.,*
889 F.3d 104 (2d Cir. 2018) ...............................................................*passim*

*Hershey v. Energy Transfer Partners, L.P.,*
610 F.3d 239 (5th Cir. 2010) ..............................................................8

*Hinds Cty., Miss. v. Wachovia Bank N.A.,*
885 F. Supp. 2d 617 (S.D.N.Y. 2012) ....................................................13

*In re Interest Rate Swaps Antitrust Litig.,*
261 F. Supp. 3d 430 (S.D.N.Y. 2017) ...................................................24, 25

*In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*,
 No. 00 CIV. 7804 (LMM), 2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) ............................................17

*Laydon v. Mizuho Bank, Ltd.*,
 No. 12-cv-3419 (GBD), 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ...................................7, 30, 31

*Leist v. Simplot*,
 638 F.2d 283 (2d Cir. 1980),
 *aff'd sub nom., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ...................6, 7

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 935 F. Supp. 2d 666 (S.D.N.Y. 2013),
 *vacated and remanded on other grounds sub nom.*
 *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ..............................................26, 28

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
 213 F. Supp. 3d 530 (S.D.N.Y. 2016) .....................................................................*passim*

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
 332 F. Supp. 3d 885 (S.D.N.Y. 2018) .....................................................................*passim*

*Myun-Uk Choi v. Tower Research Capital LLC*,
 165 F. Supp. 3d 42 (S.D.N.Y. 2016) ................................................................24, 25, 26

*Myun-Uk Choi v. Tower Research Capital LLC*,
 890 F.3d 60 (2d Cir. 2018) ...........................................................................23, 24, 25

*In re Nat. Gas Commodity Litig.*,
 337 F. Supp. 2d 498 (S.D.N.Y. 2004) ...................................................................10, 16

*In re Nat. Gas Commodity Litig.*,
 358 F. Supp. 2d 336 (S.D.N.Y. 2005) .......................................................................28

*New York v. Hendrickson Bros., Inc.*,
 840 F.2d 1065 (2d Cir. 1988).............................................................................16

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
 432 F. Supp. 3d 131 (D. Conn. 2019).......................................................................14

*In re Platinum & Palladium Antitrust Litig.*,
 No. 1:14-CV-9391-GHW, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017),
 *on reconsideration*, No. 1:14-CV-9391-GHW, 2020 WL 1503538 (S.D.N.Y. Mar. 29, 2020) .........6, 11

*In re Platinum & Palladium Commodities Litig.*,
 No. 10 Civ. 3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014)..........................................27

*Ploss v. Kraft Foods Grp., Inc.*,
 197 F. Supp. 3d 1037 (N.D. Ill. 2016) .....................................................................32

*Prime Int'l Trading, Ltd. v. BP P.L.C.,*
  937 F.3d 94 (2d Cir. 2019), *cert. denied sub nom.*
  *Atl. Trading USA, LLC v. BP P.L.C.,* No. 19-1141, 2020 WL 3146710 (U.S. June 15, 2020) ...........6

*SEC v. Lek Sec. Corp.,*
  276 F. Supp. 3d 49 (S.D.N.Y. 2017) .................................................................................6

*SEC v. Wyly,*
  788 F. Supp. 2d 92 (S.D.N.Y. 2011) ...............................................................................17

*Shak v. JPMorgan Chase & Co.,*
  156 F. Supp. 3d 462 (S.D.N.Y. 2016) .............................................................................13

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG,*
  277 F. Supp. 3d 521 (S.D.N.Y. 2017) .......................................................................*passim*

*In re Soybean Futures Litig.,*
  892 F. Supp. 1025 (N.D. Ill. 1995) ..................................................................................7

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
  547 F.3d 406 (2d Cir. 2008)............................................................................................14

*Sullivan v. Barclays PLC,*
  No. 13-CV-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)...........................*passim*

*In re Sumitomo Copper Litig.,*
  182 F.R.D. 85 (S.D.N.Y. 1998)................................................................................. 8, 29

*United States v. Ghavami,*
  2012 WL 2878126 (S.D.N.Y. July 13, 2012),
  *aff'd sub nom. United States v. Heinz,* 790 F.3d 365 (2d Cir. 2015),
  *cert. denied sub nom. Heinz v. United States,* 136 S. Ct. 801 (2016) ...........................31

*United States v. Rubin/Chambers, Dunhill Ins. Servs.,*
  831 F. Supp. 2d 779 (S.D.N.Y. 2011) .............................................................................31

*Volkart Bros. Inc., v. Freeman,*
  311 F.2d 52 (5th Cir. 1962) ..............................................................................................8

**Statutes**

7 U.S.C. § 5 ..................................................................................................................7

7 U.S.C. §6c(a)(5)(C)....................................................................................................9

7 U.S.C. § 25(a)(1)(D)...................................................................................................5

**Regulations**

Antidisruptive Practices Authority,
    78 Fed. Reg. 31,890 (May 28, 2013) ..............................................................................9

**Other Authorities**

Conference Report to 1974 amendments,
    120 Cong. Rec. 34997 (Oct. 10, 1974) ........................................................................6

H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1,
    *reprinted* in 1982 U.S. Code Cong. & Admin. News 3871, 3905-06. ......................7

*In re Anthony J. DiPlacido,*
    CFTC No. 01-23, 2008 WL 4831204 (CFTC November 5, 2008) ......................31

Jerry W. Markham, Manipulation of Commodity Futures Prices—The Unprosecutable Crime,
    8 Yale J. On Reg. 281 (1991) ......................................................................................8

## INTRODUCTION

Defendants found themselves cornered when they were served with the First Amended Complaint. Defendants Merrill Lynch Commodities, Inc. ("Merrill Lynch") and its corporate parent Bank of America Corporation ("Bank of America") had already *admitted* to the Department of Justice (DOJ) and the Commodity Futures Trading Commission (CFTC) that their former employees Defendants Edward Bases ("Bases") and John Pacilio ("Pacilio") (together, the "Individual Defendants") engaged in thousands of acts of market manipulation, designed to create artificial prices and illegitimately increase the banks' trading profits at the expense of other investors in the market. With no way of denying that the conduct took place (and they make no attempt to do so), Defendants, including Pacilio's additional former employer, Morgan Stanley & Co. LLC ("Morgan Stanley"), instead resort to Hail Mary legal arguments that do not withstand scrutiny.

*First*, there is unquestionably a private right of action under the Commodity Exchange Act ("CEA") Section 22 for the alleged market manipulation, period. Congress placed no limits on the types of conduct that can constitute manipulation, consistent with its remedial purpose in enacting the CEA. Defendants' attempt to carve out spoofing from the scope of privately actionable acts of commodity manipulation has no basis in any law and should be dismissed out of hand.

*Second*, Plaintiffs' claims are timely. Plaintiffs brought suit promptly after the criminal complaint against Bases and Pacilio was unsealed, comfortably within the CEA's two-year statute of limitations. Defendants argue that Plaintiffs should have been placed on inquiry notice prior to the unsealing of the criminal complaints by virtue of other, unrelated precious metals litigations and news reports saying nothing about the specific Defendants or conduct at issue here. None of their contrived theories comes anywhere close to satisfying the high standard for dismissing a complaint on statute of limitations grounds at the pleading stage.

*Third*, Defendants concoct a new, heightened pleading standard for CEA "actual damages," found nowhere in the law. Plaintiffs have provided detailed allegations of their trades in the same precious metals futures contracts on the same exchange and the same days as Defendants' admitted manipulation. Yet Defendants somehow also expect Plaintiffs—without the benefit of any discovery—to prove their losses. The Second Circuit has made perfectly clear that Plaintiffs are not required to do so. *See Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 113 n.4 (2d Cir. 2018) (unlike the securities laws, the CEA does not "impose a loss causation requirement, which would mandate demonstrating losses in specific trades.").

These three arguments make up the bulk of the Bank Defendants' (Merrill Lynch, Bank of America, and Morgan Stanley) joint motion to dismiss. The Individual Defendants and Morgan Stanley offer a few additional arguments, apparently taking comfort in the fact that they did not actually sign the admissions made by Merrill Lynch and Bank of America. Their sense of security is misplaced, given that Merrill Lynch and Bank of America specifically identified Bases and Pacilio in their admissions, and that Pacilio engaged in precisely the same unlawful conduct at Morgan Stanley as at Merrill Lynch. Their arguments that Plaintiffs have somehow failed to plausibly allege the elements of a CEA manipulation or manipulative device claim, or principal-agent liability, fall flat. Indeed, Merrill Lynch and Bank of America effectively concede as much by not joining these arguments.

Plaintiffs' First Amended Complaint goes far beyond what is required at the pleading stage, making allegations that not only meet each element of their claims, but are supported by criminal and regulatory admissions. The Defendants' motions to dismiss should be denied in full.

## FACTUAL BACKGROUND

"Spoofing" is a manipulative device in which traders place orders for precious metals futures contracts that they never intend to execute – and, in fact, cancel before execution – in order to send false and illegitimate supply and demand signals to the market that move futures contract prices in a desired direction vis-à-vis another order the spoofer intends to execute. Meanwhile, all the other investors who transact in the market based on the false signal created by the spoof order trade at artificial prices. Compl. ¶¶ 40, 42, 45, ECF No. 51. The goal of Defendants' scheme was simple – to illegitimately financially benefit Defendants' trading positions at the expense of investors who unknowingly traded in an artificial market created by Defendants. *See* Compl., *passim.*

Plaintiffs bring this market manipulation case against Defendants for their unlawful and intentional manipulation of precious metals futures contracts in violation of the CEA and common law.[1] Plaintiffs are traders who "transacted in thousands of precious metals futures contracts" from "approximately January 1, 2007 through December 31, 2014 (the 'Class Period')." Compl. ¶¶ 1, 5, 10-17.

On January 25, 2018, the DOJ charged the Individual Defendants with violations of the commodities fraud laws for unlawful conduct while they were employed by Merrill Lynch and Morgan Stanley, respectively. *See United States v. Bases and Pacilio*, 18-CR-48, ECF No. 1 (N.D. Ill January 25, 2018).[2] On June 25, 2019, Merrill Lynch entered into a non-prosecution agreement

---

[1]  "Precious metals futures contracts" collectively refers to "COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum Futures, and NYMEX Palladium Futures contracts, and options on those futures contracts." Compl. ¶ 1.

[2]  The January 25, 2018 Criminal Complaint charged Bases with commodities fraud and spoofing, and charged Pacilio with commodities fraud. ECF No. 1. Then, on July 17, 2018, an indictment charged Bases with (1) conspiracy to commit wire fraud affecting a financial institution and commodities fraud and (2) commodities fraud; while charging Pacilio with (1) conspiracy to commit wire fraud affecting a financial institution and commodities fraud; (2) commodities fraud; and (3) spoofing. ECF No. 66.

("NPA") and agreed to pay a combined $25 million in criminal fines, restitution and forfeiture of trading profits.[3] Under the terms of the NPA, Merrill Lynch and Bank of America agreed to cooperate with the government's ongoing investigation of the Individual Defendants and to report to the DOJ evidence or allegations of violations of the wire fraud statute, securities and commodities fraud statutes, and anti-spoofing provisions of the CEA in Bank of America's Global Markets' Commodities Business, whose function is to conduct wholesale, principal trading and sales of commodities. Merrill Lynch and Bank of America also agreed to enhance their existing compliance program and internal controls, where necessary and appropriate, to ensure they are designed to detect and deter, among other things, manipulative conduct in Bank of America's Global Markets' Commodities Business. *See NPA*, Attachment A at 7, U.S. Dep't Of Just. (June 25, 2019), https://www.justice.gov/opa/press-release/file/1177296/download.

According to their admissions, beginning by at least 2008 and continuing through 2014, precious metals traders employed by Merrill Lynch, including Bases and Pacilio, schemed to deceive other market participants by injecting materially false and misleading information into the precious metals futures market. They did so by placing fraudulent orders for precious metals futures contracts that, at the time the traders placed the orders, they intended to cancel before execution. In doing so, the traders intended to "spoof" or manipulate the market by creating the false impression of increased supply or demand and, in turn, to fraudulently induce other market participants to buy and to sell futures contracts at quantities, prices and times that they otherwise likely would not have. Over the relevant period, the traders placed thousands of fraudulent orders. *Id.*

One representative example of such market manipulation occurred on February 11, 2011, when Pacilio placed approximately three spoof orders to sell approximately 550 COMEX silver

---

[3] On the same day, the CFTC announced a separate settlement with Merrill Lynch in connection with related, parallel proceedings. Compl. ¶ 4.

futures contracts at an approximate price of $29.975, with an approximate total value of $82,431,250, in order to artificially move prices and facilitate the execution of another Merrill trader's order. Pacilio admitted his scheme to manipulate the market in a "chat" conversation with other Merrill Lynch traders, including Bases. *See* Indictment ¶¶ 15-17, *United States v. Bases and Pacilio*, 18-CR-48, ECF No. 66 (N.D. Ill July 17, 2018); Bases & Pacilio Criminal Compl. ¶ 21, *United States v. Bases and Pacilio*, 18-CR-48, ECF No. 1 (N.D. Ill Jan. 25, 2018) (Bases "chat" transcript); Compl. ¶ 50 (Pacilio's intent was to "push[]" the market through the trading activity," and he informed other traders involved in the scheme that they did not have to "spoof" the market, because Pacilio had already placed "fraudulent trades."). On that same day, Plaintiff Michael Patterson traded the exact same futures contract on the same exchange at prices made artificial by Pacilio's spoofing and was thereby injured. Compl. ¶ 51.

**ARGUMENT**

***PART I: THE BANK DEFENDANTS' ARGUMENTS***

## I.   The CEA Provides a Private Right of Action for Defendants' Manipulation.

Defendants urge the Court to dismiss Plaintiffs' claims for lack of statutory standing (Bank Defs.' Br. 13-18), based on a novel argument that simultaneously contorts Plaintiffs' complaint, rewrites the CEA in a manner utterly inconsistent with Congress' intent in originally enacting and later enhancing the CEA's market manipulation protections, and ignores decades of caselaw clearly demonstrating that Plaintiffs' manipulation claims based on Defendants' spoofing and other misconduct fit squarely within the private right of action conferred by Section 22 of the CEA.

Section 22, in relevant part, provides a private right of action for any person "who purchased or sold a [futures contract]" against any person who violates the CEA, "if the violation constitutes…the use or employment of…any manipulative device or contrivance…or a manipulation of the price of any such contract…." 7 U.S.C. § 25(a)(1)(D).

Courts and the CFTC have regularly characterized spoofing as a "manipulative trading pattern[]" and the courts have permitted civil actions by private litigants alleging market manipulation predicated on allegations of spoofing to proceed. *See CFTC v. Oystacher*, 203 F. Supp. 3d 934, 941 (N.D. Ill. 2016); *CP Stone Fort Holdings, LLC v. Doe(s)*, No. 16 C 4991, 2017 WL 1093166, at *3-4 (N.D. Ill. Mar. 22, 2017) (finding spoofing to be a scheme to manipulate the market); *In re Platinum & Palladium Antitrust Litig.*, No. 1:14-CV-9391-GHW, 2017 WL 1169626, at *6 (S.D.N.Y. Mar. 28, 2017) ("*Platinum & Palladium*") (considering spoofing as part of a "price manipulation" scheme), *on reconsideration*, No. 1:14-CV-9391-GHW, 2020 WL 1503538, at *2 (S.D.N.Y. Mar. 29, 2020) ("Defendants [] employ[ed] other price manipulation tactics, including . . . 'spoofing' . . . ."). The SEC has also called spoofing a "scheme[] to manipulate . . . markets." *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 54 (S.D.N.Y. 2017). Accordingly, the Second Circuit has already acknowledged that Section 22 allows Plaintiffs to enforce "substantive provisions of the CEA," including the very sections the CFTC charged Defendants with violating here, "through the Act's private right of action." *Prime Int'l Trading, Ltd. v. BP P.L.C.,* 937 F.3d 94, 101-02 (2d Cir. 2019), *cert. denied sub nom. Atl. Trading USA, LLC v. BP P.L.C.,* No. 19-1141, 2020 WL 3146710 (U.S. June 15, 2020) (discussing violations of CEA Sections 9(a)(2) and 6(c));  CTFC ORDER ("***to manipulate the price of Precious Metals futures contracts… by… spoofing… in violation of: Section 9(a)(2) of the Act; and, for conduct occurring on or after August 15, 2011, Section 6(c)(1) and 6(c)(3) of the Act and Regulations 180.1 and 180.2.***"). By contrast, Defendants do not cite a single case holding that spoofing cannot form the basis of a market manipulation claim under Section 22 of the CEA.

Moreover, in determining the proper scope of the private right of action conferred by Section 22, it is important to remember that the CEA is unqualifiedly remedial legislation. *See Leist v. Simplot*, 638 F.2d 283, 315 (2d Cir. 1980) (citing Conference Report to 1974 amendments, 120 Cong.

Rec. 34997 (Oct. 10, 1974) (Sen. Talmadge)), *aff'd sub nom., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357-67, 382-95 (1982). And part of Congress' efforts **to prevent manipulation** is to promote private lawsuits such as this one:

> Congress viewed private lawsuits as **critical** to protecting the public and fundamental to maintaining the credibility of the futures market.

*Cange v. Stotler & Co.*, 826 F.2d 581, 594-95 (7th Cir. 1987) (citing H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 at 56-57, *reprinted* in 1982 U.S. Code Cong. & Admin. News 3871, 3905-06).

Congress originally enacted and has since repeatedly enhanced the CEA precisely in order to prevent price manipulation, and provide ample avenues of redress for and otherwise deter futures contract price manipulation.[4] Accordingly, the CEA prohibits **all** manipulation, whatever the form, from corners and squeezes,[5] to false reporting to agencies that publish benchmark prices,[6] to spoofing. This broader prohibition of manipulation in the CEA corresponds with the differences between the respective purposes of commodity futures trading and securities trading. The socially beneficial purposes of commodity futures trading are the prices it produces. They lead to "the stabilization of commodity prices, the provision of reliable pricing information, and the insurance

---

[4] *Compare* Section 3 of the CEA, 7 U.S.C. § 5 (core purpose of the CEA is "to deter and prevent price manipulation or any other disruptions to market integrity") *with Leist*, 638 F.2d at 304-06 n.24 (statutory evolution and history show that federal legislation and regulation have the overarching purpose to prevent commodity future price manipulation*), aff'd sub nom. Curran*, 456 U.S. at 384-85.

[5] "[I]n general a party is said to 'corner' a market when it has a net long position and owns all or substantially all of the deliverable supply of a particular commodity.  A 'squeeze' is a lesser form of a corner, in which the manipulator has a dominant long position but does not have an actual monopoly of the cash commodity; rather, the cash supply is limited due to drought, unexpectedly heavy demand, or other natural or economic forces that are not necessarily within the manipulator's control.  In either case, the manipulator is in a position where he could force the shorts to pay artificially high prices as the delivery date approaches in order to settle their accounts." *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1034 (N.D. Ill. 1995) (internal citations omitted).

[6] *See, e.g., Laydon v. Mizuho Bank, Ltd.,* No. 12-cv-3419 (GBD), 2014 WL 1280464, at *2 (S.D.N.Y. Mar. 28, 2014) (sustaining CEA claim based on allegations of "deliberate and systematic submission of false Euroyen TIBOR and Yen–LIBOR rates to the JBA and BBA").

against loss from price fluctuation." *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1173 (8th Cir. 1971). Because price manipulation destroys all three of these benefits, *id.*, and the "futures market lends itself to such manipulation much more readily than a cash market," *Bd. of Trade of City of Chicago v. Olsen*, 262 U.S. 1, 39 (1923), the CEA was originally enacted and has since repeatedly been enhanced to prohibit all price manipulation.

Consistent with the need to prohibit all manipulation, "in enacting the CEA, Congress did not define manipulation by statute; similarly, the CFTC and its many predecessor agencies which have had the authority to promulgate regulations under the CEA, have refrained from defining in an exclusive or other limiting fashion what constitutes manipulation." *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 (S.D.N.Y. 1998); *see also* Jerry W. Markham, Manipulation of Commodity Futures Prices—The Unprosecutable Crime, 8 Yale J. On Reg. 281, 360 n.526 (1991) (quoting CFTC memorandum rejecting efforts to catalog manipulative practices because a list would simply enable "crafty" traders to "evade the prohibitions"). Following this Congressional and regulatory methodology of preventing manipulation, every Circuit court that has considered the issue has likewise avoided excluding categories of conduct—e.g., conduct not involving fraud, conduct not violative of an exchange rule, conduct that does not violate bids or offers—from the definition of manipulation. Instead, they define manipulation affirmatively and consistently as intentionally causing artificial prices.[7]

---

[7] *E.g., In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir. 2013) ("There is thus no manipulation without intent to cause artificial prices."); *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991) (manipulation "is an intentional exaction of a price determined by forces other than supply and demand"); *Cargill*, 452 F.2d at 1163 ("test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished . . . . The aim [is] to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand"); *Volkart Bros. Inc., v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962) ("Manipulation is any and every operation or transaction or practice . . . calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets. . . ." (internal quotation marks and citations omitted)); *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 246 (5th Cir. 2010) (same).

Defendants point to CEA's Section 4's specific mention of "spoofing" as evidence of Congress's purported "intent to exclude spoofing from the private right of action for manipulation." Bank Defs.' Br. 16. Nothing in the statute's text supports that conclusion. CEA Section 4 (codified at 7 U.S.C. § 6c) enumerates a number of different types of "prohibited transactions" and prohibited "disruptive practices," including wash trades, trades based on nonpublic information, conduct demonstrating "intentional or reckless disregard for the orderly execution of transactions," and spoofing. The section defines spoofing as "bidding or offering with the intent to cancel the bid or offer before execution." 7 U.S.C. §6c(a)(5)(C). The CFTC, then, is empowered to regulate anyone who bids or offers intending to cancel before executing the transaction, without taking into account that person's ultimate goal, any other actions the person might have taken, or the effect of the person's conduct. It would be perfectly possible for someone to do nothing more than spoof a single small order, just to test out the system or purely for the fun of it, along the lines of teenagers daring each other to call 911 and hang up. The CFTC can regulate that "disruptive" act, even if it has no effect whatsoever on market prices and was never intended to. This is what the CFTC is explaining in the 2013 guidance, from which Defendants cherry-pick an isolated phrase. *See* Bank Defs.' Br. 16. The relevant paragraph reads in full:

> The Commission also declines commenters' requests to read a manipulative intent requirement into the CEA section 4c(a)(5) prohibitions. The Commission interprets the prohibitions in CEA section 4c(a)(5) provisions to be distinct statutory provisions from the anti-manipulation provisions in section 753 of the Dodd- Frank Act; the Commission does not interpret the CEA section 4c(a)(5) violations as including any manipulative intent requirement. Including such a manipulative intent requirement is contrary to the statutory language.

Antidisruptive Practices Authority, 78 Fed. Reg. 31,890, 31,892 (May 28, 2013). In other words, the act of bidding or offering with the intent to cancel the transaction before execution can be prosecuted (by the CFTC) as a stand-alone violation not subject to any of the separate requirements

contained in the CEA's anti-manipulation provisions. But it does not follow from there that the act

of spoofing (or wash trading, or any of the other prohibited practices listed in Section 4) cannot also

be used to engage in manipulation for the purpose of creating artificial prices, for which private

litigants unquestionably have a right of action under CEA Section 22.

Further, courts have made clear that prohibited practices enumerated elsewhere in the CEA

can form part of a Section 22 manipulation claim, even if they cannot be independently prosecuted

by a private plaintiff. For instance, in *In re Natural Gas Commodity Litigation*, "Plaintiffs allege[d] that

some Defendants engaged in wash trading of natural gas as one means of manipulating the natural

gas futures market." 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004). Defendants there, like Defendants

here, argued that plaintiffs could not bring a private claim for wash trading, and additionally argued

that the specific type of wash trading alleged in plaintiffs' complaint was not even one prohibited by

CEA Section 4. *See id.* Judge Marrero brushed these arguments aside: "[E]ven if Plaintiffs might be

unable to maintain a stand-alone wash trading claim . . ., it does not mean that Plaintiffs should be

prevented from presenting evidence of wash trades in the physical market to prove their theory of

manipulation in the futures market." *Id.* A wash trading *claim* is not the same thing as a manipulation

claim involving wash trading conduct. Even the case Defendants themselves cite for the proposition

that "the CEA does not create a private right of action for spoofing" (*see* Bank Defs.' Br. 15),

understands this distinction. *See Braman v. The CME Grp., Inc.*, 149 F. Supp. 3d 874, 888 (N.D. Ill.

2015) (noting that while the CEA does not provide a private right of action specifically for providing

false information as defined in CEA Section 9, "the Court must take its analysis one step farther and

determine whether the alleged false information contributed to the alleged manipulation.").

Defendants, at bottom, understand the distinction too. They attempt to confuse the issue by

arguing that spoofing is the only type of manipulative conduct Plaintiffs allege, and that therefore

Plaintiffs' complaint is a spoofing action rather than a manipulation action. *See* Bank Defs.' Br. 17-

18. The theory seems to be that a single set of factual allegations cannot support multiple claims. Defendants' theory is undermined by the CTFC Order, the NPA, and the Individual Defendants' Criminal Indictments, which all conclude that the spoofing scheme alleged here constitutes both "spoofing" as a stand-alone violation *and* commodities fraud. *Compare* Criminal Indictment Counts Two and Three ("Commodities Fraud" arising out of the allegations in ¶¶ 1-18 of the Indictment), *with* Criminal Indictment Counts Four-Eight ("Spoofing" arising out of the allegations in ¶¶ 1-18 of the Indictment), *United States v. Bases and Pacilio*, 18-CR-48, ECF No. 66 (N.D. Ill July 17, 2018). In fact, this remarkable proposition is found nowhere in the law and certainly not in the two cases Defendants cite, *Platinum & Palladium* and *FX*. In both cases, the plaintiffs successfully pled CEA claims for manipulation of pricing benchmarks, via schemes involving an array of techniques. *Platinum & Palladium*, 2017 WL 1169626, at \*29-33; *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at \*21-22 (S.D.N.Y. Sept. 20, 2016) ("*FX*"). But the plaintiffs also asserted separate manipulative device claims under CEA Sections 6(c)(1), 9(a)(2), and CFTC Rule 180, based on those statutes' specific prohibition of submitting "a false or misleading or inaccurate report." *Platinum & Palladium*, 2017 WL 1169626, at \*34-36; *FX*, 2016 WL 5108131, at \*22-24. Both courts found that the false statements plaintiffs alleged that defendants had made as part of their manipulation schemes did not constitute "reports" within the meaning of the CEA, and therefore could not support a separate manipulative device claim for "false reports" under CEA Sections 6(c)(1), 9(a)(2), and CFTC Rule 180. *Platinum & Palladium*, 2017 WL 1169626, at \*35; *FX*, 2016 WL 5108131, at \*22-24. But nothing in either case even remotely supports the notion that an action must have a single fundamental identity in the way Defendants suggest: *either* spoofing *or* manipulation. In short, Plaintiffs have a private right of action for Defendants' manipulation of commodity futures contract prices via the technique of spoofing.

**II. All of Plaintiffs' Claims Are Timely.**

The statute of limitations is an affirmative defense that Defendants bear the burden of proving. *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 58 (S.D.N.Y. 2012). Dismissal of a complaint on statute of limitations grounds at the pleading stage, then, is almost *never* appropriate. It happens only in exceptional cases where a plaintiff's complaint, on its face, pleads itself out of court. *See Brewer v. Hashim*, 738 F. App'x 34, 34-35 (2d Cir. 2018) (statute of limitations dismissal at pleading stage only appropriate where a complaint "clearly shows the claim is out of time") (citation omitted). This case is not one of those exceptional cases.

The CEA has a two-year statute of limitations. *Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *26 (S.D.N.Y. Feb. 21, 2017). The statute begins to run when a plaintiff is placed on "inquiry notice" of a possible claim by "circumstances [that] would suggest to a person of ordinary intelligence the probability that he has been defrauded." *Cruden v. Bank of New York*, 957 F.2d 961, 973 (2d Cir. 1992) (citation omitted). Critically, the information giving rise to inquiry notice must include the identity of the defendant. *See Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 575-76 (S.D.N.Y. 2017); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 195-96 (S.D.N.Y. 2018), *adhered to on denial of reconsideration*, No. 16-CV-6496 (LAK), 2018 WL 6985207 (S.D.N.Y. Dec. 20, 2018). Here, the Complaint affirmatively pleads that Plaintiffs were not placed on inquiry notice of their claims against the Defendants until the DOJ unsealed the criminal complaint against the Individual Defendants on January 25, 2018. The criminal complaint, for the first time, informed Plaintiffs of Defendants' identity (both the Individual Defendants and the banks that employed them) and of the nature of Defendants' manipulative scheme. Plaintiffs brought suit 17 months after the criminal complaint against Bases and Pacilio was unsealed, well within the CEA's two-year statute of limitations. Their claims are timely on their face, and Defendants' motion to dismiss on statute of limitations grounds fails.

A. *Plaintiffs Were Not on Inquiry Notice Prior to January 25, 2018.*

Defendants argue, contrary to Plaintiffs' pleading, that several events prior to the DOJ's unsealing of the criminal complaint against Bases and Pacilio placed Plaintiffs on inquiry notice. To succeed in this argument, Defendants must *conclusively establish* that Plaintiffs were on inquiry notice earlier than they say they were. *See, e.g., In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 368 (S.D.N.Y. 2019) ("At a minimum, defendants' arguments do not **conclusively establish** that the statute of limitations applies, and so dismissal on that ground would be premature.") (emphasis added); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 474 (S.D.N.Y. 2016) ("[I]nquiry notice exists only when **uncontroverted evidence irrefutably demonstrates** when plaintiff discovered or should have discovered the fraudulent conduct.") (internal citations and quotation marks omitted) (emphasis added). Defendants come nowhere close to meeting this heavy burden.

Not one of the complaints or news articles that Defendants cite provides the two necessary pieces of information for the triggering of inquiry notice: the conduct *and* the identity of the defendants.

Defendants concede that neither the *Gold* nor the *Platinum & Palladium* lawsuits named the Defendants here. Bank Defs.' Br. 9. That alone is enough to conclude that these cases did not put Plaintiffs on inquiry notice. *Sonterra,* 277 F. Supp. 3d at 575; *Sullivan,* 2017 WL 685570, at *28 ("Defendants also argue that initial October 2011 press reports about possible Euribor manipulation should have alerted plaintiffs to their claims, but those early reports did not provide plaintiffs with information sufficient to identify each defendant or a good-faith basis to allege a cognizable theory of liability."); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 885 F. Supp. 2d 617, 631 (S.D.N.Y. 2012) ("[t]he suggestion of probable claims necessary to trigger inquiry notice must also be defendant-specific . . . ."); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 525 (S.D.N.Y. 2005) ("publicly available complaint" that "does not relate directly to the [allegations] Plaintiffs allege in their action against

the defendants" insufficient to put plaintiffs on inquiry notice). The idea that Plaintiffs were supposed to combine *Gold* and *Platinum & Palladium* to infer that *all* banks spoofed *all* precious metals futures contracts, Bank Defs.' Br. 9, is ludicrous—as Defendants would themselves have shouted from the rooftops if Plaintiffs had brought a complaint against them on that theory at that time.

The same is true of the three news items that Defendants cite: a 2015 DOJ "investigation into price setting in the gold, silver, platinum and palladium markets," a May 2015 CFTC "announcement of a civil enforcement action for spoofing in the gold and silver futures markets," and a June 2017 guilty plea and corresponding CFTC settlement by a former Deutsche Bank trader for spoofing the gold and silver futures markets. Bank Defs.' Br. 9-10. Courts have made clear time and again that such disclosures not naming specific defendants are inadequate to place plaintiffs on inquiry notice. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 428 (2d Cir. 2008) (defendants' argument that "stories . . . devoid of company-specific information . . . constitute 'storm-warnings' is far from compelling"); *Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.*, No. 18 CIV. 10364 (LGS), 2020 WL 2765693, at *11-12 (S.D.N.Y. May 28, 2020) (declining to find Bloomberg article reporting on unspecified banks involved in market manipulation sufficient to put plaintiffs on inquiry notice); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 179 (D. Conn. 2019) ("The articles [defendants] cite merely discuss the generics market in general, some of which mention [defendant] in very non-specific ways ... even if the standard was 'inquiry notice,' the aggregate of those articles would be insufficient … nearly all of the stories in the record are devoid of company-specific information.").

The Proposed Third Amended Complaint ("PTAC") in *Silver* is the only thing Defendants cite that actually identifies Bank of America and Merrill Lynch—but not in connection with spoofing alleged herein. Unlike here, *Silver* is a benchmark fixing case originally brought against three

banks—Deutsche Bank, HSBC, and Bank of Nova Scotia (the "Fixing Banks") —responsible for setting the price of silver bullion at a daily private auction. *See In re London Silver Fixing Ltd. Antitrust Litig.*, 213 F. Supp. 3d 530 (S.D.N.Y. 2016) ("*Silver I*"). Plaintiffs in *Silver* alleged that the Fixing Banks conspired to suppress the price for silver and silver-denominated financial products. After Deutsche Bank settled with the plaintiffs, it produced a "treasure trove" of chat messages between traders employed by Deutsche Bank and other banks, which gave rise to the more detailed silver-conspiracy allegations in the PTAC. *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 926 (S.D.N.Y. 2018) ("*Silver II*"). The PTAC never mentions Morgan Stanley at all, and barely mentions Bank of America and Merrill Lynch. The only paragraphs that do mention Bank of America and Merrill Lynch allege that those banks engaged in spread fixing, sharing of proprietary trading information and front-running, but not in spoofing. *See Silver* PTAC ¶¶ 235, 301-04, 326. Indeed, the PTAC focuses on the conspiracy claims, and barely mentions spoofing at all—again, the only paragraphs that do so refer exclusively to banks other than the Defendants here. *See id.* ¶¶ 11, 261-65, 307, 341. The *Silver* PTAC is a sprawling 190-page complaint, overflowing with specific details from the Deutsche Bank cooperation materials. Any reasonable person reading it would conclude that it contained every possible nugget of information available, and it did not include any allegations that any Defendant here engaged in spoofing. It was not until the DOJ unsealed the criminal complaint against Bases and Pacilio that any information regarding Defendants' spoofing came to light. In fact, after the DOJ unsealed that complaint, the *Silver* plaintiffs sought to amend their complaint to add new allegations about Bank of America's and Merrill Lynch's spoofing. *See* Letter from Vincent Briganti to the Honorable Valerie E. Caproni dated February 5, 2018 (informing the court of "***previously unknown acts of manipulation***."), *Silver*, ECF No. 344, No. 1:14-md-2573 (S.D.N.Y.) (emphasis added).

B. *Plaintiffs' Claims Were Tolled by the Fraudulent Concealment Doctrine.*

The doctrine of fraudulent concealment goes hand in hand with the concept of inquiry notice. It tolls an applicable limitations period when a plaintiff plausibly pleads: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point [*i.e.*, the point at which plaintiff is placed on inquiry notice] within four [here two] years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *See Sullivan*, 2017 WL 685570, at *27 (citing *New York. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988)). Plaintiffs allege facts supporting each element here.

The first element is met by alleging that "the wrong itself was of such a nature as to be self-concealing." *Silver I,* 213 F. Supp. 3d at 572 (citation and internal quotation marks omitted). Plaintiffs specifically allege that Defendants' manipulative scheme was inherently self-concealing. Compl. ¶¶ 91-93, 95. Plaintiffs also allege (and Merrill Lynch and Bank of America admit in the NPA) that by placing thousands of spoof orders Defendants created the false "impression of increased supply and demand in the market" in order to execute their scheme and increase their trading profits – conduct that courts have found inherently self-concealing. *Natural Gas*, 337 F. Supp. 2d at 513 (trades made "to present an appearance to the public of a greater demand" are "inherently self-concealing"). The criminal complaint against Bases and Pacilio further emphasizes the secretive nature of the spoofing scheme, by defining spoofing as "a method to engage in market manipulation and ***deception***," and repeatedly referring to Defendants' "***deceptive*** trading activity." *See* Bases & Pacilio Criminal Compl. ¶¶ 16-17, 20, 23- 24, 25- 26, 28- 29, 35- 37 (emphasis added). Defendants assert that their misconduct was not "concealed" because the submission and cancellation of their spoof orders was "visible to all market participants." Bank Defs.' Br. 11. But spoofing does not just mean cancelling orders—it means placing an order with the *intent* to cancel it. Evidence of that intent is certainly

nowhere to be found in the raw trade data. As Judge Castel put it, "it is unclear how the plaintiffs could have recognized that the daily quotes were manipulated based on the bare fact of their publication, any more than any other consumer—or a compliance department or senior executive of the defendants—would recognize artificially fixed prices." *Sullivan,* 2017 WL 685570, at \*28.

The second element effectively collapses with the inquiry notice analysis above. Plaintiffs specifically plead that they were ignorant of their claims until the DOJ unsealed the criminal complaint against Bases and Pacilio. Compl. ¶ 95. As Plaintiffs detail above, Defendants have failed to provide evidence to irrefutably contradict those well-pled allegations. *See In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.,* No. 00 CIV. 7804 (LMM), 2004 WL 487222, at \*5 (S.D.N.Y. Mar. 12, 2004) (finding second element of fraudulent concealment satisfied "because this is a motion to dismiss, the Court must accept Plaintiffs' allegations as true, and Plaintiffs allege that they had no knowledge of the facts underlying their cause of action prior to the filing of the purchasers' complaint and, due to the self-concealing nature of the price-fixing scheme, could not have reasonably discovered such facts.").

Finally, the Complaint adequately pleads the third element, repeatedly alleging that Plaintiffs' ignorance was not attributable to a lack of diligence, but instead to Defendants' self-concealing, manipulative scheme. *See* Compl. ¶¶ 6, 91-98. Nothing more is required at the pleading stage. *See Alaska Elec. Pension Fund v. Bank of Am. Corp.,* 175 F. Supp. 3d 44, 67 (S.D.N.Y. 2016) (*ISDAfix*) ("[R]equiring Plaintiffs, at the motion to dismiss stage, to make a showing of reasonable diligence would be premature.") (citation and internal quotation marks omitted). As Judge Scheindlin aptly observed, when a scheme is "inherently self-concealing … how could there be any affirmative acts of due diligence to plead?" *SEC v. Wyly*, 788 F. Supp. 2d 92, 111 n.129 (S.D.N.Y. 2011).

**III. Plaintiffs Plausibly Allege That They Suffered Actual Damages Under The CEA.**

To plead CEA actual damages, a plaintiff "must plausibly allege (1) that she transacted in at least one commodity contract at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations, and (2) that the manipulated prices were to the plaintiff's detriment." *Total Gas*, 889 F.3d 104 at. Importantly, the CEA (unlike the securities laws) does *not* require a plaintiff to allege the specific dates and prices of the trades on which she lost money as a result of the defendant's conduct. *Id.* at 113 n.4 ("We have never imported loss causation from the securities context [to the CEA] and we do not begin to do so with this case."); *Crude Oil*, 913 F. Supp. 2d at 60-61 (CEA plaintiffs need not plead "the date and price of the specific [futures contract] they bought and sold, and specific losses from those transactions," because "*Dura*'s loss causation requirement does not apply to the manipulation claims at issue here," nor is there a "bright line indicating when losses begin or cease to accrue. And the period during which the manipulative activity occurs is not necessarily a proxy for the period when losses attributable to artificial prices occur. The issue of 'actual damages' thus becomes a complex factual inquiry.").

The Second Circuit directly addressed pleading CEA actual damages in *Harry v. Total Gas*. The *Total Gas* plaintiffs were traders of natural gas futures and options derivative contracts, the prices of which were based exclusively on the prices of physical natural gas traded at the Henry Hub in Louisiana. *Total Gas*, 889 F.3d at 108. Defendant Total Gas was alleged to have manipulated physical natural gas prices not at the Henry Hub, but at four other regional hubs. *Id.* at 109. Significantly, the *Total Gas* plaintiffs did not allege that Total Gas "took any action to directly manipulate trading at Henry Hub." *Id.* Plaintiffs also did not allege that they "traded any natural gas or natural gas derivatives at the hubs at which Defendants traded." *Id.* The Second Circuit was tasked with deciding how much overlap was necessary between defendants' manipulation of physical

natural gas prices and the prices of the futures contracts that plaintiffs traded to plausibly allege CEA actual damages.

There is no single correct way to allege CEA actual damages. *See id.* at 112-14. The "most direct way" is privity between plaintiff and defendant, but privity is **not** required. *Id.* at 112. The "more common[]" way is for a plaintiff "to plead enough facts to make plausible the inference that the prices of her trades…have been substantially influenced by a defendant's trades….". *Id.* The facts alleged "can be quite general statements about the nature of the instruments they are trading and the institutional contexts in which those trades take place." *Id.* For example, if a plaintiff pleads that "she traded and lost money (or failed to gain as much money as she otherwise would have) during a bout of defendant's alleged market manipulation in the same contract type in the same exchange for delivery at the same time and place," the allegations are "nearly as good as if she had pled privity." *Id.* ("Suffice it to say that the more overlap, the more plausible a defendant's effect on a plaintiff will be.").

While the legal elements set forth in *Total Gas* readily align with the allegations here, the underlying facts in *Total Gas* are quite different. In *Total Gas*, there was virtually zero overlap between the prices of the Henry Hub price-based futures contracts plaintiffs traded and defendants' manipulation of physical natural gas prices at different hubs. Plaintiffs were forced to rely on an attenuated chain of causation that hinged on the supposed price interrelatedness between (a) the prices of the plaintiffs' New York Mercantile Exchange natural gas futures contracts (which are price-based on physical natural gas deliverable at Henry Hub in Louisiana), and (b) the prices of physical natural gas deliverable at four regional hubs (the locus of the *Total Gas* defendant's alleged manipulation of spot natural gas prices). *See id.* at 108-09. And the *Total Gas* plaintiffs even cited materials indicating that any causal relationship was in fact in the *opposite* direction than the one asserted in their complaint. *See id.* at 115 ("The studies and expert analysis that Plaintiffs point to do

19

not alter our reasoning. While the studies do find high cointegration of prices across regions, both seem to attribute this relationship to the outsize effect that Henry Hub prices have on every other regional hub in the United States and not vice versa."). It is no surprise, given these allegations, that the Second Circuit found that the *Total Gas* plaintiffs had not sufficiently alleged CEA actual damages because there was no plausible link between defendant's misconduct and the prices of the futures contracts plaintiffs traded.  *See id.*

Here, by contrast, the overlap between Defendants' manipulation and the prices of the precious metals futures contracts that Plaintiffs traded (and resulting injury suffered by Plaintiffs) is complete. Plaintiffs allege that Defendants specifically intended to, and did, manipulate the prices of the *very same futures contracts* that Plaintiffs traded on the *very same days* as Defendants' manipulation. *See, e.g.*, Compl. ¶¶ 48-49 (On "February 4, 2011, Defendant Bases placed a primary order, as an iceberg order, to buy 50 COMEX Gold Futures contracts (showing only one lot to the market at a time) at a price of $1,348.60. Defendant Pacilio then placed one spoof order to sell 500 COMEX Gold Futures contracts at a price of $1,348.70 and two spoof orders to sell 25 COMEX Gold Futures contracts, sending false supply and demand signals to the market. . . . [On this same date,] Plaintiff Gamma sold COMEX Gold Futures contracts. As a result of Defendants' spoofing, Plaintiff Gamma was deprived of the ability to transact in a lawful market that was free of manipulation. Defendants' spoofing caused Plaintiff Gamma and the Class to receive less to sell precious metals futures contracts. These artificial prices caused Plaintiff Gamma to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period."); Compl. ¶¶ 47-82 (alleging 14 specific examples when Plaintiffs traded the same contract, on the same exchange, on the exact day that Defendants engaged in one of their "thousands" of spoofs, and were damaged as a result). Nothing more is required to adequately plead CEA actual damages. *See Total Gas*, 889 F.3d at 112.

Defendants, of course, misread *Total Gas* to hold that even if plaintiffs trade the same contracts on the same exchange and on the same days of their admitted manipulation, it is not enough—Plaintiffs must also identify specific trading losses resulting from Defendants' manipulations. But that is not the law. Plaintiffs need only *plausibly allege* that Defendants' price manipulations were to their detriment. *See id.* Courts have good reason for imposing a different pleading burden in manipulation cases as opposed to securities fraud cases. When a plaintiff buys a stock for $10 and the price drops to $5 the next day following a corrective disclosure, the plaintiff's injury is obvious on its face. Manipulations like spoofing (or benchmark-rigging, or wash trading, or any of the other techniques at manipulators' disposal) are different. Determining the amount and duration of their impact on market prices requires expert analysis of Defendants' trading data— information not available to a plaintiff prior to discovery. *See Crude Oil,* 913 F. Supp. 2d at 61 (ascertaining damages for manipulation is a "complex factual inquiry"). Accordingly, courts regularly rebuff defendants who speculate at the pleading stage that their manipulations might in fact have benefited plaintiffs rather than harmed them. *E.g. FX*, 2016 WL 5108131, at *20 ("[T]he *LIBOR* opinions support this Court's conclusion that, because Plaintiffs lack information to identify the specific transactions on which they were injured, they need not plead them in order to state a CEA claim."); *Dennis*, 343 F. Supp. 3d at 154 ("Nor is the Court persuaded by defendants' argument that plaintiffs might just as easily have been benefitted by the alleged manipulation. This argument is premature at best."); *ISDAfix*, 175 F. Supp. 3d at 53 (claim allowed to proceed even though "discovery may well show that, for some Plaintiffs on some days, the alleged ISDAfix manipulation actually resulted in a benefit"); *Crude Oil*, 913 F. Supp. 2d at 61 ("While Plaintiffs may have a difficult time proving 'actual damages,' that is a fact-intensive inquiry for another day.") This Court should do the same.

Defendants' reliance on *Silver II* is likewise misplaced. *See* Bank Defs.' Br. 19-21. In *Silver II*,

21

plaintiffs alleged that defendants manipulated the global silver market by, among other things, suppressing the daily global benchmark price of silver (known as the London Silver Fix). Following a settlement with one defendant that provided substantial cooperation, plaintiffs named additional defendants and added specific allegations concerning the means by which certain banks that were not directly involved in setting the London Silver Fix (the "Non-Fixing Banks") had also manipulated the silver market through a variety of misconduct. Two key factors—both absent here—drove Judge Caproni's CEA actual damages analysis as to these Non-Fixing Banks.

*First*, as Judge Caproni summarized, the *Silver II* plaintiffs failed to allege "a connection between the alleged episodic market manipulation by the Non-Fixing Banks and the existence of artificial prices in the COMEX silver futures market"—let alone a connection between the manipulation and the plaintiffs' specific trades. *Silver II*, 332 F. Supp. 3d at 922. Here, the opposite is true. Merrill Lynch has already admitted that the Defendants intentionally manipulated the prices *of the very same futures contracts that Plaintiffs traded.*

*Second,* Judge Caproni observed that the alleged acts of market manipulation by the Non-Fixing Banks were sporadic. Beyond the specific chat messages cited in the complaint, "Plaintiffs have made no factual allegations of the frequency of episodic manipulation." *Id.* at 921. Additionally, in Judge Caproni's estimation, the period of artificiality created by manipulative trading strategies "may be brief." *Id.* at 923. Accordingly, it is more challenging for a plaintiff to allege that any particular trade during the class period was affected by the artificiality. *Id.* at 922.  But here, Plaintiffs allege (and Merrill Lynch admits) that Defendants executed "***thousands***" of spoofs, in a regular pattern that injected artificiality into the futures market throughout the whole Class Period. *See, e.g.*, Compl. ¶¶ 3-5, 44. More than that, Plaintiffs allege that they traded on the specific days that Defendants spoofed. *E.g.*, Compl. ¶¶ 48-49. Judge Caproni's concerns about the difficulties in pleading damages in episodic manipulation cases have no relevance here.

Defendants' other arguments based on *Silver II* also fail. First, Defendants argue that Plaintiffs cannot demonstrate that the volume of alleged spoofing activity could have impacted the market such that their trades were adversely affected, pointing to Judge Caproni's reasoning that the impact of "manipulation in highly liquid markets (like the silver markets, *see Silver* TAC ¶ 125), is likely to be less than the impact of manipulation in less liquid or illiquid markets." *See* Bank Defs.' Br. 20 (citing *Silver II*, 332 F. Supp. 3d at 923)). But pages later in her opinion, Judge Caproni exempted the Defendants here from that analysis because the Department of Justice's complaint and the CFTC Order were sufficient to conclude that Plaintiffs had alleged the existence of artificial prices in the COMEX silver futures markets caused by Defendants. *Silver II*, 332 F. Supp. 3d at 925.

Second, Defendants attempt to read into *Silver II* a requirement that Plaintiffs must allege the exact time that they traded, and a presumption that certain types of manipulation events cannot have a lasting impact on the market. *See* Bank Defs.' Br. 21. These are entirely fictitious. In fact, in both *Silver I* and *Gold*, Judge Caproni found that Plaintiffs' allegations that they sold futures on "specifically identified dates on which Defendants are alleged to have artificially" manipulated the market, coupled with allegations that adverse market events (like the spoofing here) caused artificial prices are "sufficient for CEA standing purposes" to plead damages. *See Silver I,* 213 F. Supp. 3d at 565; *In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*, 213 F. Supp. 3d 631, 667 (S.D.N.Y. 2016) ("*Gold*"); citing *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 379–80 (S.D.N.Y. 2010) (in the context of CEA class certification, "case law suggests that because plaintiffs transacted at artificial prices, injury may be presumed").

## IV. The Complaint States a Plausible Claim for Unjust Enrichment

Under New York law, a plaintiff asserting a claim for common law unjust enrichment must allege "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good

conscience require restitution." *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (footnote omitted). Plaintiffs' allegations in the Complaint easily satisfy all three factors.

*First*, in their NPA, Merrill Lynch and Bank of America admitted that from at least 2008 through 2014, precious metals traders employed by Merrill Lynch, including Individual Defendants Bases and Pacilio, "engaged in a scheme to deceive other precious metals traders by placing thousands of spoof orders that they never intended to execute, with the intent to create the false and misleading impression of increased supply and demand in the market in order to: (a) induce other market participants to trade at times, prices, and quantities that they would not have absent Defendants' manipulation of the market; and (b) **financially benefit Defendants at the expense of Plaintiffs and the Class.**" Compl. ¶ 44 (emphasis added). Defendant Pacilio continued this scheme while he was employed at Morgan Stanley. *See* Compl. ¶¶ 22, 65, 69, 75, 77, 80. *Second*, Defendants' gain was at Plaintiffs' expense. Defendants' scheme is alleged to have caused each Plaintiff to **pay more to purchase, or receive less to sell**, Precious Metals Futures Contracts. Compl. ¶¶ 10-17, 58-59, 62-64, 66-68, 70-74, 76, 78-79. As a result, Plaintiffs adequately allege that they were unfairly deprived of their money. The claim is straightforward.

Defendants cite *Myun-Uk Choi v. Tower Research Capital LLC*, 165 F. Supp. 3d 42, 51 (S.D.N.Y. 2016) ("*Tower Research*") and *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 500 (S.D.N.Y. 2017) ("*IRS*") for the proposition that unjust enrichment claims premised on market manipulation require a plaintiff to "allege that they had any direct dealings with the defendants." *See* Bank Defs.' Br. 24-25. Neither case stands for that proposition. In fact, the Second Circuit expressly *rejected* the district court's reasoning and the argument that Defendants make here. *See Tower Research*, 890 F.3d at 69 ("[A] New York unjust enrichment claim requires no 'direct relationship' between plaintiff and defendant."). Rather, Plaintiffs need only establish a "modest" connection, which they have done by showing that they traded the same contracts on the same exchanges on the same days

that Defendants admitted they engaged in spoofing, not to mention that Defendants have admitted

to spoofing that market thousands of times. *See id.* Similarly, Defendants' citation to *IRS* is

inapposite. In *IRS*, the court *sustained* the unjust enrichment claims premised on market

manipulation, and instead dismissed as too indirect only a claim from potential competitors who

alleged that defendants boycotted their new swap-exchanges, resulting in lost revenue for plaintiffs.

*IRS*, 261 F. Supp. 3d at 500. As in *IRS*, Plaintiffs here allege that Defendants directly caused them

pay more to purchase, or receive less for precious metals futures contracts, and their unjust

enrichment claims should be sustained. *See* Compl. ¶¶ 10-17, 58-59, 62-64, 66-68, 70-74, 76, 78-79.

### PART II: THE INDIVIDUAL DEFENDANTS' AND MORGAN STANLEY'S ARGUMENTS

## V.  Standards of Review

Despite Defendants' best efforts to heighten Plaintiffs' pleading burden, a "short and plain"

statement under Federal Rule of Civil Procedure 8(a) generally is all that is required where the

plaintiff's CEA claims are based on manipulative trading. *See Gold*, 213 F. Supp. 3d at 667 (evaluating

CEA manipulation claims under Rule 8(a) because "courts in this District have generally found that

'fraud is not a necessary element of a market manipulation'"); *CFTC v. Parnon Energy Inc.*, 875 F.

Supp. 2d 233, 244-45 (S.D.N.Y. 2012) (rejecting defendants' argument that "all manipulation claims"

sound in fraud and are subject to Rule 9(b) (citing *In re Crude Oil Commodity Futures Litig.*, No. 06 Civ.

6677, 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007)). Judge Woods addressed the same

argument Defendants make here in *Tower Research*, a case alleging almost identical conduct. Judge

Woods explained that although plaintiffs characterized the defendant's conduct as "fraudulent," the

complaint did not actually allege that the defendant made any false or misleading statements of fact

or material omissions as part of its alleged manipulation, because "[t]he submission of an above– or

below-market bid—even if the party intends to withdraw the bid before it can ever be matched–

does not constitute a false or misleading statement that would trigger the application of

Rule 9(b)." 165 F. Supp. 3d at 47-48 (citing *CFTC v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014)). Even when courts do apply Rule 9(b) to CEA cases, the standard is "typically relaxed in market manipulation cases." *Id.* at 48 n.3 (citing *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 714 (S.D.N.Y. 2013) ("*LIBOR I*"), *vacated and remanded on other grounds sub nom. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016)); *see also Gold*, 213 F. Supp. 3d at 668 ("This standard is generally relaxed in the context of manipulation-based claims where the complaint must simply specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." (citations omitted)). Here, Plaintiffs readily satisfy either the Rule 8(a) or 9(b) standard for the reasons detailed below.

## VI. Plaintiffs Successfully State a Claim for Price Manipulation

Contrary to the Individual Defendants' and Morgan Stanley's efforts to engraft additional elements on to CEA manipulation, plaintiff must plausibly allege only four elements to state a claim: (1) that Defendants possessed an ability to influence market prices; (2) that an artificial price existed; (3) that Defendants caused the artificial prices; and (4) that the Defendants specifically intended to cause the artificial price. *Sonterra*, 277 F. Supp. 3d at 572; *Sullivan,* 2017 WL 685570, at *25 (citing *Amaranth Nat. Gas*, 730 F.3d at 173 (citation omitted)).

Plaintiffs plead; the CFTC Order and the NPA conclude; Merrill Lynch admits; and the Individual Defendants' criminal indictment alleges that the Individual Defendants, while they were employed at Merrill Lynch and Morgan Stanley intended to, and did, cause artificial prices to exist in the precious metals market. *See, e.g.,* Compl. ¶¶ 21-22, 44-46, 99-105; CFTC Order at 2-3; NPA Attachment A ¶¶ 2-3, 19-27; Indictment ¶¶ 1(a)-(b), 2-11. The NPA and the CFTC Order also prohibit Merrill Lynch and Bank of America from challenging the findings or conclusions in either document. CFTC Order at 1, NPA ¶ 2, Attachment A at 1. For this reason, Bank of America and

Merrill Lynch did not even attempt to argue that Plaintiffs failed to plead any of these elements. Plaintiffs' allegations readily satisfy Rule 8(a), Rule 9(b), and any other pleading standard Defendants can conjure. Nevertheless, Individual Defendants and Morgan Stanley spill pages of ink arguing that Plaintiffs fail to plead "any of the four elements." Individual Defs.' Br. 4; Morgan Stanley Br. 6. As their co-Defendants have already admitted, they are wrong.

A. *The Complaint Adequately Pleads That Defendants Possessed the Ability to Influence Market Prices*

Not only Merrill Lynch's and Bank of America's admissions, but also the Individual Defendants' *own statements* support the Complaint's allegations that Defendants had the ability to influence prices. For instance, Pacilio observed to Bases "if you spoof this [the price] really moves." Compl. ¶ 47 and Indictment ¶ 15; *see also* Compl. ¶ 50 (chats showing Pacilio admitting to Bases and other traders that he was "pushing" the futures market price); NPA Attachment A ¶ 37 (detailing how Bases' and Pacilio's conduct exposed other market participants to losses by influencing futures prices); Bases & Pacilio Criminal Compl. ¶ 21 (Bases chat transcript). Even without these direct admissions, the question of whether a Defendant had the ability to influence prices is a fact-intensive determination that is "not typically ripe for disposition at the pleading stage." *Gold*, 213 F. Supp. 3d at 669 n.31; *see also Silver I*, 213 F. Supp. 3d at 568 (at the pleading stage, the court must assume that "Plaintiffs' well-pleaded allegations of artificial prices" are true)(citing *Anderson News LLC v. Am. Media Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (internal quotations omitted)).

Individual Defendants point to *Silver II* and *In re Platinum & Palladium Commodities Litig.*, No. 10 Civ. 3617, 2014 WL 3500655, at *8 (S.D.N.Y. July 15, 2014) for the false premise that precious metals markets are too liquid to be manipulated. *See* Individual Defs.' Br. 5. In reality, *Silver II* found just the opposite, pointing to a CTFC Order and DOJ Complaint, like here. *See Silver II*, 332 F. Supp. 3d at 923 (DOJ's complaint and the CFTC Order were sufficient at the pleading stage for the Court to conclude that plaintiffs had alleged the existence of artificial prices in the COMEX silver futures

markets caused by Defendants). Similarly, Morgan Stanley grouses over a supposed lack of specifics—none of which are required at this stage—about the "liquidity of the markets," "market conditions," or the "size of Morgan Stanley's positions." These arguments ignore that the Complaint goes far above and beyond the pleading standard and alleges specific instances where Defendant Pacilio caused artificial precious metal futures contract prices while employed at Morgan Stanley. *See* Compl. ¶¶ 65, 69, 75, 77, 8). These allegations more than satisfy the "ability" element.

   B.   *The Complaint Adequately Alleges Precious Metals Futures Prices Were "Artificial."*

The same facts detailed above that plausibly allege that Defendants had the ability to influence prices also plausibly allege that prices were artificial. An artificial price is simply one that does not "reflect basic forces of supply and demand." *Silver I,* 213 F. Supp. 3d at 566 (citing *Parnon Energy,* 875 F. Supp. 2d at 246). Here, where Merrill Lynch and Bank of America have admitted that Bases and Pacilio "***injected false and misleading information***" into the market that "***caused an apparent increase in supply or demand***," and the Complaint alleges specific occasions where that occurred, it is difficult to imagine how Defendants can argue that Plaintiffs have failed to plead this element. *See* NPA Attachment A ¶¶ 20-22 (emphasis added). As alleged in the Complaint and his Indictment, this is the same scheme Pacilio continued to carry out while working for Morgan Stanley. *See* Compl. ¶¶ 65, 69, 75, 77.

Individual Defendants and Morgan Stanley again resort to engrafting onto the elements to plead a primary violation of the CEA a requirement that Plaintiffs must make specific allegations concerning "market data" to plausibly allege that prices were artificial. *See In re Nat. Gas Commodity Litig.,* 358 F. Supp. 2d 336, 344-45 (S.D.N.Y. 2005) (plaintiffs adequately pled a commodities manipulation claim where they had alleged generally that prices were artificial "from June 1999 to February 2001" and "between March 2001 and December 2002"). No such requirement exists, nor could it, given that Defendants' trading data is within their sole control. *See, e.g., FX,* 2016 WL

5108131, at *20 (citing *LIBOR I*, 935 F. Supp. 2d at 716 ("plaintiffs could not reasonably be expected to possess this information")).

      C.   *The Complaint Adequately Pleads that Defendants "Caused" Price Artificiality.*

      At the pleading stage, Plaintiffs need only allege that a defendant's action *contributed* to an artificial price movement to adequately plead causation for purposes of the CEA. *Wilson*, 27 F. Supp. 3d at 535 (quoting *Parnon Energy*, 875 F. Supp. 2d at 248 (internal citations omitted)). As noted above, Plaintiffs' Complaint, the CFTC Order, the Criminal Complaint, and the NPA all detail repeated, specific examples of the Individual Defendants' conduct during their employment at Merrill Lynch and/or Morgan Stanley that caused artificial prices. *See*, *e.g.*, Compl. ¶¶ 49, 51, 54–55, 58–59, 62–64, 66–68, 70–74, 76, 78–79. The Complaint and the government filings cite multiple chats where the Individual Defendants admit that they caused artificial prices by their constant manipulation. *See*, *e.g.*, Compl. ¶¶ 47, 50; Indictment ¶¶ 15-17; Bases & Pacilio Criminal Compl. ¶ 21 (Bases "chat" transcript). Additionally, courts in this District have long recognized that prices affected "by a factor which is not legitimate" (here, Defendants' spoofing) are "necessarily artificial." *See Sumitomo*, 182 F.R.D. at 91.

      Persistent in their attempts to deny the undeniable, Individual Defendants and Morgan Stanley each cite *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 MD 2213 RPP, 2012 WL 6700236, at *16 (S.D.N.Y. Dec. 21, 2012) ("*Silver Futures*") to tell the Court it would need "imagination" to infer a link between Defendants' conduct and artificial prices. Even ignoring the Complaint's detailed factual allegations derived from Merrill's admissions, and the governments findings and allegations detailed above, *Silver Futures* is inapposite. There, plaintiffs asked the Court to infer a link between defendants' large short position and price declines that existed in the market "without corroborating factual allegations as to trades…or other evidence." *Silver Futures*, 2012 WL 6700236, at *16. The Court found that making such an inference would be "tantamount to

impermissible speculation on the basis of sheer possibility." *Id.* First, unlike the plaintiffs in *Silver Futures*, Plaintiffs here have alleged that on thousands of occasions throughout the class period, (*see* Compl. ¶¶ 4, 5, 16, 46), Individual Defendants, while employed by Merrill and Morgan Stanley, spoofed the market and caused artificial precious metals futures contract prices. *See* Compl. ¶¶ 10-17, 45-82. Second, Defendants' failed attempt at exploiting the unique and inapplicable facts from *Silver Futures* ignores law in this district on what Plaintiff must plead to allege causation at this stage of a price manipulation case. *Sonterra*, 277 F. Supp. 3d at 573 (argument that such a relationship is not supported by the evidence or is insufficiently direct to find proximate causation cannot be resolved at the pleading stage). Finally, what would actually take the Court's "imagination" would be coming up with an explanation of why Bases and Pacilio bothered to spoof **thousands of times** if the spoofing had no impact on prices. They vaunted their own price-moving prowess in chat messages, making comments like "if you spoof this it really moves," and "that was me pushing [the futures market price]." *See* Compl. ¶ 4, CFTC Order at 3. The idea that these admissions are insufficient to plausibly *plead* causation, prior to any discovery or expert analyses, is meritless.

> D.   *The Complaint Adequately Pleads that Defendants Specifically Intended to Influence Market Prices.*

With regard to CEA manipulative intent, Plaintiffs need only allege that Defendants "acted (or failed to act) with the purpose or conscious object of causing or [a]ffecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Dennis*, 343 F. Supp. 3d at 176 (citing *Gold*, 213 F. Supp. 3d at 670). Manipulative intent can be alleged by either (a) facts showing that Defendants had both the motive and opportunity to manipulate, or (b) strong circumstantial evidence of conscious misbehavior or recklessness. *See Laydon*, 2014 WL 1280464, at *5 (S.D.N.Y. Mar. 28, 2014); *Gold*, 213 F. Supp. 3d at 670. Though only one suffices, the Complaint here adequately pleads both.

First, Plaintiffs repeatedly allege, and the Merrill Lynch and Bank of America admit,[8] that the Individual Defendants intentionally sent false supply and demand signals to the market in order to move prices in an artificial direction. *See* Compl. ¶¶ 2, 44-45, 48, 50, 52-53, 56-57, 60-61, 65, 69, 75, 77, 80, 102-03; NPA Attachment A ¶¶ 26, 30; CFTC Order at 2-3; *see also Gold*, 213 F. Supp. 3d at 670 (showing intent by placing trades that "did not reflect the legitimate forces of supply and demand."). As noted above, Pacilio's and Bases's own chats confirm the same. *See Laydon* 2014 WL 1280464, at *6 (court can "infer manipulative intent, particularly based on direct evidence from certain Defendants' communications"). Second, Plaintiffs have adequately alleged manipulative intent by alleging that all Defendants shared a common motive to increase profits through an ability to manipulate the price of precious metals futures contracts. *See* Compl. ¶ 82; *see also CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 533 (S.D.N.Y. 2008) ("profit motives render the inference of intent even more plausible."); *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 530 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013), *and aff'd*, 730 F.3d 170 (2d Cir. 2013); *In re Anthony J. DiPlacido*, CFTC No. 01-23, 2008 WL 4831204, at *29 (CFTC November 5, 2008) ("demonstrable motive may support an inference of specific intent"). This is particularly true here, where Plaintiffs' complaint has the benefit of direct evidence of Defendants' intent from Defendants' communications. *See* Compl. ¶¶ 47, 50 (citing chat messages where Individual Defendants state their intent).[9]

---

[8] The Court should consider Merrill Lynch's and Bank of America's admissions as direct evidence that Bases and Pacilio intended to cause artificial prices. *See, e.g.*, *United States v. Ghavami*, No. 10 CR 1217 KMW, 2012 WL 2878126, at *9 (S.D.N.Y. July 13, 2012) (using against individuals the admissions their corporate employers made in a non-prosecution agreement), *aff'd sub nom. United States v. Heinz*, 790 F.3d 365 (2d Cir. 2015) *cert. denied sub nom. Heinz v. United States*, 136 S. Ct. 801 (2016); *see also United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 831 F. Supp. 2d 779, 785 (S.D.N.Y. 2011) (similar).

[9] Individual Defendants argue that the Complaint impermissibly group pleads: (1) "ability to influence prices"; (2) "causation"; and (3) "intended." *See* Individual Defs.' Br. 5, 7-8 fn.3, 8-9. These

E.   *Plaintiffs Adequately Allege Principal-Agent Liability.*

Plaintiffs adequately allege principal-agent liability against the bank defendants. "The liability of a principal for the acts of its agents is governed by Section 2(a)(1)(B) of the CEA. 7 U.S.C. § 2(a)(1)(B)." *Gold*, 213 F. Supp. 3d at 674. Under that provision, a claim for principal-agent liability requires that the agent was acting in the capacity of an agent when he or she committed the unlawful acts and that the agent's actions were within the scope of his or her employment. *Id.* The corporate defendants do not deny that Plaintiffs have established both of these elements. Instead, they simply argue that the underlying manipulation claims fail, and only against Morgan Stanley. *See* Morgan Stanley Br. 6-10. As detailed above, Defendants are incorrect. Accordingly, they present no valid argument against the claims based on principal-agent liability. *See Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1065 (N.D. Ill. 2016) (denying motion to dismiss principal-agent claim where plaintiffs adequately stated the underlying manipulation claim).

F.   *Plaintiffs Plausibly Allege a CEA Manipulative Device Claim.*

To plead a manipulative device claim, a plaintiff must allege that defendants "engaged in manipulative acts in connection with the sale of commodities, scienter, and economic loss." *Silver I,* 213 F. Supp. 3d at 569. Therefore, the same wrongful conduct that triggers Defendants' liability for manipulation (Claim One) similarly triggers their liability for use of manipulative device (Claim Two). Predictably, Defendants repeat arguments regarding the plausibility of the claims pleaded, and Plaintiffs' purported lack of standing. *See* Morgan Stanley Br. 10-11; Individual Defs.' Br. 11. These arguments all fail for the same reasons discussed above.

---

arguments ignore that the Complaint alleges specific conduct by each of the Individual Defendants, *see* Compl. ¶¶ 47-48, 50, 52-53, 56-57, 60-61, 65, 69, 75, 77, 80, and cites liberally to each Individual Defendant's criminal docket, *see* Compl. ¶¶ 3, 5, 21-23, 46.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss in their entirety.

Dated: July 13, 2020

**LOWEY DANNENBERG, P.C.**                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/Vincent Briganti                                           /s/ Deborah Clark-Weintraub
Vincent Briganti                                              Deborah Clark-Weintraub
Raymond P. Girnys                                           Max R. Schwartz
Johnathan Seredynski                                        Thomas L. Laughlin, IV
Amir Alimehri                                                 Jeffrey P. Jacobson
44 South Broadway, Suite 1100                          The Helmsley Building
White Plains, NY 10601                                    230 Park Avenue, 17th Floor
Telephone: (914) 997-0500                               New York, NY 10169
Facsimile: (914) 997-0035                                Telephone: (212) 223-6444
Email: vbriganti@lowey.com                             Facsimile: (212) 223-6334
rgirnys@lowey.com                                          Email: dweintraub@scott-scott.com
jseredynski@lowey.com                                    mschwartz@scott-scott.com
aalimehri@lowey.com                                       tlaughlin@scott-scott.com
                                                                  jjacobson@scott-scott.com

*Interim Co-Lead Counsel for Plaintiffs and the Class*