UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/4/2021__
```

-------------------------------------------------------------------X
                       :

IN RE MERRILL, BOFA, AND MORGAN STANLEY   :
SPOOFING LITIGATION                       :        19-cv-6002 (LJL)
                       :
                       :       OPINION & ORDER
                       :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiffs Gamma Traders – I LLC ("Gamma"), Vega Traders, LLC ("Vega"), Robert

Charles Class A, L.P., Robert L. Teel, Michael Patterson, Yuri Alishaev, Abraham Jeremias, and

Morris Jeremias (collectively, "Plaintiffs") bring this action against Defendants Merrill Lynch

Commodities, Inc. ("MLCI"), Bank of America Corporation ("BAC"), Morgan Stanley & Co.

LLC ("MSC"), Edward Bases ("Bases"), John Pacilio ("Pacilio"), and John Doe Nos. 1-18

(collectively, "Defendants").  They allege Defendants unlawfully and intentionally manipulated

the price of contracts for COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum

Futures, and NYMEX Palladium Futures  and options on those futures contracts (collectively,

"precious metals futures contracts") traded on the New York Mercantile Exchange ("NYMEX")

and the Commodity Exchange, Inc. ("COMEX") from January 1, 2007 through December 31,

2014 (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*

(the "CEA"), and the common law.  Dkt. No. 51. (the "Amended Complaint" or "AC") ¶ 1.

Defendants now move to dismiss the complaint pursuant to Federal Rules of Civil

Procedure 9(b) and 12(b)(6).  For the following reason, Defendants' motion is granted.

### A.      The Relevant Parties

Plaintiffs are companies and individuals who transact in precious metal futures contracts

on either of or both the NYMEX or COMEX.  Three of the Plaintiffs are either limited liability

companies or limited partnerships.  AC ¶¶ 10-12.  The remaining five Plaintiffs are individuals

who transact in precious metals futures contracts on those exchanges.  *Id.* ¶¶ 13-17.  Gamma

alleges that it transacted in "thousands" of COMEX Gold Futures, COMEX Silver Futures,

NYMEX Platinum Futures, and NYMEX Palladium Futures contracts and options on those

futures contracts during the Class Period.  *Id.* ¶ 10.  Vega alleges that it transacted in "thousands"

of COMEX Gold Futures and COMEX Silver Futures and options on those futures contracts

during that same time.  *Id.* ¶ 11.  The remainder of the Plaintiffs allege that they transacted in one

or more of the identified precious metals futures contracts during the Class Period without

providing any estimation of the extent of their trading.

Defendants are trading firms and two of the futures traders then employed by them who

during the Class Period engaged in transactions in precious metals futures contracts on the

NYMEX and COMEX.  *Id.* ¶ 2.  Defendant Bases was an employee of MLCI from at least June

2010 until approximately November 2015.  *Id*. ¶ 21.  Defendant Pacilio was an employee of

MLCI from at least approximately October 2007 until approximately June 2011.  *Id.* ¶ 22.  From

approximately July 2011 until approximately May 2019, he was an employee of MSC.  *Id.*

Bases and Pacilio are referred to herein as the Individual Defendants.  MLCI is an indirectly

wholly owned subsidiary of BAC.  *Id*. ¶ 18.  MSC has no corporate relationship to MLCI or

BAC.  The John Doe defendants are alleged to be "other individuals or entities that participated

in the manipulation of precious metals futures contracts and the "unlawful conduct" described in

the AC.  *Id*. ¶ 23.

### B.    General Background

The action grows out of an indictment returned January 25, 2018 against Bases and

Pacilio charging the two with commodities fraud, spoofing, and conspiracy during the time they

were employed by MLCI and MSC, respectively, *United States v. Bases & Pacilio*, No. 18-cr-48

(N.D. Ill. Jan. 25, 2018), Dkt. No. 1 (the "Indictment"), and a non-prosecution agreement ("NPA") signed by MLCI and BAC with the U.S. Department of Justice ("DOJ") on June 25, 2019, and a settlement with the U.S. Commodity Futures Trading Commission ("CFTC") on the same date.  The Indictment and the NPA, which are described further below, contained allegations that Bases and Pacilio engaged in a device called "spoofing" in connection with orders they placed for precious metals futures contracts by placing orders for futures contracts with the intent to cancel those orders before execution.  The Court explains the basic terms and the operation of the scheme as alleged in the Amended Complaint before turning to the governmental allegations and the specific claims against the Individual Defendants.

A "futures contract," put quite simply, is an agreement that obligates the parties to the contract to buy or sell a specific product or financial instrument at some time in the future.  AC ¶ 24.  Futures contracts trade on markets designated and regulated by the CFTC.  *Id.* ¶ 30.

The precious metal futures contracts at issue here trade on one of either COMEX or NYMEX, both of which use an electronic trading system called Globex to allow market participants to trade futures contracts.  *Id.* ¶ 32.  Traders using Globex can place orders in the form of "bids" to buy or "offers" to sell futures contracts at various prices.  *Id.*

Two different types of orders are relevant here.  A "limit order" permits "the buyer, or seller, to define the maximum purchase price of buying, or minimum sale price for selling, a specified contract."  *Id.* ¶ 36.  If any portion of a limit order can be matched, it is immediately executed.  *Id.*  Limit orders are visible to all traders using the Globex system.  *Id.*

In an "iceberg order," by contrast, the total order is divided into a portion that can be seen by other market participants, and a portion that is not visible.  *Id.* ¶ 37.  When the visible portion of the order is executed, the remaining portion becomes visible.  *Id.*  This process repeats until

the entire remainder of the order is executed or cancelled.  *Id.*

When a buyer's bid price and a seller's offer price match for a particular contract, Globex automatically "executes" the order.  *Id.* ¶ 35.  Orders are executed according to a "first-in, first-out" algorithm ("FIFO").  *Id.* ¶ 39.  Under the FIFO order matching method, as a general rule, orders on the same side of the market (i.e., bids or offers) and at the same price are filled based on time priority.  *Id.*  Thus, the order that was placed first is executed first, regardless of the order's size.  *Id.*  Iceberg orders, however, are an exception.  Once the visible quantity of an iceberg order is filled, the replenishment quantity goes to the back of the time priority queue.  *Id.*

Key to understanding the scheme alleged in the Amended Complaint is that trades on Globex are conducted using a visible "order book" where bids and offers at various price points, or "levels," are displayed to the marketplace (except for the submerged portion of an iceberg order) but the identity of the entity placing the order is not.  *Id.* ¶ 32.  The tactic known as "spoofing" exploits that lack of transparency.  A trader interested in sending false and illegitimate supply and demand signals to the market allegedly can do so by placing an order in the "order book" at a level where the trader knows it will not be filled and then quickly cancelling it.  Because the identity of the market participants is not known, the trader can preserve its anonymity.  Moreover, Plaintiffs allege, a trader can exploit the false supply and demand signals, by placing an "iceberg order" on the other side of the market.  "For example, if a trader wants to buy futures contracts at a price below the lowest ask price then available in the market . . . he/she will place a genuine order, often in the form of an iceberg order to reduce any upward pricing pressure, at that below market price and work to spoof prices lower."  *Id.* ¶ 40. To spoof the prices lower, the trader will place large orders that he never intends to execute and at a price where they will not be immediately filled on the opposite side of the market.  *Id.*  These

orders will be visible to other investors, sending a false signal that investors are selling their futures contracts and potentially causing prices to drop. *Id.*

C.     **The Criminal Proceedings**

On January 25, 2018, a grand jury sitting in the Northern District of Illinois returned an indictment charging the Individual Defendants with eight counts of conspiracy, commodities fraud, and spoofing in connection with activities they engaged in while at MSC and/or MLCI. The first count charged Bases and Pacilio with conspiracy to commit wire fraud affecting a financial institution and commodities fraud in violation of 18 U.S.C. § 1349. Indictment ¶ 18. The second count and third counts charged Bases and Pacilio, respectively, with commodities fraud in violation of 18 U.S.C. §§ 1348 and 2. *Id.* ¶ 20. The fourth through eighth counts charged Pacilio with spoofing, which the Indictment defined as "the act of bidding or offering with the intent, at the time the bid or offer was placed, to cancel the bid or offer before execution," in violation of 7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2), and 18 U.S.C. § 2. *Id.* ¶ 24.

The purpose of the conspiracy was described as "to deceive other market participants by injecting materially false and misleading information into the precious metals futures market that indicated increased supply or demand in order to induce market participants to buy or to sell precious metals futures contracts at prices, quantities, and times that they would not have otherwise, in order to make money and avoid losses for themselves and the financial institutions that employed them." *Id.* ¶ 3. The Indictment further charged that "fraudulent orders to buy, which created the false impression in the market of increased demand, . . . was intended to drive commodity futures prices up," *id.* ¶ 7, and that fraudulent orders to sell "w[ere] intended to drive commodity futures prices down." *Id.* ¶ 8. The Indictment stopped short, however, of charging the two with manipulation or alleging that market prices were affected by their trades.

The Indictment included text messages in which the Individual Defendants discussed

spoofing.  It charged, for example, that on February 11, 2011, Pacilio sent messages to an electronic chat with other traders that suggested he had been spoofing:

| | |
|---|---|
| Pacilio: | that was me pushing it |
| Pacilio: | dont do it yourself. i will help you |
| Pacilio: | dont spoof it |
| Pacilio: | what did you get 70 lots there? |
| Trader 1: | Ok |
| Trader 2: | Yep |

*Id*. ¶ 17.  On November 16, 2010, Pacilio wrote by electronic chat, "the algos are really geared up in here. if you spoof this it really moves."  *Id*.

Counts four through eight listed specific spoofing trades conducted by Pacilio with the dates and approximate times of the spoof trades.  *Id*. ¶¶ 23-24.  The Indictment elsewhere listed a spoof trade by Bases on June 10, 2011.  *Id*. ¶ 18.

A second superseding indictment was returned on February 27, 2020.  No. 18-cr-0048 (N.D. Ill. Feb. 27, 2020), Dkt. No. 244 (the "Superseding Indictment").  It added substantive charges of wire fraud affecting a financial institution against each of Bases and Pacilio. Superseding Indictment ¶¶ 23-24.  It also listed additional spoof trades by Bases with the exact dates, times, and amounts of the trades.  *Id*. ¶¶ 22, 24.  However, it too did not charge Bases or Pacilio with manipulation or allege that market prices were affected by their activity.

On June 25, 2019, MLCI entered into the NPA and agreed to pay a combined $25 million in criminal fines, restitution, and forfeiture of trading profits.  AC. ¶ 4.  As part of the NPA, MLCI admitted that its traders engaged in conduct that was described in an attached Statement of Facts and admitted that such conduct constituted commodities fraud in violation of 18 U.S.C. § 1348(1).  The attached Statement of Facts generally tracked the language of the Indictment with the claim that the trades were intended to artificially move the prevailing price and to either move commodity future prices up or down, but without a claim that the market was manipulated

or that prices were artificially affected.  BAC also signed the NPA and undertook certain

obligations as part of the agreement.  *Non-Prosecution Agreement*, U.S. Dep't of Just. (June 25,

2019) at 1, https://www.justice.gov/opa/press-release/file/1177296/download.

### D.   Plaintiffs' Allegations

Plaintiffs allege that, during the Class Period, they traded the same futures on the same

days that Bases and Pacilio allegedly spoofed the markets and that "[t]he illegitimate supply and

demand signals conveyed by the spoof orders were . . . disseminated to the market and

artificially moved prevailing market prices in the direction of Defendants' genuine orders,

injuring Plaintiffs and Class Members."  AC ¶ 45.  Plaintiffs further allege that "Defendants'

own statements during the Class Period confirm that their spoof orders were designed to—and

did—artificially move the prices of precious metals futures contracts."  *Id.*  These manipulative

actions, Plaintiffs claim, caused prices to be artificial throughout the Class Period.  *Id.* ¶ 45.

Plaintiffs set forth dates, drawn from the Indictment and NPA, on which the Individual

Defendants are alleged to have spoofed the markets and to have moved the market.  Plaintiffs

allege that on each of these days, one or more of the Plaintiffs traded the same future that the

Individual Defendants spoofed.  These dates are: November 16, 2011, *id.* ¶ 47; February 4, 2011,

*id.* ¶¶ 48-49; February 11, 2011, *id.* ¶ 50-51; March 29, 2011, *id.* ¶ 52; June 10, 2011, *id.* ¶¶ 53-

55; November 14, 2011, *id.* ¶ 56; February 9, 2012, *id.* ¶¶ 57-59; July 26, 2012, *id.* ¶ 60; January

10, 2014, *id.* ¶¶ 61-64; January 24, 2014, *id.* ¶¶ 65-68; February 18, 2014, *id.* ¶¶ 69-74; February

28, 2014, ¶¶ 75-76; April 17, 2014, *id.* ¶¶ 77-79; and October 6, 2014, *id.* ¶ 80.  Plaintiffs allege

that, through this manipulative conduct, Defendants unlawfully increased their profits at the

expense of Plaintiffs and the Class.  *Id.* ¶ 82.

Plaintiffs' Amended Complaint is the latest in a series of complaints filed in this District

and the Eastern District of New York by various groups of plaintiffs alleging manipulation of

one or more of the precious metals futures contracts markets.  The topic also has attracted press

attention, as well as regulatory attention.

In 2014, a group of plaintiffs brought lawsuits in the Eastern and Southern Districts of

New York alleging that a number of banks conspired to suppress the price of the Silver Fixing, a

twice daily auction that set the benchmark price of silver, in violation of the Sherman Act and the

CEA.  On October 14, 2014, the Judicial Panel on Multidistrict Litigation consolidated the cases

in the Southern District of New York.  No. 14-md-2573, (S.D.N.Y. Oct. 14, 2014), Dkt. No. 1.

On December 7, 2016, Plaintiffs filed a proposed third amended complaint (the "*Silver* PTAC").

No. 14-md-2573, (S.D.N.Y. Dec. 7, 2016), Dkt. No. 180-2.  In the *Silver* PTAC, Plaintiffs

alleged that, "[b]y their concerted action, Defendants dictated the price of physical silver and

thereby financial instruments tied to the price of physical silver, such as COMEX silver futures.

This is because the prices of financial instruments like COMEX silver futures are directly and

proximately caused by, and directly linked to, the price of physical silver that Defendants set."

*Id.* ¶ 373.  The *Silver* PTAC proposed a putative class consisting of "[a]ll persons or entities that

transacted in U.S.-Related Transactions in or on any over-the-counter ('OTC') market or

exchange in physical silver or in a derivative instrument in which silver is the underlying

reference asset . . . at any time from January 1, 2007 through December 31, 2013."  *Id.* ¶ 360.

U.S.-Related Transactions were defined as "any transaction in a Silver Instrument (a) by any

person or entity domiciled in the U.S. or its territories, or (b) by any person or entity domiciled

outside the U.S. or its territories but conducted, in whole or in part, in the U.S. or its territories."

*Id.*  Silver Instruments included "exchange-traded financial instruments, such as silver futures

and options contracts, as well as OTC transactions, such as silver swaps and silver forward

agreements."  *Id.* ¶ 129.  The *Silver* PTAC named MLCI as being among the group of banks

engaged in the conspiracy and included text messages in which an MLCI trader discussed manipulating silver prices and shared information about contemporaneous trading in silver and silver financial instruments.  *Id.* ¶¶ 302-03.  Plaintiffs alleged that the defendant banks (including MLCI) "specifically intended to and did cause unlawful and artificial prices in silver and silver financial instruments, including COMEX silver futures contracts in violation of the CEA."  *Id.* ¶ 393.  Litigation in the *Silver* case is ongoing.

Also in 2014, a group of plaintiffs filed lawsuits in the Northern District of California and the Southern District of New York alleging that a number of banks had conspired to manipulate the price of the London Gold Fixing, which sets the benchmark price for gold, in violation of the Sherman Act and the CEA.  The cases were consolidated in the Southern District of New York on August 14, 2014.  No. 14-md-2548 (S.D.N.Y. Aug. 14, 2014), Dkt. No. 1.  On March 16, 2015, the plaintiffs filed a second consolidated amended complaint.  No. 14-md-2548 (S.D.N.Y. Mar. 16, 2015), Dkt. No. 44 (the "*Gold* SCAC").  The *Gold* SCAC specifically alleged manipulation of the gold futures contracts traded on COMEX.  *See id.* ¶ 115 ("Defendants' conduct was specifically intended to manipulate the COMEX gold futures segment of the gold market . . . in which the Bank Defendants had taken large short positions."); *id.* ¶ 144 ("The injury futures investors experienced was a direct result of Defendants' coordinated efforts to influence COMEX gold futures and options prices by manipulating the price of the underlying commodity.").  The *Gold* SCAC sought relief on behalf of a putative class consisting of: "All persons or entities who during the period from January 1, 2004 through June 30, 2013 . . . (i) sold gold bullion or gold bullion coins; (ii) sold gold futures contracts traded on COMEX or other exchanges operated in the United States; (iii) sold shares in Gold ETFs; (iv) sold gold call options traded on COMEX or other exchanges operated in the United States; (v) bought gold put

options traded on COMEX or other exchanges operated in the United States (vi) sold over-the-counter gold spot or forward transactions or gold call options; or (vii) bought over-the-counter gold put options." *Id.* ¶ 341.  Litigation in the *Gold* case is ongoing.

On November 25, 2014, a group of plaintiffs filed a lawsuit in the Southern District of New York alleging that a group of banks had conspired to manipulate the global benchmarks for platinum and palladium in violation of the Sherman Act, the Clayton Act, and the CEA.  No. 14-cv-9391, (S.D.N.Y. Nov. 25, 2014), Dkt. No. 1.  Plaintiffs alleged that, "[b]ecause they move in lockstep with the price for physical platinum and palladium, Defendants' coordinated suppression of the Fix Price had the effect of artificially lowering the prices of platinum and palladium futures and options traded on NYMEX . . ."  *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *5 (S.D.N.Y. Mar. 28, 2017) ("*Platinum & Palladium*").  Plaintiffs brought their claims on behalf of a putative class consisting of: "All persons or entities who traded or held in the United States physical platinum or palladium; platinum or palladium derivative products that settled or were marked-to-market at the Platinum and Palladium Fixings; or NYMEX platinum or palladium futures and options contracts, beginning at least as early as January 1, 2007 and continuing to the present."  *Id.* ¶ 154.  Litigation in the *Platinum & Palladium* case also is ongoing.

These actions and regulatory investigations of alleged manipulation in each of the precious metals futures contracts markets attracted widespread attention in the mainstream media, which is described below.

## PROCEDURAL HISTORY

Plaintiffs filed their complaint on June 27, 2019.  Dkt. No. 1.  Defendants filed a motion to dismiss on January 13, 2020.  Dkt. No. 33.  On March 3, 2020, Plaintiffs filed the Amended Complaint, mooting the motion to dismiss pursuant to Rule 3(C) of this Court's Individual

Practices in Civil Cases.  Dkt. No. 51.  On May 8, 2020, Defendants filed a renewed motion to

dismiss.  Dkt. No. 55.  Plaintiffs filed their opposition on July 13, 2020, Dkt. No. 64, and

Defendants replied on August 13, 2020, Dkt. No. 67.  The Court heard oral argument on

February 24, 2021.

## LEGAL STANDARDS

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a

complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 554, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact

to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."

*Twombly*, 550 U.S. at 556; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46

(2011).  However, although the Court must accept all the factual allegations of a complaint as

true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*,

556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  The ultimate issue "is not whether a

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support

the claims."  *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes*, 416

U.S. 232, 235-36 (1974)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir.

2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely

to assess the legal feasibility of the complaint, not to assay the weight of the evidence which

might be offered in support thereof.") (internal quotation marks and citation omitted).

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Brothers*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citation omitted); *see also Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss.").   In the instance of a case where the discovery accrual rule is at issue, "[w]here . . . the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 n.3 (2d Cir. 1993).

 If it appears from a complaint that the claims are prima facie time-barred, the burden is on the plaintiff to "plausibly alleg[e] that they fall within an exception to the applicable statute of limitations." *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 436 (S.D.N.Y. 2014), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (citing cases).

## DISCUSSION

### A.    Timeliness of Plaintiffs' CEA Claims

Defendants argue first that all of Plaintiffs' claims are time-barred by the statute of limitations under the CEA.

A claim pursuant to the CEA must be brought "not later than two years after the date the cause of action arises."  7 U.S.C. § 25(c).  The Second Circuit has held that a CEA claim accrues at the earliest of each of two possible points in time.  First, a CEA claim can accrue when the plaintiff discovers her "CEA injury." *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108 (2d

Cir. 2019).  This is referred to as "actual knowledge."  *Id.* at 109.  *Levy* favorably cited *Cancer Foundation, Inc. v. Cerberus Capital Management, L.P.*, 559 F.3d 671, 674 (7th Cir. 2009), for the proposition that "[a] plaintiff does not need to know that his injury is actionable to trigger the statute of limitations – the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim."  *Levy*, 917 F.3d at 109.  Second, even in the absence of actual knowledge by the particular plaintiff bringing suit, a CEA claim will accrue, and the statute of limitations will begin to run, when the plaintiff has constructive knowledge of her CEA injury or is put on "inquiry notice."  *See id.* (citing *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2d Cir. 1994)); *see also Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 575 (S.D.N.Y. 2017) (same).  Inquiry notice is sometimes referred to as "storm warnings." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005).  Such constructive knowledge arises where "the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded."  *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 912 (S.D.N.Y. 2018) ("*Silver II*") (quoting *Koch v. Christies Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012)).  "'Inquiry notice . . . gives rise to a duty of inquiry when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded."  *Koch*, 699 F.3d at 151 (quoting *Lentell*, 396 F.3d at 168).  In such circumstances, the accrual of the claim will be timed in one of two ways: "(i) '[i]f the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose'; and (ii) if some inquiry is made, '[the court] will impute knowledge of what an investor in the exercise of reasonable diligence[] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud.'"  *Id.* (quoting *Lentell*, 396, F.3d at 168); *see also LC Cap. Partners v. Frontier Ins. Grp.,*

*Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (same).  The statute of limitations begins to run when the plaintiff has either "actual or inquiry notice of the injury."  *In re Merrill Lynch Ltd P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998).

The undisputed evidence, apparent from the Amended Complaint and papers integral to the Amended Complaint, which are incorporated therein or of which the court can take judicial notice, shows that, by December 2016 at the latest, Plaintiffs had at least inquiry notice, if not actual notice, that they were injured by commodities market manipulation in each of the markets for COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum Futures, and NYMEX Palladium Futures.  On December 7, 2016, plaintiffs in the *Silver* action—represented by the same lawyers as the plaintiffs in this case—publicly filed a complaint in federal court in the Southern District of New York that contained the allegation that the silver futures market— including COMEX Silver Futures, one of the very markets alleged to have been manipulated here—was manipulated during the same time period—2007 to 2014—as alleged here.  The plaintiffs there alleged defendants there had conspired to manipulate the price of the London Silver Fix, with an impact on the COMEX Silver Futures, in violation of the CEA and the Sherman Act.  *See Silver* PTAC ¶ 393 ("Defendants, through their manipulative acts alleged herein, specifically intended to and did cause unlawful and artificial prices in silver and silver financial instruments, including COMEX silver futures contracts in violation of the CEA.")  The *Silver* PTAC even identified Bank of America and Merrill Lynch, also defendants here, as defendants.  *Id.* ¶ 100.  It also identified spoofing as one means by which traders manipulated the market.  *Id*. ¶¶ 261-63.  It cited text messages sent between traders referencing manipulation not only in the silver market but also in the markets for gold and palladium.  *Id*. ¶ 303.  The *Silver* PTAC brought the case on behalf of a class consisting of "[a]ll persons or entities that transacted

in U.S.-Related Transaction in or on any over-the-counter ('OTC') market or exchange in physical silver or in a derivative instrument in which silver is the underlying reference asset . . . at any time from January 1, 2007 through December 31, 2013." *Id.* ¶ 360.  Plaintiffs here are members of this putative class to the extent that they traded and were injured as the result of trading manipulated COMEX Silver Futures.

Plaintiffs were on at least inquiry notice of manipulation throughout the Class Period in the market for COMEX Gold Futures at an even earlier date.  The *Gold* SCAC was filed on March 16, 2015.  The *Gold* SCAC alleged persistent manipulative suppression of the London Gold Market Fixing, which produces a benchmark rate for gold.  *Gold* SCAC ¶ 1.  The *Gold* SCAC alleged that the defendants were motivated to suppress the London Gold Market Fixing, in part, because of their large "short" positions in COMEX Gold Futures.  *Id.* ¶ 115 ("Defendants' conduct was specifically intended to manipulate the COMEX gold futures segment of the gold market (by manipulating the price of the commodity underlying COMEX gold futures contracts) in which the Bank Defendants had taken large short positions."). According to the *Gold* SCAC, "[b]ecause the futures price is essentially an expectation of what the spot price will be for the underlying futures contract at maturity, gold futures and physical prices are very closely correlated" and accordingly, an artificially low Fixing meant "artificially lowered prices on COMEX for both futures and options." *Id.* ¶ 115.  Among other causes of action, the plaintiffs in *Gold* brought claims for market manipulation in violation of the CEA.  *Id.* ¶ 366.  The *Gold* plaintiffs brought the action on behalf of a putative class of all persons or entities who, inter alia, traded COMEX Gold Futures in the period from January 1, 2004 to June 30, 2013—i.e, to the extent Plaintiffs here traded in and were injured as a result of manipulation of the COMEX Gold Futures, they were members of the *Gold* putative class.  *Id.* ¶ 341.  The

*Gold* SCAC alleged that spoofing was common practice among institutions trading in gold futures.  *Gold* SCAC ¶ 293.

Finally, with respect to Plaintiffs' claims of manipulation of the platinum and palladium markets, on November 25, 2014, a group of plaintiffs filed a putative class action against a number of banks alleging that they had conspired to manipulate the London Platinum and Palladium Fix.  *Platinum & Palladium*, 2017 WL 1169626, at *3.  The defendants' manipulation was alleged to have artificially lowered the prices of platinum and palladium futures and options traded on NYMEX.  *Id.* at *5.  The plaintiffs brought the action on behalf of a putative class of all those who had traded NYMEX Platinum or Palladium futures and options contracts in the period from January 1, 2007 to the date of the filing of the complaint, meaning that Plaintiffs here—to the extent they traded in and were injured by manipulation of those markets—were putative class members.  No. 14-cv-9391 (S.D.N.Y. Nov. 25, 2014), Dkt. No. 1 ¶ 154.  Further, text messages cited in the *Silver* PTAC referenced manipulation of NYMEX Palladium Futures, providing additional notice to Plaintiffs.  *Silver* PTAC ¶ 303 ("I sold the high in silver and pd.").

Moreover, the actions and the accompanying regulatory investigations of manipulation in the precious metals market attracted widespread attention in the mainstream media.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("We have previously held that it is proper to take judicial notice of the fact that press coverage . . . contained certain information, without regard to the truth of [the] contents," in deciding inquiry notice).  On February 23, 2015, for example, the Wall Street Journal reported that the DOJ was investigating at least 10 major banks for possible rigging of the gold, silver, platinum, and palladium markets, and that the CFTC had opened a civil investigation.  Jean Eaglesham & Christopher M. Matthews, *Big Banks Face Scrutiny Over Pricing of Metals: U.S. Justice Department*

*investigates price-setting process for gold, silver platinum, and palladium*, Wall St. J. (Feb. 23,

2015), https://www.wsj.com/articles/big-banks-face-scrutiny-over-pricing of metals-

1424744801.  In May 2015, the CFTC publicly announced a civil enforcement action against two

individuals for spoofing in the gold and silver futures markets.  *CFTC v. Khara*, No. 15-cv-3497

(S.D.N.Y. Mar. 31, 2016), Dkt. No. 35.  And on June 1, 2017, a Deutsche Bank trader, who was

alleged to have spoofed the gold and silver futures markets and to have coordinated his spoofing

with others who traded in the market, pleaded guilty.  *United States v. Liew*, No. 17-cr-1 (N.D.

Ill. May 24, 2017), Dkt. No. 20.

These lawsuits and the accompanying attention paid by the media to the lawsuits and

regulatory investigations of market manipulation were sufficient to put a reasonable investor of

ordinary intelligence on, at least, inquiry notice of their CEA injury.  The lawsuits were not filed

as individual actions in a remote foreign courthouse where they might have evaded notice.  They

were filed as class actions in the Southern District of New York—the very court in which

Plaintiffs have filed this action.  Plaintiffs here were not named plaintiffs in the earlier litigation

but they are not alleged to be unsophisticated and are not held to the standard of an

inexperienced investor.  All of them traded in the precious metals futures markets; at least two of

them allege that they executed thousands of trades.  All of the publicly available information

combined to provide at least constructive notice to Plaintiffs of the probability that they had been

injured by manipulation in the precious metals futures markets and had suffered a CEA injury.

*See, e.g.*, *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 388 (S.D.N.Y. 2003) (holding

that plaintiffs were on constructive notice where "abundant material was in the public domain

regarding the existence of widespread banking conflicts of interest and allegedly inflated buy

ratings in Wall Street stock research"); *see also Newman v. Warnaco Grp.*, 335 F.3d 187, 193

(2d Cir. 2003) ("The issue that the Court must consider is not whether Plaintiffs in this case were given inadequate information about the alleged investor fraud but whether Plaintiffs 'had constructive notice of fact sufficient to create a duty to inquire further into that matter. An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice.'" (quoting *Dodds*, 12 F.3d at 350).

Plaintiffs resist this conclusion and argue alternatively that (1) the statute of limitations did not begin to run for each of MLCI, BAC, MSC, and each Individual Defendant until Plaintiffs knew that such Defendant was engaged in market manipulation or spoofing and that such conduct was the cause of their injury; or (2) if the statute of limitations clock began to run, it was stopped and the time period for them to sue was tolled as a result of the application of the doctrine of fraudulent concealment. They claim that the first time that they knew or were put on inquiry notice of their claims was with the publication of the indictment. As noted, Plaintiffs have named a series of "John Doe" Defendants. AC ¶ 23. On Plaintiffs' hypothesis, the statute of limitations clock would not begin to run for each of those Defendants until Plaintiffs knew or were on inquiry notice of their names. Plaintiffs' arguments are not persuasive.

First, the knowledge to which the cases refer, whether in the form of "actual" or "constructive knowledge," is knowledge of the CEA injury. It is not knowledge of the identity of the specific Defendant or of the other elements of a cause of action. *See Levy*, 917 F.3d at 108; *Cerberus Cap. Mgmt., LP*, 559 F.3d at 674 ("A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim."); *Roeder v. J.P. Morgan Chase & Co.*, 2021 WL 797807, at *6 (S.D.N.Y. Feb. 26, 2021) ("Under the federal injury discovery rule, accrual beings 'when the plaintiff knows or has reason to know of the injury which is the basis of

his action.'") (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002)); *see also Rotella v. Wood,* 528 U.S. 549, 555-57 (2000).

In *Levy* itself, the plaintiff was aware she had been injured by manipulation of the commodities markets and filed a lawsuit against several banks.  Later, she discovered the identity of several other defendants when she received a copy of a class complaint asserting similar claims to her own.  She sued the new defendants, claiming that the clock for them began to run only when she learned or should have learned of their identities.  The district court rejected that argument and the Second Circuit affirmed.  The Second Circuit held: "The relevant inquiry . . . is not whether Levy had discovered the identity of the defendants or whether she had discovered the manipulation scheme she alleges in her complaint.  Rather, the question is when Levy discovered her CEA injury—that is, a loss that was the result of a CEA violation." *Levy*, 917 F.3d at 108.  The same result also follows for "inquiry notice."  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 484-85 (S.D.N.Y. 2014) ("The specificity required to trigger inquiry notice is not necessarily specificity with regard to each defendant, but rather specificity that notifies a plaintiff that he has been injured.").[1]

The same conclusion follows here.  Plaintiffs claim that they could not have discovered the identity of the particular defendants until the government investigations revealed them.  Hr'g

---

[1] In their brief and at argument, Plaintiffs were able to identify only two cases to support their proposition that the injury discovery rule is defendant-specific—*Sonterra* and *Sullivan v. Barclays PLC*, 2017 WL 685570, at *28 (S.D.N.Y. Feb. 21, 2017).  In *Sonterra*, the court did hold that the government's NPA with one defendant did not put the other defendants on inquiry notice as to CEA claims against the other defendants.  277 F. Supp. 3d at 575.  However, it did so prior to the Second Circuit's decision in *Levy* and without explanation or analysis.  *Sullivan* is further afield.  In that case, the court did not find that the plaintiffs were on inquiry notice of their CEA injury with respect to any defendant.  *Sullivan*, 2017 WL 685570, at *28.  Therefore, while there is language in *Sullivan* that suggests that injury accrual is a defendant-specific inquiry, the court neither had the occasion to consider the issue nor did it have the benefit of *Levy*.

Tr. 23:3-23:11. The "spoof" trades do not identify themselves as "fake" and Defendants neither incriminated themselves nor were publicly incriminated by others until the Indictment. However, having been put on notice of the probability of a CEA injury, Plaintiffs had a duty at least to inquire. They could not just sit back and let the class actions run their course, neither intervening and taking discovery nor engaging in any other questioning; nor could they let the Government do the work for them, suing thereafter if they were dissatisfied with the results of the class action or saw an opportunity for additional recovery. Plaintiffs do not allege that they engaged in any inquiry. To the contrary, they allege that they did not engage counsel, nor did they investigate the misconduct reported until June 25, 2019, after the criminal complaints against Bases and Pacilio were unsealed. AC ¶¶ 95-96. But that date is too late—by then there was nothing as to which to inquire. Their duty arose when they knew of the CEA injury.[2] They did not investigate. Accordingly, knowledge is imputed to them as of the date the duty of inquiry arose. *See Koch*, 699 F.3d at 151.

Second, Plaintiffs argue that, as a result of fraudulent concealment, the clock did not start running for each entity and individual engaged in spoofing until the Government revealed their names. Plaintiffs offer two arguments in favor of this position. Plaintiffs allege that the spoof trades were self-concealing. *See* AC ¶ 92 ("By its very nature, the unlawful activity alleged herein was self-concealing. Defendants engaged in secret and surreptitious activities to submit and cancel trade orders in order to manipulate the prices of NYMEX and COMEX precious metals futures contracts to artificial levels."). When a spoof is placed and then quickly cancelled, other market participants do not know the name of the entity placing the bid or offer.

---

[2] It does not appear that, aside from listing the dates of their trades, there is anything that Plaintiffs' counsel discovered as a result of the "duty of inquiry" other than what was already in the public domain that they have pleaded in the complaint.

Nor do they know either that the trader never had any intent that the bid or order would be filled when the bid or offer was placed but instead intended to cancel the order, or that an iceberg trade was on the other side of the market.  Thus, they claim as a categorical matter, any trader who makes spoof trades also engages in self-concealing conduct.  Not only has the trader violated the law, but he has done so in a way that leaves the statute of limitations open for an indefinite period until the plaintiff knows or should know of the trader's specific identity.  Plaintiffs also allege that "Defendants MLCI and MSC have made repeated public statements that they maintain established procedures that ensure compliance with all applicable laws and regulations."  *Id.* ¶ 94.

Plaintiffs make no other arguments for fraudulent concealment.  They do not allege that Defendants took any measures to conceal the spoofing, other than the concealment inherent to the trading.  Plaintiffs do not allege that there was anything about the way in which Defendants spoofed the markets that made the spoofing particularly difficult to discover or that they engaged in any other conduct that would toll the statute of limitations or estop Defendants from relying on it.

Plaintiffs' first argument proves too much.  Under the doctrine of fraudulent concealment, the limitations period is tolled when a plaintiff plausibly alleges with the particularity required by Federal Rule of Civil Procedure 9(b): (1) that the defendant concealed from him the existence of his cause of actions; and (2) that he remained in ignorance of the violation during the limitations period; and (3) that the plaintiff's continuing ignorance as to the claim was not a result of a lack of due diligence.  *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004); *see Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 399 (S.D.N.Y. 2010) ("[A] claim of fraudulent concealment must be pleaded with

particularity, in accordance with the heightened pleading standards of Rule 9(b).").  Under Plaintiffs' argument, however, the statute of limitations would not begin to run for *any* claim involving spoofing until the defendant confessed or the plaintiff actually knew his identity otherwise.  There would be no duty of inquiry.  The clock would not start running and a plaintiff would have no duty to inquire until he knew of the answer and knew of the defendant who caused his CEA injury through spoofing.

The law does not compel this result.  The fraudulent concealment doctrine is a principle of equity that prevents a "a defendant [who has] conceal[ed] a fraud, or commit[ed] a fraud in a manner that it concealed itself" in order to frustrate the plaintiff's ability to comply with the statute of limitations from arguing that the plaintiff's claim should be dismissed because the plaintiff did not comply with the statute of limitations.  *State of N.Y. v. Hendrickson Brothers*, 840 F.2d 1065, 1083 (2d Cir. 1988) (quoting *Bailey v. Glover*, 88 U.S. 342, 349 (1874)).  The doctrine has been applied in cases of fraud where, based on the method by which the fraud was committed, the plaintiff would be oblivious to the fact that he was harmed at all and not just to the identity of the person who has injured him.  It has also been applied in the case of wrongs such as bid-rigging, where there is something in the conduct over and above that which harms the plaintiff and conceals the wrong from the plaintiff.  *See Hendrickson Brothers*, 840 F.2d at 1083; *see also Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 135 (S.D.N.Y. 2016) ("Allegations of price-fixing conspiracies in violation of antitrust law constitute the type of unlawful activity that is inherently self-concealing."); *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) ("By alleging a price-fixing scheme, the plaintiff sufficiently has alleged the first prong of fraudulent concealment and . . . there is no need to require the pleading of affirmative actions taken by defendants to prevent the plaintiff's

discovery of its claim."). The Second Circuit has explained the logic of the rule as applied to

bid-rigging in *Hendrickson Brothers*, quoting the Tenth Circuit's decision in *Western Paving*:

> [If] a bidrigging conspiracy exists, it must remain concealed to be successful. Any
> knowledge of the conspiracy would lead plaintiff to seek action immediately and
> result in the collapse of the conspiracy. Furthermore, unlike many conspiracies, a
> bidrigging conspiracy is likely to exist for an extended period of time. To be
> attractive to all bidders, the conspiracy must cover more than one job—or must
> provide some quid pro quo to the "losing" bidders. The very nature of a bidrigging
> conspiracy makes it likely that future bids will also be rigged. . . . These additional
> bidrigging activities not only provide the compensation for one of the "losing"
> bidders in the original bid but also help to conceal the bidrigging activity on the
> other bids. Such subsequent fraudulent acts may in themselves amount to
> affirmative acts of concealment.

*Hendrickson Brothers*, 840 F.2d at 1084 (quoting *Colorado ex rel. Woodard v. Western Paving*

*Construction Co.*, 833 F.2d 867, 881 (10th Cir. 1987)).

Accepting Plaintiffs' allegations as true for purposes of this motion, they lack the

attributes of any of the conduct identified to be self-concealing in *Hendrickson Brothers*.

Plaintiffs' injury was not concealed from them. As indicated above, they knew of the harm as

early as 2016. This case thus does not involve the self-concealing conduct at issue when the

plaintiff accepts "a sham article [believing] that [it] is genuine." *Hendrickson Brothers*, 840 F.2d

at 1083. In that kind of case, the plaintiff is unaware of the injury. She has no cause to

investigate it. Here Plaintiffs knew of the wrong; they just did not know the identity of everyone

who perpetrated it. The wrong itself was not concealed.

This is also not a case like *Hendrickson Brothers* itself. Plaintiffs do not allege that

Defendants engaged in a conspiracy, much less a conspiracy that by its nature would have to

"exist for an extended period of time" with additional fraudulent acts to be effective. The fraud

allegedly consummated by each spoof trade was complete at the moment each fake order was

placed and a Defendant was able to dispose of all or part of an iceberg order. Each act of alleged

manipulation did not depend upon any future act of manipulation or act of a co-conspirator to be effective.  Nor did the fraud itself depend upon the continued silence of others.  Therefore, Defendants' acts individually and collectively do not fall into the *Hendrickson Brothers* bucket. Plaintiffs enjoyed the benefit of the discovery accrual rule—delaying the start of the limitations period until after they had actual or constructive knowledge of their CEA injury.  They could not avoid the duty of inquiry by virtue of the fraudulent concealment doctrine.  The claim of fraudulent concealment cannot be accepted without leaving the limitations period extended for an open-ended period and depriving it, and the notion of inquiry notice, of any real meaning.

Plaintiffs' allegations regarding the public statements of MSC and MLCI do not add to the mix.  These statements—which are not quoted in the Amended Complaint—are not sufficient to invoke fraudulent concealment, for at least two reasons.  First, communications to the community at large will not generally support a finding of fraudulent concealment.  *See Twersky*, 993 F. Supp. 2d. at 445 (holding that equitable estoppel for fraudulent concealment is "appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to defendants' misconduct toward the potential plaintiffs, not a community at large.") (quoting *Doe v. Kolko*, 2008 WL 4146199, at *4 (S.D.N.Y. Sept. 5, 2008)).  There is no evidence or allegation that these statements were directed at Plaintiffs, that they referred specifically to market manipulation in the precious metals futures contracts markets, or that Defendants knew that Plaintiffs would rely upon them in foregoing to investigate their claims, or that they desired that result.  They are the everyday statements that corporations make that are not specific to any particular claim of wrongdoing and that do not warrant that every one of the corporation's employees is complying with the law.  Second, the Second Circuit has held that "[i]t is well established that general statements about reputation, integrity, and compliance with

ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).  If that is so, the statements also are too general for a would-be plaintiff to rely upon them in foregoing an investigation of his CEA injury.

Finally, even if Defendants' alleged spoofing were self-concealing or their statements were enough to invoke fraudulent concealment, Plaintiffs have not made a showing of due diligence in investigating their claims.  Plaintiffs have not alleged that they made any efforts at all during the limitations period to investigate.  As such, Plaintiffs have not adequately pleaded due diligence.  *See Hinds Cnty.,* 700 F. Supp. 2d at 400 ("[D]ue diligence is not adequately pled if plaintiffs 'did not allege in the [complaint] that they exercised due diligence' or if they 'make no allegation of any specific inquiries of [defendants], [or] detail when such inquiries were made, to whom, regarding what, and with what response.'") (quoting *Merrill Lynch*, 154 F.3d at 60).  Without having pleaded that they made inquiries, Plaintiffs have not established that they satisfied the due diligence requirement for the fraudulent concealment test for statute of limitations purposes.

## C.    Actual Damages Under the CEA

Defendants additionally argue that the Amended Complaint should be dismissed because Plaintiffs have failed to plead actual damages under the CEA.

Section 22 of the CEA limits the parties who can bring actions for violations of its provisions.  "There are no citizens' arrests for commodities fraud."  *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 109-110 (2d Cir. 2018).  The language of the statute makes a party who violates its terms "liable for actual damages," 7 U.S.C. 25(a)(1), and thus a party who did

not suffer actual damages "resulting" from a CEA violation has not stated a claim for relief,

*Total Gas*, 889 F.3d at 111-12; *see also In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D.

366, 378 (S.D.N.Y. 2010) (in order to state a manipulation claim under the CEA, Plaintiffs must

allege "actual damages resulting from" the alleged manipulation) (quoting 7 U.S.C.

§ 25(a)(1)(D)).

The Second Circuit has recently laid out the standards a plaintiff must satisfy in pleading

damages resulting from market manipulation under the CEA.  *Total Gas.*, 889 F.3d at 111-112.

"For one trader to have injured another, the former must have taken an action that had an impact

on the latter's position and that impact must have been negative."  *Id.* at 112.  A plaintiff can

satisfy these standards by pleading facts that plausibly allege that: (1) that she transacted in at

least one commodity contract at a price that was lower or higher than it otherwise would have

been absent the defendant's manipulations; and (2) that the manipulated prices were to the

plaintiff's detriment.  *See id.*  "The most direct way to plead such harm is to point to a specific

manipulated transaction or set of transactions between a plaintiff and a defendant with the

plaintiff on the (net) losing end and the defendant on the (net) winning end."  *Id.*  However,

privity between the plaintiff and the defendant is not required.  *See id.*  "More commonly, [a

plaintiff] will have to plead enough facts to make plausible the inference that the prices of her

trades with a third party have been substantially influenced by a defendant's trades with a third

(or fourth or fifth. . .) party."  *Id.*  For example, if a plaintiff pleads that "she traded and lost

money (or failed to gain as much money as she otherwise would have) during a bout of

defendant's alleged market manipulation in the same contract type in the same exchange for

delivery at the same time and place," the allegations are "nearly as good as if she had pled

privity."  *Id.*  "[U]nlike in the case of privity," however, mere coincidence or overlap in trading

is not sufficient to show that the connections were "inherently . . . to the plaintiff's detriment." *Id.* at 112-13.  A plaintiff thus cannot rest on allegations that a price was manipulated at the time she traded; "[s]he will have to plead additional facts to make it plausible that the impact on her was harmful rather than neutral or beneficial."  *Id.* at 113; *see also id.* ("When a plaintiff seeks to make plausible a connection between distinct contract types traded on distinct exchanges without a formal rule-based price linkage she will have to plead with greater detail.").  However, the CEA does "not impose a loss causation requirement, which would mandate demonstrating losses in specific trades." *Id*. at 113 n.4.[3]

The Amended Complaint fails plausibly to allege that Plaintiffs bought at a price that was higher or sold at a price that was lower than it should have been due to Defendants' conduct or that the manipulated prices were to Plaintiffs' detriment.  Plaintiffs' allegations take two forms: (1) first, they identify specific dates on which they claim spoof trades were placed and allege that they traded on the same days; and (2) second, they allege that Defendants manipulated thousands of trades and the Court should therefore infer from the magnitude of the spoof conduct and the fact that the Plaintiffs were in the market that they were injured.  Neither allegation is sufficient.

First, allegations that the plaintiffs traded after a manipulative act and, to their detriment, at an artificial price caused by that manipulative act can under certain circumstances suffice to plead harm as a result of the manipulative act.  *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 565 (S.D.N.Y. 2016) (holding that plaintiffs had adequately pleaded actual damages under the CEA by alleging that they "sold a particular quantity of silver futures

---

[3] In *Total Gas*, the Second Circuit made clear that "a plaintiff [also] could allege that she traded (at a detriment) in a contract the price of which was tied, via explicit agreement or other mutual understanding, to the price of a contract that a defendant was plausibly manipulating."  *Id.* at 113.  That method of pleading damages is not at issue in this case.

on specifically identified dates when defendants are alleged to have artificially suppressed the fix price," and that "the effects of Defendants' manipulation persisted beyond the Fixing window"). However, Plaintiffs have not made any such allegations. Plaintiffs identify 30 days on which Defendants manipulated the price of one or more precious metals futures contracts. AC ¶¶ 47-82. Each of those dates corresponds to a spoof identified by both date and time in the Indictment and Superseding Indictment. At least one Plaintiff is alleged to have traded "on" 14 of those same dates: November 16, 2011, *id.* ¶ 47; February 4, 2011, *id.* ¶¶ 48-49; February 11, 2011, *id.* ¶ 50-51; March 29, 2011, *id.* ¶ 52; June 10, 2011, *id.* ¶¶ 53-55; November 14, 2011, *id.* ¶ 56; February 9, 2012, *id.* ¶¶ 57-59; July 26, 2012, *id.* ¶ 60; January 10, 2014, *id.* ¶¶ 61-64; January 24, 2014, *id.* ¶¶ 65-68; February 18, 2014, *id.* ¶¶ 69-74; February 28, 2014, ¶¶ 75-76; April 17, 2014, *id.* ¶¶ 77-79; and October 6, 2014, *id.* ¶ 80. No Plaintiff is alleged to have traded on the remaining 16 days on which Defendants spoofed. Thus, on over half of the days on which Defendants spoofed, no Plaintiff is alleged to have traded. Plaintiffs, moreover, steadfastly avoid pleading that, on the dates there were spoof trades, they traded *after* the spoof. Given the specificity of the information available to Plaintiffs in terms of the date and time of a trade, the only plausible inference is that they traded before the spoof. If they traded after and proximate to the spoof, there is no reason for them not to have alleged it. And, if their trades all occurred before the spoof, there is no plausible inference that the trade took place at a price that was artificially impacted as a result of the spoof. There also is no basis for an inference that Plaintiffs were harmed as a result of Defendants' alleged manipulation as opposed to having been benefitted. Therefore, Plaintiffs' allegations that their trades occurred on the same days as the spoofs cannot establish, without more, that they suffered harm resulting from the alleged CEA violation.

Second, Plaintiffs allege that Defendants "spoofed the markets for precious metals futures contracts thousands of times throughout the Class Period," AC ¶ 4; *see also id.* ¶ 44, and ask the Court to infer from that allegation that they suffered injury resulting from that conduct. To accept that argument would be tantamount to permitting a "citizens' arrests for commodities fraud." *Total Gas*, 889 F.3d at 109-110. The Class Period is alleged to have extended from January 1, 2007 through December 31, 2014. AC ¶ 1. The Amended Complaint covers trades with respect to four different contracts and options on those futures contracts. *Id.* One Plaintiff alleges that it transacted in "thousands" of trades with respect to four of those contracts and options on those futures contracts. *Id.* ¶ 10. Another alleges that it transacted in thousands of trades with respect to four of those contracts and options on those contracts. The others do not identify any magnitude of their trading. There are approximately 252 trading days in a year. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 506 n.60 (S.D.N.Y. 2018); *see also* NYSE Trading Days: 2020, https://www.nyse.com/publicdocs/Trading_Days .pdf. If the spoofs were spread evenly over the Class Period and across markets, Plaintiffs' allegations would establish no more than that there was a spoof trade in any particular market on only one out of four days. Of course, there is no necessary reason to suspect that the spoof trades were spread evenly across markets and over time. But that is the point. Absent either a far greater volume of trading or some additional facts pleaded, it is a matter of pure speculation that these Plaintiffs—as opposed to others in the market—were impacted as a result of Defendants' conduct, and impacted negatively.

Plaintiffs allege that a spoof order "create[s] a false impression of supply or demand" at the moment it is placed. AC ¶ 40. They do not claim, nor could they, that such "episodic manipulation warp[s] market forces continuously throughout the class period or in a predictable

manner." *Silver II*, 332 F. Supp. 3d at 922; *see also In re LIBOR*, 27 F. Supp. 3d at 461 ("[S]ince LIBOR was allegedly artificial only for discrete days during the Class Period, by their own reckoning, plaintiffs may have transacted on many days when LIBOR was 'true.'"). "Manipulative trading strategies like 'spoofing' or triggering stop-loss orders depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief." *Silver II*, 332 F. Supp. 3d at 923.  Over a period of seven years, even thousands of fraudulent spoofs whose effect lasted only a matter of seconds would not necessarily impact specific trades of others, particularly in a "highly liquid, broad market" like that for precious metals futures.  *Id.* at 907.  Thus, even assuming (what is not alleged) that Plaintiffs were regularly in the market and transacting throughout the Class Period, while Defendants were also placing spoof orders, it does not follow that any particular trade of the Plaintiffs—or necessarily any of the trades made by Plaintiffs—would have been affected by Defendants' alleged manipulative conduct.  To infer otherwise would be to sustain a claim based on rank speculation prohibited by the Supreme Court's decisions in *Twombly* and *Iqbal*.  *See Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

### D.     The Existence of a Private Right of Action for Spoofing

Defendants argue that there is no private right of action for spoofing under the CEA and that the Amended Complaint does not state a claim for market manipulation.  Dkt. No. 55 at 13-18.  In light of the Court's rulings on the statute of limitations and actual damages, the Court does not reach this issue.

### E.     Unjust Enrichment

In order to succeed on a claim for unjust enrichment under New York law, a plaintiff must prove that (1) defendant was enriched; (2) at plaintiff's expense; and (3) equity and good conscience militate against permitted defendant to retain what plaintiff is seeking to recover.

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011).  The first

two prongs require a nexus among the parties or "proof that the defendant 'received a specific

and direct benefit from the property sought to be recovered, rather than an indirect benefit.'"  *In

re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 500 (S.D.N.Y. 2017) (quoting *In re

Commodity Exch.*, 213 F. Supp. 3d at 676).  A New York unjust enrichment claims "requires no

'direct relationship' between plaintiff and defendant."  *Myun-Uk Choi v. Tower Rsch. Cap. LLC*,

890 F.3d 60, 69 (2d Cir. 2018).  "Rather, the requirement of a connection between plaintiff and

defendant is a modest one."  *Id*.

Defendants' motion to dismiss the unjust enrichment claim is granted.  Defendants argue

that Plaintiffs' claim for unjust enrichment must be dismissed because Plaintiffs have not alleged

that they transacted directly with Defendants.  *See Platinum & Palladium*, 2017 WL 1169626, at

*38 ("[B]ecause Plaintiffs do not allege that they transacted directly with Defendants, they have

not adequately pleaded that Defendants were enriched at their expense.").

Plaintiffs concede that they have not alleged direct transactions with Defendants, but

point to *Tower Research* for the proposition that they do not have to allege a direct transaction

with Defendants in order for the unjust enrichment claim to survive.  In *Tower Research*, a

spoofing case, the Second Circuit held that an unjust enrichment claim could survive a motion to

dismiss where plaintiffs alleged "it to be a near statistical certainty that they directly traded with

Defendants . . . during the relevant period, in which Defendants continually manipulated the

market on which the trades occurred."  890 F.3d at 61.  As this language implies, direct trading

was still required to state a claim for unjust enrichment.  And Plaintiffs here have made no such

claim that it is statistically likely that they traded directly with Defendants.  As such, the unjust

enrichment claim fails.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  Because the statute of limitations on Plaintiffs' claims has run, and because Plaintiffs have not proffered a reason for tolling the statute of limitations, the Amended Complaint is dismissed with prejudice.

The Clerk of Court is respectfully directed to close the case.


SO ORDERED.

Dated: March 4, 2021
      New York, New York                     LEWIS J. LIMAN
                                         United States District Judge